UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

SACRED HEART HEALTH SERVICES d/b/a AVERA SACRED HEART HOSPITAL, AVERA HEALTH and LEWIS & CLARK SPECIALTY HOSPITAL, LLC,

Plaintiffs,

vs.

MMIC INSURANCE, INC. d/b/a MMIC AGENCY, INC. and CONSTELLATION, INC. f/k/a MMIC GROUP, INC.,

Defendants.

**4:20-CV-4149-LLP**

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

Defendants MMIC Insurance, Inc. d/b/a/ MMIC Agency, Inc. ("MMIC") and Constellation, Inc. f/k/a/ MMIC Group, Inc. ("Constellation") have filed a Motion to Dismiss Plaintiffs' claims in their entirety. (Doc. 49). For the following reasons, Defendants' Motion to Dismiss is granted in part and denied in part.

## BACKGROUND

The following facts are alleged in Plaintiffs' Amended Complaint. Avera Health is a large regional health system that owns and operates the Avera Sacred Heart Hospital in Yankton, South Dakota. (Doc. 44, ¶¶ 23-24). Lewis & Clark Specialty Hospital, LLC ("LCSH") is a hospital and surgery center in Yankton owned by physicians in that community. (Doc. 44, ¶¶ 25-26).

### A. Avera's Healthcare Liability Policies

Avera purchased a combined Healthcare System Liability Protection Policy Excess of Self Insured Retention ("Avera's Primary Policy") and Healthcare System Umbrella/Excess Liability ("Avera's Excess Policy") from MMIC which was in effect from January 1, 2014 through April 1, 2015 ("Avera Policies") (Doc. 44, ¶¶ 27-28; 44-1 at 412; 51-10 at 668, 677). Avera's Primary Policy provides that:

> MMIC agrees to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of any claim or claims first made against and reported to the insured during the policy period and occurring

> within the coverage territory arising out of the performance of medical professional services rendered or which should have been rendered on or after the retroactive date by the insured or by any person for whose acts or omissions the insured is legally responsible.

(Doc. 44-1 at 415). Excluded from coverage was "any willful, fraudulent, dishonest, criminal or malicious act or omissions, by or with the knowledge or consent of, or at the direction of, any insured." (Doc. 44-1 at 415). Avera's Primary Policy provides that "MMIC shall pay damages for all covered claims in excess of the self-insured retention, up to the limits of liability as shown on the Declarations Page." (Doc. 44-1 at 415). Avera's self-insured retention liability limit under Avera's Primary Policy was $2 million per event and $6 million in the aggregate of covered losses. (Docs. 44, ¶ 30; 41-1 at 412).

Pursuant to Avera's Excess Policy, MMCI was to provide up to an additional $10 million for covered losses which Avera becomes "legally obligated to pay as damages" in excess of Avera's self-insured retention limits. (Docs. 44, 81-82; 51-10 at 679). Specifically, Avera's Excess Policy provides that:

> MMIC agrees to pay on behalf of the insured, in accordance with the applicable provisions of the underlying insurance those sums, in excess of the applicable limits of the underlying insurance, which the insured shall be legally obligated to pay as damages, because of any claim or claims to which the underlying insurance would apply except for the exhaustion of its applicable limit of liability, first made against the insured and reported to MMIC during the policy period and occurring within the coverage territory, arising out of performance of medial professional services rendered or which should have been rendered on or after the retroactive date by the insured or by any person for whose acts or omissions the insured is legally responsible.

(Doc. 51-10 at 679). "Damages" are defined under the policies as "all amounts of money which are payable to compensate for loss because of injury to which this insurance applies." (Doc. 44-1 at 423).

According to Avera's Primary Policy, MMIC had the right, but not the duty to defend Avera and the right to settle any claim or suit covered under the policy within the available limits of liability. Specifically, Avera's Primary Policy provided:

> MMIC shall have the right but not the duty to defend, or associate in the defense and control of any covered claim or suit made or brought against the insured that is likely to involve MMIC. However, MMIC shall have no duty to

> defend any claim or suit or perform other acts or services in connection with any claim or suit. MMIC shall have the right to investigate any covered claim or suit to the extent that MMIC believes is proper. MMIC shall also have the right to settle any claim or suit covered under this Policy within the available limits of liability.

(Doc. 44-1 at 415). Once Avera had exhausted its self-insured retention limits under Avera's Primary Policy, MMCI was obligated to defend Avera. Specifically, Avera's Excess Policy provided:

> With respect only to insurance afforded by this Policy, if no underlying insurance is available due to exhaustion of its Policy limits by payment of losses, or if no coverage is provided by underlying insurance, MMCI shall have the right and duty to defend any suit against the insured alleging such damages, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation or such settlement of any claim or suit as it deems expedient, but MMCI shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of MMIC's liability has been exhausted by payment of judgment or settlements.

(Doc. 51-10 at 681).

Avera's Primary Policy provided that "[t]he insured agrees not to, except at the insured's own expense, voluntarily pay or assume any obligation to pay damages or defense costs above the self-insured retention." (Doc. 44-1 at 421). Avera's Primary and Excess Policies contained "cooperation" and "no voluntary payments" clauses which provided:

> **Insured's Duties in the Event of an Occurrence, Claim or Suit**
>
> . . .
>
> (c) The insured shall cooperate with MMIC and, upon MMIC's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damages with respect to which insurance is afforded under this Policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at the insured's own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

(Docs. 44-1 at 427; 51-10 at 672). Avera's Primary and Excess Policies also both contained a "no action" provision which provided as follows:

> No action shall lie against MMIC unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, not until the

> amount of an insured's obligation to pay shall have been finally determined either by final judgment after expiration of period for appeal against such insured after actual trial or by written agreement of the insured, the Claimant and MMIC. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by this Policy.

(Docs. 44-1 at 428; 51-10 at 673).

**B. LCSH's Healthcare Liability Policies**

MMCI issued a combined Health System Liability Protection Policy ("LCSH's Primary Policy") and a Healthcare System Umbrella/Excess Liability Policy ("LCSH's Excess Policy") to LCSH which was in effect from April 1, 2013 through April 1, 2014 ("LCSH's Policy"). (Doc. 44-2 at 455-58). LCSH's Primary Policy was subject to a primary coverage limit of $1 million per claim and $3 million in aggregate and LCSH's Excess Policy was subject to a liability limit of $2 million per claim and $2 million in aggregate. (Docs. 44, ¶¶33-38; 44-2 at 455-58). LCSH's Primary Policy provides that:

> MMIC agrees to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of any claim or claims first made against and reported to the insured during the policy period and occurring within the coverage territory arising out of the performance of medical professional services rendered or which should have been rendered on or after the retroactive date by the insured or by any person for whose acts or omissions the insured is legally responsible.

(Doc. 55-10 at 703). Excluded from coverage is "any willful, fraudulent, dishonest, criminal or malicious act or omissions, by or with the knowledge or consent of, or at the direction of, any insured." (Doc. 55-10 at 703). LCSH's Excess Policy provides:

> MMIC agrees to pay on behalf of the insured, in accordance with the applicable provisions of the underlying insurance those sums, in excess of the applicable limits of the underlying insurance, which the insured shall be legally obligated to pay as damages, because of any claim or claims to which the underlying insurance would apply except for the exhaustion of its applicable limit of liability, first made against the insured and reported to MMIC during the policy period and occurring within the coverage territory, arising out of performance of medial professional services rendered or which should have been rendered on or after the retroactive date by the insured or by any person for whose acts or omissions the insured is legally responsible.

(Doc. 44-2 at 463).

Unlike Avera's Primary Policy, under LCSH's Primary Policy, MMCI had a duty to defend LCSH. Specifically, LCSH's Primary Policy provided that:

> MMIC shall have the right and duty to defend any suit against the insured alleging such damages, even if any of the allegations of the suit are groundless, false, or fraudulent, and may make such investigation or such settlement of any claim or suit at it's sole discretion, but MMIC shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of MMIC's liability hereunder has been exhausted by payment of judgments or settlements."

(Doc. 51-11 at 703). LCSH's Primary and Excess Policies both had "cooperation," "no voluntary payments, and "no action" clauses identical to those in Avera's Primary and Excess Policies. (Doc. 51-11 at 712).

**C. The Sossan Lawsuits**

The 36 lawsuits against Plaintiffs revolved around a spine surgeon named Allen Sossan who was granted privileges at LCSH in 2008 and Avera Sacred Heart Hospital in 2009. (Doc. 44, ¶ 48). LCSH was the sole hospital defendant in 17 of the "Sossan lawsuits." (Doc. 44, ¶ 49). Avera was the sole hospital defendant in six cases, and co-defendant with LCSH in 13 cases. (Doc. 44, ¶ 50).

The MMIC liability policies provided defense and liability coverage to Plaintiffs for some of the claims made against them in the Sossan Lawsuits. (Doc. 44, ¶ 51). The lawsuits alleged, among other things, that Sossan performed unnecessary spinal surgeries and alleged that Avera and LCSH were negligent in their credentialing, retention, and supervision of Sossan. (Doc. 44, ¶¶ 52-53). For example, the Sossan Lawsuits alleged that Plaintiffs negligently:

> (1) granted privileges to Sossan, (2) maintained those privileges after problems with his surgeries came to light, (3) failed to warn patients of his history of unnecessary procedures, (5) failed to prevent him from performing unnecessary procedures, (5) failed to require that patients grant informed consent, and (6) failed to supervise Sossan.

(Doc. 44, ¶ 54).

Although Sossan was a named defendant, he previously had exhausted insurance coverage and fled to Iran. (Doc. 44, ¶ 55). Physicians Don Swift, Kynan Trail, Scott Shindler, Paul Hicks, Daniel Johnson, David Abbott, and Joe Boudreau, all members of LCSH, also were named as defendant in some of the lawsuits. (Doc. 44, ¶ 56). Other than Dr. Trail, these physicians also

were insured by MMIC under professional liability policies. (Doc. 44, ¶ 57). It was agreed at the outset that the physicians' MMIC policies would be treated as excess insurance. (Doc. 44, ¶ 58).

The Sossan Lawsuits were all assigned to a single state circuit judge, the Honorable Bruce Anderson. (Doc. 44, ¶ 59). Six suits were brought in this court, but they were dismissed without prejudice so they could join the state court proceeding before a single judge. Avera and LCSH moved for summary judgment in all 36 cases. (Docs. 44, ¶ 60; 51-12). Judge Anderson denied these motions in November 2015, holding that the negligent credentialing claims were viable under South Dakota law, and making clear the claims would be presented to juries. (Doc. 44, ¶¶ 61-63).

In the Sossan Lawsuits, the plaintiffs claimed general damages, including for pain and suffering, and special damages. (Doc. 44, ¶ 64). Collectively, the special damages alone amounted to $11,693,638. (Doc. 44, ¶ 65). Considering the 10 percent in annual pre-judgment interest assessed under South Dakota law, the amount claimed in special damages and pre-judgment interest was $22,349,888. (Doc. 44, ¶¶ 66-67). The potential general damage exceeded that amount.

After five years of litigation, on June 11, 2019, Nicholas Ghiselli, Chief Legal Officer for Constellation and its subsidiary MMIC, and MMIC adjusters Dawn Domsten and Shelly Davis met with representatives and attorneys for Avera, LCSH, and the physicians to discuss the prospect of mediation and global settlement of the lawsuits. (Doc. 44, ¶ 68). On behalf of MMIC, Ghiselli spoke with Chris Specht, Director of Risk Management for Avera, and agreed MMIC would contribute $2,000,000 as "seed money" to get the negotiations started at the mediation. (Doc. 44, ¶ 68). Ghiselli confirmed MMIC's commitment in an email to Specht (Avera) on June 17, 2019. (Doc. 44, ¶ 70).

On June 19, 2019, Ghiselli sent an email to Mark Malloy, MMIC's outside coverage counsel in Milwaukee, and Joseph Farchione, a Denver attorney hired to examine potential liability under the Sossan Lawsuits. (Doc. 44, ¶ 69). In the email, Ghiselli introduced the parties and instructed them to "please coordinate on the likelihood of coverage and liability." (Doc. 44, ¶ 69). The email also stated: "Conflict of interest. We believe Avera and MMIC have a conflict of interest, which is why we have retained our own counsel." (Doc. 44, ¶ 69). The email closed with instructions to Malloy and Farchione to "please coordinate the coverage and liability analysis

between each other. I don't think they can be separated for contribution purposes." (Doc. 44, ¶ 69).

In a June 21, 2019, email to Specht at Avera, Ghiselli stated "As you know, we retained Joe Farchione, at our expense, to help us determine our liability after we committed to a mediation. Joe is connected with Mark Malloy [MMIC's outside counsel] on Tuesday to discuss the claims and coverage. MMIC initially committed two million dollars to start a mediation. We will stand by that commitment. However, we need to completely understand the liability and allocation of responsibility among the parties. To date, MMIC does not have enough information. I do not believe we can gather the information in time to responsibly participate in a mediation by July 22, 2019." (Docs. 44, ¶ 71; 51-5 at 625).

One June 25, 2019, Ghiselli instructed MMIC adjusters Domsten and Davis that Farchione would "take the lead in managing" the Sossan Lawsuits "including defense counsel." (Doc. 44, ¶ 72). In an email to Farchione and others representing the Defendants' interests on July 8, 2019, Ghiselli told Farchione and Malloy that:

> I need a well-reasoned articulated answer for [Specht] for why [MMIC] can or cannot contribute to mediation. If your team finds weak evidence of negligent credentialing, MMIC will be limited to its already committed two million. If your team finds strong evidence of negligent credentialing, we will contribute in proportion to our exposure. As we all know, we cover one of nine claims. Avera is willing to contribute above its SIR. I would like to give Chris an answer when you are ready in percentage of fault, if any. For example, if we think we have 10% exposure, MMIC would be willing to commit two million to a twenty million dollar number. The mediation is scheduled for September 5 and 6. . . I think it is prudent to have both of you at the mediation, but I am open for discussion. The authority will be determined in advance.

(Docs. 44, ¶ 73; 51-7 at 629-30).

On August 16, 2019, there was a conference call between Defendant MMIC, including its coverage counsel Mark Malloy, Joseph Farchione, attorneys and representatives for Avera, LCSH, and the Individual Physicians, during which Farchione, on behalf of Defendant MMIC, advocated for delaying any mediation in order to bring a summary judgment motion that was limited to claims that Defendant MMIC believed were covered under the policies it sold to Plaintiffs. (Doc. 44, ¶ 74).

In an email sent to Ghiselli on August 19, 2019, Farchione referenced MMIC's agreement to contribute at least $2 million toward a global resolution of the lawsuits without further conditions attached, stating: "You gave him the $2M without strings." (Doc. 44, ¶ 75). Ghiselli again confirmed MMIC's agreement to contribute $2 million to a global settlement of the Sossan Lawsuits in emails to Specht on August 20 and 25, 2019. (Doc. 44, ¶¶ 76-77). The $2 million that Defendant MMIC agreed to offer and pay was substantially less than the internal global reserves that Defendant MMIC had set for the Sossan Lawsuits. (Doc. 44, ¶ 78).

On September 1, 2019, Ghiselli wrote in an email addressed to Defendant MMIC's coverage counsel Mark Malloy; liability counsel, Joseph Farchione; and MMIC Claim Adjuster Shelly Davis, stating:

> As I see it, our attendance is largely irrelevant with the exception of providing legal guidance and educating the mediator. We agreed to pay two million dollars to get the mediation started – that was the totality of the agreement – no other terms. MMIC will pay two million dollars on the condition it globally resolves all claims. We do not have additional authority."

(Doc. 44, ¶ 80).

**D. Mediation**

On September 5-6, 2019, the parties to the Sossan Lawsuits and their attorneys, representatives, and insurers began a multi-day mediation in Sioux Falls. (Doc. 44, ¶ 82). Prior to the mediation, Avera had previously paid $4,129,363 in claims attributable to its 2014 self-insured aggregate retention limit of $6 million under its insurance policy with MMIC. (Doc. 44, ¶ 84).

During the mediation, Avera offered the plaintiffs in the Sossan Lawsuits $1,870,637, thus meeting its aggregate $6 million self-insured retention limit under its policy. (Doc. 44, ¶ 84). MMIC representatives Tim Schultz, Dawn Domsten, and Shelly Davis reaffirmed MMIC's commitment to contribute $2 million to settle the Sossan Lawsuits to Chris Specht, Avera's Director of Risk Management and the attorneys representing the Avera Companies, LCSH, and the Individual Physicians at the mediation. (Doc. 44, ¶ 87). These MMIC representatives also informed Avera, LCSH, and the Individual Physicians at that time that Defendant MMIC would

refuse to contribute anything more than $2 million to settle the Sossan Lawsuits—a position that Plaintiffs allege had never before been disclosed to Plaintiffs. (Doc. 44, ¶ 87).

Avera offered the 36 plaintiffs in the Sossan Lawsuits $3.95 million as a global settlement, of which $2 million had been agreed to be paid by Defendant MMIC. (Doc. 44, ¶ 88). During the mediation on the morning of September 6, 2019, a meeting was held between Defendant MMIC and representatives and attorneys for Avera, LCSH, and the Individual Physicians. (Doc. 44, ¶ 89). At that meeting, Tim G. Schultz, Vice-President of Claims for Defendant MMIC, informed Avera, LCSH, and the Individual Physicians for the first time that it was conditioning its $2 million contribution upon an agreement to waive any and all bad faith and other claims that MMIC's insureds may have against Defendant MMIC. (Doc. 44, ¶ 89). Also that same morning at the mediation, Farchione reiterated this demand to LCSH and stated that their "marching orders" were that no contribution would be made without the demanded waiver. (Doc. 44, ¶ 90). When Plaintiffs declined MMIC's demand to waive any bad faith claims it may have against MMIC, it is alleged that Defendant MMIC withdrew the $2 million that it had previously agreed to contribute as "seed money" to settle the claims, refused to contribute any funds to resolve the Sossan Lawsuits, and left the mediation. (Doc. 44, ¶ 92).

**E. Settlement**

It is alleged that the actions taken by the Defendants placed the Avera Companies in an extremely precarious position as they faced extraordinary exposure from 36 lawsuits and were now alone in the mediation. (Doc. 44, ¶ 93). Ultimately, Avera, LCSH, and the physicians settled the claims at their own cost without Defendant MMIC because it is alleged that MMIC left the mediation and refused to participate in further settlement negotiations. (Doc. 44, ¶ 94). The global settlement of $10,675,000 paid to settle the 36 lawsuits, without any contribution from Defendants, was within the limits of liability coverage owed by MMIC under the Insurance Policies. (Doc. 44, ¶ 95). Each of the LCSH physicians personally contributed $50,000 toward the settlement. (Doc. 44, ¶ 96). The individual physicians have assigned their claims against MMIC to LCSH. (Doc. 44, ¶ 106).

On September 20, 2019, after the settlement was reached, attorneys for Avera and LCSH wrote to MMIC seeking payment of the $2 million it had agreed to pay. (Doc. 44, ¶ 97). By letters dated September 27, 2019, MMIC refused to pay the funds absent a waiver of Bad Faith and all

other claims against it. (Doc. 44, ¶ 98). In the responsive letters to Avera written by Defendant MMIC's coverage counsel, Mark Malloy, and copied to Ghiselli, Defendant MMIC represented that it had "engaged separate counsel, Joe Farchione, to conduct a full review of the merits of the case and provide an evaluation of the merits of the case (with no consideration of coverage issues)." (Doc. 44, ¶ 98). In those same letters, Defendant MMIC stated through its coverage counsel Mark Malloy that "a mutual release was always going to be contingency of any MMIC contribution toward settlement," although it had never disclosed that fact. (Doc. 44, ¶ 99). Plaintiffs allege that Defendant MMIC is responsible to indemnify Plaintiffs for all amounts over $1,879,637 up to the total amount of the settlement agreement for the Sossan Lawsuits under the policy. (Doc. 44, ¶ 102).

**F. Procedural History**

On October 14, 2020, Plaintiffs Sacred Hearth Health Services d/b/a Avera Sacred Heart Hospital, Avera Health, and Lewis & Clark Specialty Hospital, LLC filed a complaint against MMIC Insurance, Inc. d/b/a MMIC Agency, Inc. (Doc. 1). On November 19, 2020, Defendant MMIC filed its Answer to Plaintiffs' Complaint. (Doc. 12).

On April 20, 2021, Plaintiffs filed an Amended Complaint adding Constellation Inc. f/k/a/ MMIC Group, Inc. as a named defendant who Plaintiffs allege is the alter ego or agency of Defendant MMIC. (Doc. 44). In their Amended Complaint, Plaintiffs allege claims for breach of contract, alleging that MMIC breached its duties under the liability policies when it refused to defend and indemnify Plaintiffs and when it conditioned indemnification upon release of Plaintiffs' bad faith claims against it. (Doc. 44, ¶¶ 128-29, 142-43). Plaintiffs also allege claims for bad faith, for breach of contract for withdrawing its $2 million settlement contribution, promissory estoppel, and deceit.

Defendants have moved to dismiss Plaintiffs' Amended Complaint in its entirety. Defendants also seek to dismiss all claims alleged against MMIC's parent corporation, Constellation, Inc. The motion has been fully briefed and argued and is ready for disposition.

**STANDARD OF REVIEW**

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint are assumed true and construed in favor of the plaintiff, "even if

it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (internal quotations omitted). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal citations omitted). The complaint must allege facts, which, when taken as true, raise more than a speculative right to relief. *Id.; Benton v. Merrill Lynch & Co., Inc.*, 524 F.3d 866, 870 (8th Cir. 2008). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not 'show[n]'—'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing Fed. R. Civ. P. 8(a)(2)). "Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted).

When considering a motion to dismiss under Rule 12(b)(6), the court generally must ignore materials outside the pleadings, but it may consider "'some materials that are part of the public record or do not contradict the complaint,' as well as materials that are 'necessarily embraced by the pleadings.'" *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (citations omitted). In general, material embraced by the complaint include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." *Ashanti v. City of Goden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012).

**DISCUSSION**

In Counts 1 and 2 of the Amended Complaint, Plaintiffs allege that MMIC breached its contractual duty to defend and indemnify Plaintiffs and that MMIC breached its duties when it conditioned indemnification upon release of Plaintiffs bad faith claims against MMIC. (Doc. 44, ¶¶ 128-29, 142-43). Plaintiffs allege that because of MMIC's breaches, Plaintiffs had no choice but to enter into a settlement agreement to resolve the Sossan Lawsuits without any cooperation or contribution from MMIC. (Doc. 44, ¶¶ 130, 144). Plaintiffs allege that they were forced to pay for the cost of the Sossan Settlement without the help or participation of MMIC and that as a result of MMIC's breach of its duties under their liability policies, they are entitled to the amounts paid to resolve the Sossan Lawsuits and attorneys' fees. (Doc. 44, ¶¶ 132-33, 146).

In response, MMIC argues that Plaintiffs breached their insurance policies when they unilaterally settled without MMIC's consent and that as a result, MMIC is relieved of any liability under the policies. Avera was self-insured up to $6 million in aggregate for the policy period. Avera's policy provides that Avera "agrees not to, except at the insured's own expense, voluntarily pay or assume any obligation to pay damages or defense costs above the self-insured retention." (Doc. 51-10). Both Avera's and LCSH's policies include a "cooperation clause" and "non-voluntary payments clause" which provides that:

> The insured shall cooperate with MMIC and, upon MMIC's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damages with respect to which insurance is afforded under this Policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at the insured's own cost, voluntarily make any payment, assume any obligation or incur any expense other than for the first aid to others at the time of the accident.

Finally, both Avera and LCSH's policies include a "no-action" provision which provides that:

> No action shall lie against MMIC unless, as a condition precedent, thereto, there shall have been full compliance with all of the terms of this Policy, not until the amount of an insured's obligation to pay shall have been finally determined either by final judgment after expiration or period for appeal against such insured after actual trial or by written agreement of the insured, the Claimant and MMIC. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by the Policy.

MMIC argues in support of its Motion to Dismiss that the liability policies specifically provide that MMIC will not be obligated to indemnify Plaintiffs if they voluntarily settle claims without MMIC's consent. MMIC argues that under the plain language of the policies, and absent MMIC's consent to a settlement, MMIC's duty to indemnify is conditioned upon Plaintiffs obtaining a final judgment after an "actual trial" which, they argue, Plaintiffs failed to do in this case.

Plaintiffs contend that MMCI waived its right to enforce the "cooperation," "no voluntary payments," and "no action" clauses because MMCI: 1) breached its duty to defend; 2) breached its duty to settle in good faith; and 3) defended subject to a reservation of rights.

## I. Waiver of "No Action" and "No Voluntary Payments" Clause by Breaching Contractual Duty to Defend

### A. Legal Overview

While ordinarily the insured is barred by the "cooperation," "no voluntary payments," and "no action" clauses from settling without the insurer's consent, courts have almost universally held that an insurer is precluded from relying on these provisions if the insurer commits a prior material breach of one of its contractual defense obligations. *Great Divide Ins. Co. v. Carpenter ex rel. Reed*, 79 P.3d 599, 608 (Alaska 2003) ("Our case law permits an insured whose insurer has committed a material breach of one of its defense obligations to enter into a settlement agreement with the injured claimant."); *see also Safeco Ins. Co. v. Superior Court*, 71 Cal.App.4th 782, 787 (Cal. Ct. App. 1999) ("[I]f the insurer wrongfully refuses to defend, leaving the insured to his own resources to provide a defense, then the insurer forfeits the right to control settlement and defense. In that event, the insured is free to settle the lawsuit on his own, and the insurer is bound by a stipulated judgment."); *Butler Bros. v. Am. Fidelity Co.*, 139 N.W. 355, 358 (Minn. 1913) ("Undoubtedly the insured may waive the condition requiring a trial of the issue, and the authorities are practically unanimous in holding that a denial of liability and refusal to take the defense is a waiver of this condition."); *c.f. Piedmont Office Realty Trust, Inc. v. XL Specialty Ins. Co.*, 771 S.E.2d 864, 867 (Ga. 2015) ("Although an insurer that denies coverage and refuses to defend an action against its insured waives the provisions of the policy against a settlement by the insured and becomes bound to pay the amount of any settlement (within a policy's limits) made in good faith, XL did not wholly abandon Piedmont—it did not refuse the cover the underlying claim."). Thus, if an insurer unjustifiably refuses to defend or makes an unwarranted withdrawal from the defense of suit, the insured may proceed alone and make any good faith settlement of the claims against it and the insurer may not use the "no action" or "no voluntary payments" clause to defeat recovery against it. *Milbank Mut. Ins. Co. v. Wentz*, 352 F.2d 592, 600 (8th Cir. 1965) (applying North Dakota law).

In *Wolff v. Royal Ins. Co.*, 472 N.W.2d 233 (S.D. 1991), the South Dakota Supreme Court appeared to recognize that despite policy provisions prohibiting settlement without insurer consent, an insured may settle rather than proceed to trial if an insurer breaches its duty to defend. Although the parties in that case agreed to apply Nebraska substantive law, the court in *Wolff*,

citing to a case arising from the Second Circuit Court of Appeals and American Jurisprudence (Second) on Insurance stated that:

> As a general rule, when an insurer declines coverage, an insured may settle rather than proceed to trial to determine its legal liability. *Luria Bros. & Co. v. Alliance Assur. Co., Ltd.*, 780 F.2d 1082, 1091 (2d Cir. 1986)). However, the amount must be reasonable in view of the size of possible recovery and degree of probability of claimant's success against the insured. *Id.* The insurer's denial of coverage must be unjustified before policy provisions such as a cooperative clause, are considered waived. *Id.* (citing 44 Am.Jur.2d *Insurance* §1421).

*Wolff v. Royal Ins. Co.,* 472 N.W.2d 233, 235 (S.D. 1991).

Both Avera and LCSH have alleged claims for breach of their contractual duties to defend. In Counts 1 and 2 of the Amended Complaint, Plaintiffs allege that MMIC breached its contractual duty to defend and indemnify Avera and that MMIC breached its duties when it conditioned indemnification upon release of Avera's bad faith claims against MMIC. (Doc. 44, ¶¶128-29, 142-43). Plaintiffs allege that because of MMIC's breaches, Plaintiffs had no choice but to enter into a settlement agreement to resolve the Sossan Lawsuits without any cooperation or contribution from MMIC. (Doc. 44, ¶ 130). Plaintiffs allege that they were forced to pay for the cost of the Sossan Settlement without the help or participation of MMIC and that as a result of MMIC's breach of its duties under the Policy, Plaintiffs are entitled to the amounts paid to resolve the Sossan Lawsuits and attorneys' fees. (Doc. 44, ¶¶ 132-33; 140-46).

An insurer's duties to defend and indemnify are "contractual dut[ies] arising out of the terms of a liability insurance policy." *Litz v. State Farm Fire & Cas. Co.*, 695 A.2d 566, 569 (Md. 1997); *see also Meadowbrook, Inc. v. Tower Ins. Co,* 559 N.W.2d 411, 415 (Minn. 1997) ("An insurer's duty to defend an insured is contractual."); *Farr v. Farm Bureau Ins. Co. of Neb.*, 61 F.3d 677, 679 (8th Cir. 1995) ("The nature of the duty to defend is defined by the insurance policy as a contract.") (Nebraska law); 14 Couch on Insurance § 200:5 (2003) (collecting cases). However, "[a]n insurer's duty to defend is distinct from—and broader than—its duty to indemnify." *Geidel v. De Smet Farm Mutual Ins. Co. of S.D.*, 926 N.W.2d 478, 481 (S.D. 2019). One distinguishing feature is the fact "[t]he duty to defend arises prior to the completion of litigation[.]" *Id.* (quoting 14 Steven Plitt et al., *Couch on Insurance*, § 200:3 (3d ed.)). "[T]herefore insurers are required to meet their defense obligation before the scope of the insured's liability has been determined." *Id.*

Under South Dakota law, an insurer's duty to defend is activated "[i]f it at least 'arguably appears from the face of the pleadings in the action against the insured that the alleged claim, if true, falls within policy coverage.'" *Geidel v. De Smet Farm Mutual Ins. Co. of S.D.*, 926 N.W.2d 478, 481 (S.D. 2019) (citing *Hawkeye-Sec. Inc. v. Clifford ex rel. Clifford*, 366 N.W.2d 489, 491 (S.D. 1985)). A duty to defend "prevails notwithstanding that ambiguous language reveals other claims not covered in the policy, and even though extraneous facts indicate the claim is false, groundless, or even fraudulent." *Id.* (quoting *Hawkeye-Sec. Inc.*, 926 N.W.2d at 491); *see also Couch on Insurance* Third Edition § 200:1 (3d ed.) (last updated June 2021) ("Typically, even if only one claim in a complaint containing multiple claims could be covered, the insurer must defend the entire action and the insurer must demonstrate that all the claims of the suit fall outside the policy's coverage to avoid defending the insured.").

The insurer must establish there is no duty to defend by showing that the claim clearly falls outside of policy coverage. *Geidel,* 926 N.W.2d at 481. *Id.* However, "[i]f, after considering the complaint, and when appropriate, other record evidence, doubt exists whether the claim against the insured arguably falls within policy coverage, such doubts must be resolved in favor of the insured." *Id.* (quoting *Hawkeye-Sec.*, 366 N.W.2d at 492). "This is especially applicable where those doubts exist pre-trial." *Id.*

The Sossan Lawsuits included claims that were covered and not covered under the terms of Plaintiffs' insurance policies. Avera and LCSH's policies provide that coverage does not apply to "any willful, fraudulent, dishonest, criminal or malicious act or omission, by or with the knowledge or consent of, or at the direction of, any insured" and thus claims against Plaintiffs alleging intentional and fraudulent conduct were excluded from coverage under the policies. Claims against Avera and LCSH alleging negligent credentialing and supervision potentially fell within coverage of the policies. MMCI had a duty to defend LCSH at the outset under the terms of its policy and accepted LCSH's tender of defense under a reservation of rights to contest coverage of this claim at a later date. Under the terms of Avera's policy with MMCI, MMCI had a right, but not a duty to defend Avera until Avera exhausted its self-insured retention limits under the policy.

MMCI argues that under the language of Avera's Primary and Excess Policies, it had no duty to defend Avera because Avera had not exhausted its self-insured retention limits under the

language of the policies. With regard to LCSH, MMCI argues that it has failed to state a claim for breach of duty to defend because MMCI agreed to defend LCSH subject to a reservation of rights and agreed to contribute $2 million towards the global settlement of the Sossan Lawsuits. If MMCI had no duty to defend Avera, and LCSH failed to state a claim for breach of a contractual duty to defend, then unless other exceptions apply, Plaintiffs are not excused from complying with the "no voluntary payments" and "no action" provisions.

### A. Did MMCI have a duty to defend Avera before Avera executed the agreement settling the Sossan Lawsuits?

Under Avera's policies, MMIC was to provide coverage up to $10 million for covered losses after Avera exhausted its self-insured retention limits of $2 million per claim and $6 million in the aggregate for the policy period. (Doc. 44, ¶ 30). Avera alleges that it had previously paid $4,129,363 in claims attributable to its 2014 self-insured retention aggregate limit of $6 million. (Doc. 44, ¶ 84). Avera alleges that during the mediation, it offered $1,870,637, thus meeting its aggregate $6 million limit under the policy and thus triggering MMIC's duty to defend Avera up to an additional $10 million under the umbrella/excess liability policy. (Doc. 44, ¶ 86).

MMIC disputes that its duty to defend Avera was triggered under the terms of the Policy. MMIC argues that its duty to defend was contingent on Avera's exhaustion of its Policy limits by "payment" of losses, not by Avera's "offer" to pay certain losses. (Doc. 53 at 781-82).

Avera's Primary Policy provides that MMIC "has the right, but not the duty to defend or associate in the defense and control of any covered claim or suit made or brought against the insured that is likely to involve MMIC." (Doc. 44-1 at 415). Avera's Excess Policy, however, obligates MMIC to defend Avera "[w]ith respect only to insurance afforded by [the] Policy, if no underlying insurance is available due to exhaustion of its Policy limits by *payment* of losses, or if no coverage is provided by underlying insurance." (Doc. 51-10 at 692) (emphasis added).[1]

---

[1] In Avera's Excess liability Policy, MMCI's duty to defend is defined as follows:

> **Defense**
>
> This Policy does not apply to defense, investigation, settlement, trial attendance, legal expenses or legal fees covered by underlying insurance. However, MMIC shall have the right to associate with the insured or the underlying insurance carrier in defense of any claim or proceeding for which

In this diversity jurisdiction case, South Dakota law governs the interpretation of the liability policies in this case. *See Secura Ins. v. Horizon Plumbing, Inc.*, 670 F.3d 857, 861 (8th Cir. 2012). Under South Dakota law, courts must construe an insurance contract's language "with reference to the policy as a whole and the plain meaning and effect of its words." *Cornelius v. Nat'l Cas. Co.*, 813 N.W.2d 167, 169 (S.D. 2012). "If the rules of interpretation leave a genuine uncertainty as to which of two or more meanings is correct, the policy is ambiguous." *Id.* (internal quotations and citation omitted). "If the provisions of an insurance policy are ambiguous [the Supreme Court of South Dakota applies] the rule of liberal construction in favor of the insured and strictly against the insurer." *Id.* at 170 (internal quotations and citation omitted). This approach, however, does not mean that "the court may seek out a strained or unusual meaning for the benefit of the insured." *Id.*

"Under well-settled insurance principles, there are two levels of insurance coverage, primary and excess. Primary coverage is insurance coverage whereby under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability. 'Excess' or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted." *Travelers Indem. Co. v. Illinois v. Ins. Co. of N. Am.*, 213 F.3d 643, 2000 WL 278390, at *1-2 (9th Cir. 2000) (unpublished) (citing *Reliance Nat'l Indemn. Co. v. Gen. Star Indem. Co.*, 85 Cal.Rptr.2d 627, 634 (Cal. Ct. App. 1999)); *Kline v. Kemper Group*, 826 F.Supp. 123, 130 (M.D. Pa. 1993) (applying Pennsylvania law and noting that excess policy "does not come into play" until primary coverage limit has been reached); *Int'l Environmental Corp. v. Nat'l Union Fire Ins. Co of Pittsburgh*, 843 F.Supp. 1218, 1124 n.3 (N.D. Ill. 1993) (applying Illinois law and noting, "[g]enerally, excess policies supplement primary policies, kicking in when losses exceed primary coverage."). An excess insurer generally has no duty to defend until all the primary insurance has

---

coverage may be afforded by this Policy and to make such investigation relative to such claim or proceeding as it deems expedient.

With respect only to insurance afforded by this Policy, if no underlying insurance is available due to exhaustion of its Policy limits by payment of losses, or if no coverage is provided by underlying insurance, MMIC shall have the right and the duty to defend any suit against the insured alleging such damages, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation or such settlement of any claim or suit as it deems expedient, but MMIC shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of MMIC's liability has been exhausted by payment of judgments or settlements.

been exhausted. *Travelers Indemn. Co of Ill.*, 2000 WL 278390 at *2; *see also, e.g.*, *ABT Bldg. Prod. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 472 F.3d 99, 135 (4th Cir. 2006) (J. Niemeyer, dissenting) (stating that North Carolina courts have joined numerous other jurisdictions in holding that an excess insurer's duty to defend is triggered only when the limits of primary insurance have been exhausted); *Nat'l Elec. Mfrs. Ass'n v. Gulf Underwriters Ins. Co.*, 162 F.3d 821, 826 (4th Cir. 1998) (holding that under District of Columbia law, an excess insurer's duty to defend is not triggered until primary insurance is exhausted); *Signal Co's v. Harbor Ins. Co.*, 612 P.2d 889, 802 (Cal. 1980) (holding that the excess insurer was not obligated to contribute to defense costs which were incurred by the primary insurer before the primary insurer's coverage was exhausted and before notification of the excess insurer that its participation in defending the action was desired).

Self-insured retentions are considered by courts to be equivalent to primary liability insurance, and policies which are subject to self-insured retentions are considered the equivalent of excess policies which generally include no duty to defend until the self-insured retention is exhausted. *See, e.g.*, *Lasorte v. Those Certain Underwriters at Lloyd's Severally Subscribing to Policy Numbers 115NAP108111970 and 115NAP109111970*, 995 F.Supp.2d 1134, 1146 (D. Mont. 2014) (stating that under New York law, "[a] policy with a Self Insured Retention . . . is designed to absolve the insurer of any financial obligation, whether it falls under the duty to indemnify or the duty to defend, until the Self Insured Retention is exhausted. It acts like an excess policy where the insured acts as its own primary insurer."); *Travelers Indem. Co. v. Illinois v. Ins. Co. of N. Am.*, 213 F.3d 643, 2000 WL 278390 at *2 (9th Cir. 2000) (unpublished) ("It is well-recognized that self-insurance retentions are the equivalent to primary liability insurance, and that policies which are subject to self-insured retentions are 'excess policies' which have no duty to indemnify until the self-insured retention is exhausted.") (quoting *Pacific Employers Ins. Co. v. Domino's Pizza, Inc.*, 144 F.3d 1270, 1276-77 (Cal. 1998)); *Boston Gas Co. v. Century Indemnity Co.*, 910 N.E.2d 290, 294 n.7 (Mass. 2009) ("Excess . . . insurance over a qualified purely self-insured retention of risk would not be considered 'primary'; the self-insurance itself is the 'primary' layer. The excess policies [issued] in this case provided the first layer of excess coverage over [insured] primary layer of self-insurance.").

Although the South Dakota Supreme Court has not examined whether an insured must first exhaust self-insured retention limits before an insurer's duty to defend arises, the court has required a non-owners automobile liability policy to be exhausted before looking to the umbrella policy. *See Nat'l Farmers Union Property & Cas. Co. v. Farm & City Ins. Co.*, 689 N.W.2d 619, 622 (S.D. 2004) (stating that the court adopts the rule followed by a majority of courts in this country requiring a non-owner's liability policy to be exhausted before looking to the umbrella policy). Given the fact that the South Dakota Supreme Court has required exhaustion of a non-owners automobile liability policy before an umbrella policy applies, the language of Avera's insurance policy conditioning a duty to defend on "exhaustion of policy limits by payment of losses," and the South Dakota Supreme Court's emphasis on the duty to defend being defined by the contract, this Court predicts that the South Dakota Supreme Court would enforce the policy language requiring Avera to exhaust it self-insured retention limits before MMIC's duty to defend under its excess policy is activated. The question remaining, however, is whether under the language of the policies, Avera exhausted its self-insured retention limits.

Avera's excess policy provides that "if no underlying insurance is available due to *exhaustion of its Policy limits by payment of losses*, or if no coverage is provided by underlying insurance, MMCI shall have the right and duty to defend any suit against the insured alleging such damages. . . ." There are no South Dakota cases that have analyzed the requirement in an excess liability policy that a primary insurer "exhaust" underlying policy limits "by payment of losses." Courts in other jurisdictions that have analyzed similar language in an excess/umbrella policy have concluded that such language requires, at a minimum,[2] that "the claims aggregating the full amount of the specific policy have been settled thereunder and full liability of the insurer discharged." *See Waste Mgmt of M.N., Inc. v. Transcontinental Ins. Co.*, 502 F.3d 769, 773 (8th Cir. 2007) ("[A]n insurance policy is exhausted when the insured proves that claims aggregating the full amount of

[2] Other courts have interpreted language in an excess liability policy requiring "exhaustion by payment of losses" to mean that the underlying liability limits be actually paid. *See, e.g., Ali v. Fed. Ins. Co.*, 719 F.3d 83, 92-94 (2d Cir. 2013) (finding that the excess insurer's liability was not triggered because there no evidence showing that the primary insurer actually paid the policy's limits); *Trinity Homes LLC v. Ohio Casualty Ins. Co.*, 629 F.3d 653, 658 (7th Cir. 2010) (holding that the excess liability policy was exhausted when an insured and the primary insurer entered into a settlement agreement where the primary insurer paid a large percentage of the total limit and the insured paid the remainder); *KB Home Jacksonville LLC v. Liberty Mutual Fire Ins. Co.*, Civ. No. 18-0371, 2019 WL 4247269, at *8 (M.D. Fla. Sept. 5, 2019) ("Offering the policy limits, or even being legally obligated to pay the policy limits at a later date, is simply not synonymous with 'payment of judgments or settlements.' 'To hold otherwise would make the 'payment of' language in [the Policies] superfluous.").

the specific policy have been settled thereunder and full liability of the insurer discharged.") (quoting *Reliance Ins. Co. in Liquidation v. Chitwood*, 433 F.3d 660, 664 (8th Cir. 2006) (applying Missouri law)); *Zeig v. Mass. Bonding & Ins. Co*, 23 F.2d 665, 666 (2d Cir. 1928) ("The claims are paid to the full amount of the policies, if they are settled and discharged, and the primary insurance is thereby exhausted."); *Qualcomm, Inc. v. Certain Underwriters at Lloyd's, London*, 73 Cal.Rptr.3d 770, 778 (Cal. Ct. App. 2008) (stating that CGL policy was exhausted only after "the insurers under each of the Underlying policies have paid or have been held liable to pay the full amount of the Underlying Limit of Liability.").

In the frequently cited *Zieg v. Massachusetts Bonding & Ins. Co.*, 23 F.2d 665 (2d Cir. 1928) case, the Second Circuit Court of Appeals examined whether the excess policy in that case applied even though the insured settled the primary claims for less than their value. In that case, Manhattan dressmaker Louis Zeig had purchased property insurance totaling $15,000 in coverage, plus an excess policy that attached after the primary insurance was "exhausted in the payment of claims to the full amount of the expressed limits." *Id.* at 666. In a subsequent burglary, Zeig lost more than $15,000 in property. He initially filed claims for $15,000 with the primary insurance providers, but ultimately settled those claims for $6,000. *Id.* Because the losses from the burglary were greater than $15,000, however, Zeig, also filed a claim under the excess policy, attempting to recover his losses in excess of $15,000. The insurer had argued that its duty to indemnify under the excess policy was not triggered because the policy required actual payment of $15,000 as a condition precedent to liability. *Id.*

The Second Circuit in *Zeig* disagreed with the insurer. The court said that "[i]t is doubtless true that the parties could impose such a condition precedent to liability upon the policy, if they chose to do so[,]" but found that:

> Nothing is said about the 'collection' of the full amount of the primary insurance. The clause provides only that it be 'exhausted in the payment of claims to the full amount of the expressed limits.' The claims are paid to the full amount of the policies, if they are settled and discharged, and the primary insurance is thereby exhausted. There is no need of interpreting the word 'payment' as only relating to paying in cash. It often is used as meaning the satisfaction of a claim by compromise, or in other ways. To render the policy in suit applicable, claims had to be and were satisfied and paid to the full limit of the primary policies. Only such portion of the loss as exceeded, not the cash settlement, but the limits of these policies, is covered by the excess policy.

*Id.* Furthermore, the court stated that:

> [T]he [insurer] had no rational interest in whether the insured collected the full amount of the primary policies, so long as it was only called upon to pay such portion of the loss as was in excess of the limits of those policies. To require an absolute collection of the primary insurance to its full limit would in many, if not most, cases involve delay, promote litigation, and prevent an adjustment of disputes which is both convenient and commendable.

*Id.* The court concluded that "[t]he plaintiff should have been allowed to prove the amount of this loss, and, if that loss was greater than the amount of the expressed limits of the primary insurance, he was entitled to recover the excess to the extent of the policy in suit." *Id.*

The Court also finds instructive the District of Montana's decision in *Lasorte v. Those Certain Underwriters at Lloyd's Severally Subscribing to Policy Numbers 115NAP108111970 and 115NAP109111970*, 995 F.Supp.2d 1134 (D. Mont. 2014). In *Lasorte*, the plaintiff filed a sexual discrimination and retaliation suit against her employer. *Id.* at 1136. At the time, the employer was insured under an Employment Practices Insurance Policy which contained a self-insured retention provision that required the insured to act as its own insurer for the first $25,000 in costs associated with a claim. *Id.* The employer notified the insurer of the claim and retained defense counsel. *Id.* The insurer responded with a letter to the employer acknowledging the claim was covered by the policy and expressing approval of the employer's choice of counsel. *Id.*

The employer in *Lasorte* resolved the discrimination suit by entering into a stipulated judgment in favor of the employee for $210,000, an assignment of claims, and a covenant not to execute. *Id.* at 1137. The insurer refused to indemnify the employer for the stipulated judgment, claiming its duty to pay any loss amount under the policy was never triggered because the employer, by failing to pay $25,000 toward the judgment or for defense costs, failed to exhaust the self-insured retention. *Id.* The provision in the policy provided that:

> When a Claim is made solely against a client Company the Client company Any One Insured Event amount [the Self Insured Retention], as shown in the Declarations, shall apply first, *when exhausted* the Client company Each Insured Event amount, as shown in the Declarations, shall apply subject to the LIMIT of LIABILITY.

*Id.* at 1142. The insurer's argued that the phrase "when exhausted" meant that the insured must actually pay out the $25,000 amount of the self-insured retention for it to be exhausted. *Id.* The court recognized that "self-insurance retentions are the equivalent to primary liability insurance,

and that policies which are subject to self-insured retentions are excess policies which have no duty to indemnify until the self-insured retention is exhausted." *Id.* at 1140. However, relying on *Zeig*, the court held that the phrase "when exhausted" was ambiguous and as such, should be construed against the insurer to include settlement by compromise. *Id.* at 1144.

The policy language in *Lasorte* provided that the insurer will pay all qualifying "Loss amounts" the insured is legally obligated to pay, subject to the self-insured retention and Limits of Liability sections of the policy. *Id.* at 1141. The court found that the plain meaning of these provisions was that the insurer was obligated to pay on behalf of the Insured the loss amount the insured is legally obligated to pay, to the extent the loss amount is in excess of the Self-Insured Retention. *Id.* at 1144. The court found that under the policy language,

> The insurer's obligation to pay loss amount arose . . . when the Insured Employer became legally obligated to pay a loss amount in excess of $25,000. That occurred when the Employer settled the Plaintiff's claims against it by entering into the stipulated judgment in the underlying litigation.

*Id.*

The court in *Lasorte* also addressed the insured's argument that the insurer's duty to defend was triggered at the initiation of the underlying litigation. *Id.* at 1145. The court rejected the insured's argument, reasoning:

> A policy with a Self Insured Retention . . . is designed to absolve the insurer of any financial obligation, whether it falls under the duty to indemnify or the duty to defend, until the Self Insured Retention is exhausted. It acts like an excess policy where the insured acts as its own primary insurer. The primary insurer has the duty to defend prior to exhaustion of the primary insurance, which in this case is the Self Insured Retention. "The word 'primary is used . . . in the field of excess insurance to distinguish coverage which attaches immediately upon the happening of an occurrence, from excess coverage, which attached only after a predetermined amount of 'primary' coverage has been exhausted." "Although an excess insurance carrier may elect to participate in an insured's defense to protect its interest, it has no obligation to do so." The intention behind a Self Insured Retention is for the insurer to have no financial exposure for amounts below the Self Insured Retention. In return, the policyholder pays a reduced premium. The risk to the carrier in opting out of controlling the defense is that it will find itself obligated to pay under other policy provisions. Imposing a duty to defend on the Insurer prior to exhaustion of the Self Insured Retention would transform the Self Insured Retention into a deductible and defeat the parties' intention with regard to the Self Insured Retention.

*Id.* at 1146.

As stated above, while ordinarily the insured is barred by the "cooperation," "no voluntary payment," and "no action" clauses from settling without the insurer's consent under South Dakota law, an insurer is precluded from relying on these contractual clauses as a defense to liability for an insured's voluntary settlement if the insurer commits a prior breach of its contractual duty to defend. Under the terms of Avera's policies with MMCI, MMCI had the right, but not the duty to defend Avera until Avera "exhausted [its] policy limits by payment of losses." Avera's policy does not define either the term "exhausted" or the phrase "payment of losses." However, as stated above, courts have interpreted similar language to mean that an insurer's duty to defend does not arise under an excess/umbrella policy until either the primary insurer (in this case Avera) settled and was fully discharged of liability,[3] or until Avera, as primary insurer, actually paid the claims or losses. Because it was not possible for either of these conditions to occur prior to Avera settling the Sossan Lawsuits, MMCI did not have a duty to defend Avera prior to Avera's settlement of the Sossan Lawsuits and thus cannot be liable for breaching any such duty. Because MMCI did not breach a duty to defend Avera prior to Avera's settlement of the Sossan Lawsuits, MMIC did not waive its rights to enforce the "no action" and "no voluntary payments provisions" under Avera's policy unless another exception excusing compliance with these contractual provisions applies.[4]

### A. Does LCSH state a claim for breach of duty to defend?

LCSH's policy provides that "MMIC shall have the right and duty to defend any suit against the insured" alleging damages arising out of the performance of medical professional services rendered or which should have been rendered on or after the policy period and occurring within the coverage territory. MMCI had a duty to defend LCSH at the outset under the terms of

[3] In *Zieg*, the court found that the insured had exhausted its underlying insurance policy when the claims were "settled and discharged, and the primary insurance is thereby exhausted." 23 F.2d at 666. In *Lasorte*, the court found exhaustion of the underlying policy when the insured settled the claims against it by entering into the stipulated judgment in the underlying litigation. 995 F.Supp.2d at 1144.

[4] The Court also notes that similar to the policy in *Lasorte*, Avera's policy conditions MMCI's duty to indemnify on sums that Avera became "legally obligated to pay as damages" in excess of its self insured retention limits. Avera did not become "legally obligated to pay" damages for the Sossan Lawsuits until it executed the global settlement agreement settling the Sossan Lawsuits.

its liability policy and MMCI accepted LCSH's tender of defense under a reservation of rights to contest coverage at a later time.

Unlike Avera's policy, under LCSH's liability policies, MMCI had a duty to defend LCSH from the outset and could therefore be liable for breach of such duty thereby waiving its rights to enforce the "no voluntary payments" and "no action" provisions. However, MMIC argues that LCSH has failed to state a claim that MMIC breached any duty to defend. Specifically, MMIC argues that:

> While LCSH alleges MMIC breached the duty to defend, it does not allege (nor could it allege) that MMIC failed to provide them with a defense. And the Amended Complaint alleges no other conduct that could constitute a breach of the duty to defend. All alleged conduct relates to the settlement negotiations and MMCI's alleged failure to settle the case and/or indemnify LCSH for the settlement payment.
>
> . . . .
>
> Avera and LCSH allege MMIC refused to settle at the amount they requested and MMIC conditioned its $2 million offer on a release of bad faith claims. These allegations do not meet the requirements of a breach of duty to defend claim or an improper defense claim.

(Doc. 50 at 561-63).

This Court concludes that under the facts alleged, a reasonable inference can be made that MMCI abandoned its defense of LCSH. Instructive on this issue in the South Dakota Supreme Court's decision in *Church Mutual Ins. Co. v. Smith*, 509 N.W.2d 274 (S.D. 1993). In *Church Mutual*, an excess insurer sued a primary insurer to recover attorney's fees it incurred in performing its secondary duty to defend its insureds from the time that the primary insurer was notified of the lawsuit against the insureds to the time that it actively began defending the insureds. Although the primary insurer initially denied coverage, it eventually agreed to provide counsel subject to a reservation of rights. The primary insurer filed a declaratory judgment action asking the court to determine whether coverage existed for the insureds. *Id.* at 275. The counsel retained by the primary insurer while the declaratory judgment action was being decided by the courts did not actively participate in defense of the insureds whose underlying case was being litigated. *Id.* at 276. The trial court, however, held that there was no evidence that the insurer's participation was inadequate and found that the insurer had retained counsel who reviewed depositions and kept

abreast of the case in order to be prepared to take over the insured's defense if the court decided it was the primary insurer. *Id.*

On appeal, the South Dakota Supreme Court stated that even though the primary insurer had tendered a defense subject to a reservation of rights, it found that under the facts of the case, the primary insurer had violated its duty to defend. *Id.* at 276. The court noted that although it agreed to provide counsel subject to a reservation of rights, counsel was not actually hired to represent the insured, but to step in and defend if the court ultimately found that the insureds were covered under the policy. *Id.* The court said that "[w]e see no real difference between a primary carrier who refuses to defend and one who agrees to defend but does not actually do so." *Id.* The court also found that hiring "trial counsel" for the carrier's benefit did not provide a defense to the insured. *Id.*

In ruling on a Motion to Dismiss, the Court is required to accept as true all factual allegations in the Amended Complaint and make all reasonable inferences in favor of Plaintiffs. In doing so, the Court concludes that under the facts alleged, which include MMCI's alleged withdrawal from settlement negotiations, a reasonable inference can be made that MMIC abandoned its defense of LCSH. Because a factual question exists as to whether MMIC breached its duty to defend LCSH prior to its settlement of the Sossan Lawsuits, the Motion to Dismiss is denied with regard to Plaintiff LCSH. *See Weitzel v. Sioux Valley Heart Partners*, 714 N.W.2d 884, 894 (S.D. 2006) ("Whether a contract has been breached is a pure question of act for the trier of fact to resolve."). Accordingly, this Court declines to dismiss LCSH's claims for breach of duty to defend and for breach of duty to indemnify.

## II. Waiver of "No Action" and "No Voluntary Payments" Clause by Breaching Implied Duty to Settle in Good Faith

Plaintiffs also argue that MMCI waived its rights under the "no voluntary payments" and "no action" provisions by breaching its duty to settle in good faith. Some jurisdictions have held that an insured may settle without the consent of the insurer despite the presence of a "no voluntary payments" and "no action" provision in the policy if an insurer breaches its duty to settle in good faith. The South Dakota Supreme Court has not yet had an opportunity to examine this issue.

South Dakota recognizes a cause of action in tort for a breach of the duty to settle in good faith. *Zochert v. Protective Life Ins. Co.*, 921 N.W.2d 479, 490 (S.D. 2018) (citing *Trouten v.*

*Heritage Mut. Ins. Co.*, 632 N.W.2d 856, 862 (S.D. 2001)) (stating that although it has "consistently refused to recognize an independent tort action for the breach of the implied covenant of good faith and fair dealing[,]" . . . an exception exists in the context of an insurance contract where a violation of the implied contractual provision constitutes the independent tort of bad faith."). *Id.* Although the duty of good faith and fair dealing has its origins in contract, South Dakota courts have held that the duty to settle in good faith sounds in tort because of the fiduciary-like relationship that exists in a third-party coverage situation such as this. *See Bertleson v. Allstate Ins. Co.*, 796 N.W.2d 685, 700 (S.D. 2011) (stating that in third-party coverage situations, the relationship of an insurer to its insured is like that of a fiduciary because the insurer must give as much consideration to its insured's interests as it does its own); *Matter of Certification of a Question of Law from the United States district Court, District of South Dakota, Western Division*, 399 N.W.2d 320, 322 (S.D. 1987) ("The better rule is that an insurer's violation of its duty of good faith and fair dealing constitutes a tort, even though it is also a breach of contract.") (quoting 16A J.A. Appleman & J. Appleman, *Insurance Law and Practice* § 8878.15, at 422024 (1981)); *Weeg v. Iowa Mutual Ins. Co.*, 141 N.W.2d 913, 916 (S.D. 1966) (stating that a contract "may establish a relationship demanding the exercise of proper care and acts and omissions in performance may give rise to a tort liability"). "It is the existence of this fiduciary relationship between insurer and insured, aside from insurer's subsisting implied covenant of good faith and fair dealing under the insurance policy, that exposes an insurer to tort liability for failing to exercise good faith in evaluating and negotiating third-party claims against an insured." *Zurich Am. Ins. Co. v. Fluor Corp.*, Civ. No. 4:16-0429, 2019 WL 4750459 at *6 (E.D. Mo. Sept. 30, 2019).

In South Dakota, an insurer commits third-party bad faith when it breaches "its duty to give equal consideration to the interests of its insured when making a decision to settle a case brought against it by a third party." *Bertelsen v. Allstate Ins. Co.*, 796 N.W.2d 685, 700 (S.D. 2011). "Sometimes the duty to exercise good faith and give equal consideration is expressed by telling the jury "that in making the decision whether to settle or try a case, the insurer must in good faith view the situation as it would if there were no policy limits applicable to the claim." *Kunkel v. United Sec. Ins. Co. of N.J.*, 168 N.W.2d 723, 727 (S.D. 1969). Whether or not an insurer has adhered to the standard of good faith usually depends upon circumstances and elements involved in a particular case. *Id.* "The decision to settle must be thoroughly honest, intelligent, and impersonal. It must be a realistic decision tested by the expertise which an insurer necessarily

assumed under the terms of its policy." *Id.* "[T]he character and extent of the insurer's negligence are [also] factors to be considered by the trier of fact in determining if there is bad faith." *Id.* Where the insurer recognizes liability and the probability of a verdict in excess of policy limits circumstances constituting a failure to exercise good faith may weigh in favor of an insured." *Id.*

MMIC argues in its Motion to Dismiss that although South Dakota recognizes a cause of action for a breach of duty to settle in good faith, there is no authority under South Dakota law that bad faith on the part of the insurer would relieve Plaintiffs from their obligations under the "no action" and "no voluntary payments" clauses. Plaintiffs have also each alleged a claim for breach of duty to settle in good faith. MMIC argues that Plaintiffs have failed to state a claim for bad faith because MMIC contends that a judgment in excess of liability limits is an element of such a claim under South Dakota law.

**A. Under South Dakota law, would an insurer's breach of the duty to settle in good faith relieve an insured from its obligations under the "no action" and "no voluntary payments" clauses of an insurance policy?**

As discussed above, courts almost universally allow an insured to voluntarily settle with a third party despite a "no action" or "no voluntary payment" provision in an insurance contract when an insurer has breached its contractual duty to defend. The general idea is that by committing a prior material breach of the contract, the insured has waived any of the insured's preconditions to performance.

The majority of courts that have considered this question have held that the breach of the duty to settle in good faith, even though it is implied and not an express duty like the duty to defend, also excuses the insured from compliance with the cooperation clause. In such circumstances, an insured may enforce a settlement against the insurers if reasonable and made in good faith. *Nat'l Union Fire Ins. Co.*, 673 F.Supp. 267, 274 (N.D. Ill. 1987) ("[A]ll the courts that have considered the question have allowed insureds (1) to effect reasonable settlements on their own after their insurers have breached their duty to settle and (2) to enforce those settlements against the insurers if reasonable and made in good faith."). The idea behind this exception is that if an insurer has violated a duty to settle in good faith, "the insurer cannot escape liability merely because the insured has taken control of the defense and settled the case in a manner that, except for the insurer's material breach, would violate the cooperation clause or other terms of the insurance contract." *Great Divide Ins. Co. v. Carpenter*, 79 P.3d 599, 610 (Alaska 2003); *see also*

*N. Am. Van Lines v. Lexington Ins. Co.*, 678 So.2d 1325, 1333 (Fla. Dist. Ct. App. 1996) (stating that if an insurer arbitrarily rejected a reasonable settlement, it has breached it policy provisions, thus entitling the insured to settle the case and seek reimbursement "because the insured has paid an obligation for which the insurers should have been liable had they not breached the contract."). "To hold otherwise would mean, as a matter of law, that an insurer would automatically be insulated from a violation of a good faith duty to settle, regardless of the breach, if only because of a rule that the contractual duty to cooperate was violated by the insured." *Weber v. Indemnity Ins. Co. of N. Am.*, 345 F.Supp.2d 1139, 1145 (D. Haw. 2004) (discussing *Carpenter*, 79 P.3d 599); *see also Traders & General Ins. Co. v. Rudco Oil & Gas Co.*, 129 F.2d 621 (10th Cir. 1942) ("[B]efore [the insurers] may interpose the voluntary settlement made by [the insured] as a bar to recovery upon the policy, it must . . . appear that it acted in good faith and dealt fairly with the assured."); *Crawford v. Inifinity Ins. Co.*, 139 F.Supp.2d 1226, 1230-31 (D. Wyo. 2001), *aff'd*, 64 F.App'x 146 (10th Cir. 2003) (stating that an insurer's bad faith may relieve an insured of his or her obligations under the insurance contract); *Fireman's Fund Ins. Co. v. Sec. Ins. Co.*, 367 A.2d 864, 869 (N.J. 1976) ("The breach of an insurer's covenant [to act in good faith], whether it be express or implied, leaves the insured free, despite the limiting policy provisions, to protect his own interest in minimizing a potential liability in excess of the policy limits by agreeing to a reasonable good faith settlement of the negligence actions and then, on proof of the insurer's default, to recover from it the amount of its policy limits."); *Hyatt Corp. v. Occidental Fire & Cas. Co. of N.C.*, 801 S.W.2d 382, 389 (Mo. Ct. App. 1990) (citing *Nat'l Union Fire Ins. c. Cont'l Ill Corp.*, 673 F.Supp. 267 (N.D. Ill. 1987) ("Where an insurer breaches its good faith duty to consider offers of settlement, the insured may effect reasonable good faith settlements on its own and enforce such settlements against the insurer."); *Isadore Rosen & Sons, Inc. v. Security Mut. Ins. Co.*, 291 N.E.2d 380, 382 (N.Y. App. Div. 1972) (stating that insurer's duty of good faith "may be breached by neglect and failure to act protectively when the insured is compelled to make settlement at his peril; and unreasonable delay by the insurer, in dealing with a claim, may be one form of refusal to perform which could justify settlement by the insured."); Allan D. Windt, *Insurance Claims and Disputes* § 3:11 (6th ed.) (updated Mar. 2020) (stating that in insured is not bound by contractual obligations if the insurer breaches its duty to act reasonably and diligently to safeguard the insured's interest during settlement of a dispute in which the insured is or could be sued).

Citing to some of its prior precedent, the Arizona Supreme Court in *State Farm Mut. Auto. Ins. Co. v. Peaton* provided that:

> As a general matter, insurance carriers owe their insureds three duties, two express and one implied. These are duties to indemnify, the duty to defend, and the duty to treat settlement proposals with equal consideration. Any breach, actual or anticipatory, of these duties deprives the insured of the security that he has purchased because the breach leaves him exposed to personal judgment and damage which may not be covered or may exceed the policy limits. Accordingly, when such a breach occurs, the insured is generally held to be freed from his obligations under the cooperation clause. . . No other rule is sensible. The insured exposed by his insurer "to the sharp thrust of personal liability . . . need not indulge in financial masochism. . . ."

812 P.2d 1002, 1010-11 (Ariz. 1990). The court explicitly rejected the insurer's argument that only breaches of the duty to indemnify and defend (both express provisions of the policy) can trigger the insured's authority to settle with a claimant before trial. *Id.* at 1012. The court stated that an insured will be excused from compliance with the cooperation clause if it proves that the insurer breached its duty to settle in good faith. *See Peaton*, 812 P.2d at 1013-14. Ultimately, however, the court granted summary judgment in favor of the insurer because it found that the insurer had not breached its implied duty to settle and concluded that the insurer's breach of the cooperation clause relieved the insurer of any obligation under the policy. *Id.*

In *Nunn v. Mid-Century Ins. Co.*, the Supreme Court of Colorado held that when an insurer has exclusive control over the defense and settlement of claims pursuant to the insurance contract, and has acted unreasonably by refusing a settlement offer that would avoid any possibility of excess liability of its insured, the insured may take steps to protect itself from potential exposure to such liability by entering into a pretrial stipulation agreement and assigning its bad faith claims to the third party. 244 P.3d 116, 119 (Colo. 2010) (*en banc*). The court, citing to its prior decision in *Old Republic*, reasoned that:

> Under these circumstances, it is possible that the stipulated judgment "'may not actually represent an arm's length determination of the worth of the plaintiff's claim.'" Nevertheless, we have recognized that "[w]here an insurer has wrongfully subjected its insured to an excess judgment, . . . the risk of collusion may be tolerable in light of the 'relative positions of the parties.'" Indeed, we have declined to hold pretrial stipulated judgment per se unenforceable because a stipulated judgment might be the insured's "only viable recourse against an insurer that has acted in bad faith." Accordingly, although we have held that a pretrial stipulated judgment cannot be enforced against an insurer in the absence of a determination of bad faith, we have explicitly left the door open for the enforceability of such a

> judgment in the event that an insured or an assignee of the insured successfully litigates a claim of bad faith.

*Id.* at 120 (citing *Old Republic Ins. Co. v. Ross*, 180 P.3d 427, 434 (Colo. 2008) (*en banc*)).

As discussed above, the South Dakota Supreme Court has recognized that by breaching its contractual duty to defend, an insurer waives its rights to enforce the "no voluntary payments," "cooperation," and "no action" clauses. This Court predicts that the South Dakota Supreme Court would follow the majority rule and conclude that an insurer has waived its rights under the "cooperation," "no voluntary payments" and "no action" provisions if the insured proves that the insurer breached of its duty to give equal consideration to the interests of its insured when settling a case.

**B. Do Plaintiffs state a claim for breach of duty to settle in good faith?**

Plaintiffs allege that MMIC committed bad faith in various ways, including by:

- Considering its own interests at the expense of its insured and putting its own interests before those of its insureds;
- Failing to negotiate and enter into a settlement in good faith within the policy limits of its insureds;
- After actively soliciting mediation for several years, abruptly seeking to delay and postpone mediation when the opportunity finally presented itself in order to explore coverage issues more thoroughly and pursue a summary judgment ruling only on the specific claims it believed were covered under its policies issued to its insureds;
- With the knowledge that it had a conflict of interest, prioritizing insurance coverage issues and its own interests and financial exposure over the liability interests and financial exposure of its insureds;
- With the knowledge that it had a conflict of interest, intermingling the issues of coverage and liability, including communication and coordination between coverage counsel and liability counsel;
- With knowledge that it had a conflict of interest, failing to assess, consider, and treat the liability and financial exposure of [each Plaintiff] separately from [each other];
- Failing to defend and indemnify [Plaintiffs];
- Conditioning its payment of liability coverage under the policy to settle the Sossan Lawsuits on [the Plaintiffs'] waiver of [their] bad faith claims against Defendant MMIC;
- Failing to perform a fair investigation and fair evaluation of the claims.

(Doc. 44, ¶¶159, 171).

MMCI argues that Plaintiffs have failed to state a claim for bad faith under South Dakota law. MMCI argues that it had no obligation to offer $2 million to settlement in the first instance given the uncertainty regarding liability and the presence of covered and uncovered claims and that as a result, MMIC's request for a release in exchange for the $2 million contribution cannot form the basis of a bad faith claim. (Doc. 50 at 567-68). MMIC also argues that because Plaintiffs did not suffer a judgment in excess of liability, they have failed to state a claim for bad faith under South Dakota law.

**1. Duty to settle in good faith**

MMCI argues that it has no duty to settle under the terms of the policies and no duty to contribute $2 million to settlement. As a result, MMCI argues that it was not bad faith to, on the second day of mediation, make its $2 million settlement contribution contingent on Plaintiffs' waiver of bad faith claims against MMCI. It is true that there is no express duty without regard to the facts to settle under Plaintiffs' liability policies. However, the South Dakota Supreme Court has acknowledged that "A covenant is implied in an insurance contract that neither party will do anything to injure the rights of the other in receiving the benefits of the agreement. This covenant includes a duty to settle claims without litigation in appropriate cases." *Helmboldt v. LeMars Mut. Ins. Co.*, 404 N.W.2d 55, 57 (S.D. 1987) (quoting *Kooyman v. Farm Bureau Mut. Ins. Co.*, 315 N.W.2d 30 (Iowa 1982)). This implied duty to settle claims in appropriate cases may include a duty to make policy limits available for settlement. *See N. River Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 600 F.2d 721, 724 (8th Cir. 1979) (applying South Dakota law) ("The insurance company is not permitted to reject a settlement offer simply because it would require it to pay its policy limits. Nor may it give consideration to its own financial interest at the expense of those of the insured. And in evaluating a settlement offer made by a plaintiff the insurer must approach the matter as though there were no policy limits and that it would be required to pay any sum that the plaintiff would be likely to recover."); *Crabb v. Nat'l Indem. Co.*, 205 N.W.2d 633, 636-37 (S.D. 1973) (recognizing a duty to settle within policy limits under certain circumstances); *Kunkel v. United Sec. Ins. Co. of N.J.*, 168 N.W.2d 723, 726-27 (S.D. 1969) ("Sometimes the duty to exercise good faith and give equal consideration is expressed by telling the jury that in making the decision whether to settle or try a case, the insurer must in good faith view the situation as it would if there were no policy limits applicable to the claim."); *see also W. Casualty & Surety Co. v. Herman,*

405 F.2d 121, 123 (8th Cir. 1968) (applying Missouri law) ("Good faith requires the company to make any settlement within the policy limits that an honest judgment and discretion dictates."); *Noonan v. Vermont Mut. Ins. Co.*, 761 F.Supp.2d 1330, 1333 (M.D. Fla. 2010) (stating that the crux of a bad faith claim is the self-serving delay caused by the insurer's failure to adjust the claim in a timely manner, which exposes its insured to an excess judgment).

In *Helmbolt v. LeMars Mut. Ins. Co., Inc.*, a car driven by Helmboldt crossed the center line and collided with a vehicle driven by Olson, causing her severe personal injuries. 404 N.W.2d 55, 56 (S.D. 1987). Both Helmbolt and Olson carried automobile insurance policies with LeMars. *Id.* Helmbolt's policy provided $50,000 in liability coverage per accident and Olson's policy included $100,000 of underinsured motorist coverage which required LeMars to pay the difference between the insurance available through the policy of the negligent party, and $100,000 which amounted to $50,000. *Id.* The injured party's attorney attempted to settle the case for $100,000 which represented the limit on Helmbolt's policy and the additional $50,000 available through Olson's underinsurance coverage. *Id.* However, LeMars refused to offer more than $50,000 without a waiver of Olson's right under their underinsurance provision, claiming nothing had to be paid on Olson's policy until a judgment in excess of $50,000 was entered against Helmbolt. *Id.* The jury awarded a $160,000 judgment in favor of the Olson's. *Id.* LeMars paid Olson's $50,000 on Helmbolt's policy and $50,000 on Olson's policy which left $60,000 on the judgment. *Id.*

Subsequent to trial, Helmbolt agreed to pay Olson's $4,500 and to assign Olson's his bad faith claim against LeMars. *Id.* Olson's filed a lawsuit alleging that LeMars failed to negotiate in good faith within the policy limits. *Id.* In its review, court stated the implied covenant of good faith and fair dealing includes "a duty to settle claims without litigation in appropriate cases." *Id.* at 57. The court stated that "[i]t is settled that a finding of bad faith may be warranted on the grounds that an insurance company did not pursue settlement negotiations with the same intensity, interest and good faith it would have if there were no policy limits." *Id.* The court reiterated some of the factors listed by the court in *Kunkel* that a factfinder may consider in its bad faith analysis., which include:

> (1) the strength of the injured claimant's case on the issues of liability and damages; (2) attempts by the insurer to induce the insured to contribute to a settlement; (3) failure of the insurer to properly investigate the circumstances so as to ascertain the

> evidence against the insured; (4) the insurer's rejection of advice of its own attorney or agent; (5) failure of the insurer to inform the insured of a compromise offer; (6) the amount of financial risk to which each party is exposed in the event of a refusal to settle; (7) the fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and (8) any other factors tending to establish or negate bad faith on the part of the insurer.

*Id.* (citing *Kunkel*, 168 N.W.2d at 727). Considering all the evidence in the record, the court in *Helmbolt* found that issues regarding liability and damages were fairly certain and that LeMars knew that Helmbolt would not have the finances to cover an excess judgment. *Id.* at 57-58. The Court also noted that evidence showed that LeMars had evaluated the case to be worth $60,000 to $80,000, but that it only offered to settle for $50,000, conditioned upon a release of Olson's underinsured claim. *Id.* at 58. The court concluded that there was ample evidence of LeMars' bad faith and violation of its fiduciary relationship to one or both of its insureds to give "equal consideration" to their interests. *Id.* As a result of LeMars' conduct, the court found that the Olsons were "forced to endure the rigors and uncertainties of trial, and Helmbolt faced potential personal responsibility for an excess judgment—which in fact occurred." *Id.* The court concluded that LeMars ignored its duty of good faith for the purpose of protecting its own interest. *Id.*

In *Kunkel v. United Sec. Ins. Co. of N.J.*, the plaintiff, Kunkel, drove his car into the rear of an automobile driven by Ronken and in a subsequent suit, Ronken recovered a judgment against Kunkel for $45,022.28 to his person and property. 168 N.W.2d 723, 724 (S.D. 1969). At the time of the accident, Kunkel was insured by an automobile liability policy issued to him by United Security Insurance. *Id.* United paid its policy limits of $25,000 for bodily injury and $1,224 for property damage, together with interest and costs and sued United to recover, among other things, the unpaid portion of the judgment totaling $18,798.58. *Id.* at 724-25. In its complaint, Kunkel alleged that United had received an offer to settle for $25,000 before the jury verdict and that "United knew, or in good faith should have known, that the jury would render a verdict in excess of liability coverage, and did not in good faith refuse to settle or attempt to settle the claim." *Id.* at 725. The policy at issue in *Kunkel* gave United the right to make such investigation and settlement of the claim or suit as United deemed expedient. *Id.* Ultimately, the jury found in favor of Kunkel and entered a verdict for $18,798.58 plus interest, along with other damages. *Id.*

On appeal, the South Dakota Supreme Court in *Kunkel* found that there was sufficient evidence to sustain the jury's verdict. The court found that even before the offer of settlement was

made while the jury was deliberating, the evidence showed that the claimant had a strong case on the issue of liability and that the claimant's injuries were serious. *Id.* at 730. Despite these facts, the court noted that the insurer made neither a serious offer to settle or a counter offer. *Id.* at 731. The courts stated that a refusal to discuss settlement may be considered along with other evidence in determining the issue of bad faith. *Id.* at 731 (citing *State Automobile Ins. Co. of Columbus, Ohio v. Rowland*, 427 S.W.2d 30 (Tenn. 1968)). The court also noted the insurer's refusal to disclose policy limits. *Id.* The court stated that while the insurer had no affirmative duty to disclose policy limits, courts had recognized that doing so was relevant to evaluating a case and as an aid to achieving settlement. *Id.* Applying those factors to the facts of the case, the court in *Kunkel* concluded that:

> The record establishes that [the insurer] recognized great danger of a verdict exceeding policy limits. . . When we consider the comparative hazards; that is, settling the case for $25,000 within policy limits, or exposing the insured to a possible verdict nearly three times in excess of that amount, we believe a jury could find that United did not exercise its duty of good faith and did not give equal consideration to its own and Kunkel's comparative hazards.

*Id.*

MMCI argues that there is no duty to settle here as a matter of law because unlike in an underinsured motorist case like *Helmboldt* and *Kunkel*, Plaintiffs' liability under the Sossan Lawsuits was not certain and the lawsuits included claims for intentional torts that were clearly not covered under Plaintiffs' liability policies. There is no South Dakota law stating that a covenant of good faith and fair dealing is implied only in underinsured motorist policies, when liability is certain, and when all third-party claims are covered under the policy. To the contrary, the South Dakota Supreme Court has stated that there is a covenant of good faith and fair dealing that is implied in all insurance contracts which requires an insurer to settle in appropriate circumstances. *Id.* The likelihood of liability on the merits is certainly a factor one may consider in determining whether an insurer did not give equal consideration to the interests of its insured in settling within policy limits and is a factual questions that may not be addressed at this stage. *See Kunkel*, 168 N.W.2d at 727 (listing some factors a factfinder may consider in determining whether an insurer breached its duty to settle in good faith).

The Court acknowledges that the claims in the Sossan Lawsuits included claims for intentional torts that were clearly not covered under Plaintiffs' policies. The Court also acknowledges that that MMCI reserved its rights to challenge coverage of the negligent credentialing claims against LSCH and if had not already, would likely do as well with regard to the negligent credentialing claims alleged against Avera. The South Dakota Supreme Court has not addressed how, or to what extent, or if at all, an insurer may take into account coverage considerations in exercising its discretion to settle. However, in *Luke v. American Family Mut. Ins. Co.,* the South Dakota Supreme Court made clear that an insurer is not precluded from bad faith liability if it refuses to settle based on an incorrect determination that the policy did not provide coverage, even if that determination was made in good faith. *See* 476 F.2d 1015, 1020 (S.D. 1972); *accord Cook v. U.S. Cap. Ins. Co.*, Civ. No. 93-1077, 1994 WL 327039, at *5-6 (N.D. Cal. June 29, 1994) ("A good faith belief in noncoverage is not relevant to a determination of the reasonableness of a settlement offer.").

Generally, an insured has no duty to settle with regard to claims that are not covered under the policy. *St. Paul Fire & Marine Ins. Co. v. Convalescent Servs., Inc.*, 193 F.3d 340, 343 (5th Cir. 1999) (stating that requiring an insurer to settle within policy limits to avoid exposing its insured to non-covered damages "would, in effect, extend that actual coverage of the insurance contract" and "ignores the most basic proposition that an insurer has no duty to settle a non-covered claim."); *Ross Neely Sys. Inc. v. Occidental Fire & Cas. Co.*, 196 F.3d 1347, 1352 (11th Cir. 1999) (insurer is not "under a duty to settle a compensatory damages award merely to minimize its insured's exposure to [non-covered] punitive damages"); *Magnum Foods, Inc. v. Continental Casualty Co.*, 36 F.3d 1491, 1506 (10th Cir. 1993) (a duty of good faith does not include settlement of the non-covered claim); *Enserch Corp. v. Shand Morahan & Co.*, 952 F.2d 1485, 1494 (5th Cir. 1992) ("We cannot allow an insured to settle allegations against it (some of which might be covered by its insurance, some of which might not) for its policy limits and then seek full indemnification from its insurer when some of that settled liability may be for acts clearly excluded by the policy."); *Zieman Mfg. Co. v. St. Paul Fire & Marine Ins. Co.*, 724 F.2d 1343, 1346 (9th Cir. 1983) (stating that an insurer has no obligation to make a settlement offer which is in excess of the covered claims for the purpose of insulating the insured from the potential of punitive and other uncovered damages); *Lira v. Shelter Ins. Co.*, 913 P.2d 514, 516-17 (Colo. 1996) ("An insurer who has not contracted to insure against its insured's liability for punitive damages has no

duty to settle the compensatory part of an action in order to minimize the insured's exposure to punitive damages."); *Johansen v. California State Auto. Assn. Inter-Ins. Bureau*, 15 Cal.3d 9, 18 (Cal. 1975) (stating that the insurer was not "under a duty to settle since its policy did not provide for coverage."); *DeWitt v. Monterey Ins. Co.*, 204 Cal.App.4th 233, 236 (Cal. Ct. App. 2012) (stating that "an insurer has a duty to accept a reasonable settlement offer only with respect to a *covered* claim."); *Camelot by the Bay Condo. Owners' Assn. v. Scottsdale Ins. Co.*, 27 Cal.App.4th 33, 52 (Cal. Ct. App. 1994) ("Here, the trial court attempted to hold Scottsdale to a duty to protect Breihan against financial risk for even those defects which would ultimately be determined to be noncovered items. The *Comunale* rule presupposes that an insurer denies coverage at its own risk *if, and only if*, coverage is ultimately found."); *Seren Innovations, Inc. v. Transcon. Ins. Co.*, Civ. No. A05-917, 2006 WL 1390262, at *5 (Minn. Ct. App. May 23, 2006) (stating that an insurer does not have a duty to settle all claims within the policy limits regardless of whether the policy provide coverage for a particular claim); *Trotter v. State Farm Mut. Auto. Ins. Co.*, 377 S.E.2d 343, 349 (S.C. Ct. App. 1988) (stating that an insurer has no duty to settle a claim that is not covered by the policy). However, if an insured has "tendered to [an insurer] an amount representing the insured's good faith assessment of its exposure on the uncovered claims, an insurer may be liable for bad faith if it refuses to supplement the insured's contribution with an amount reasonably representative of the covered claims." *Homestead Ins. Co. v. Cornish & Carey Residential, Inc.*, Civ. No. 92-20369, 1993 WL 255486, at *3 (N.D. Cal. June 30, 1993), *affirmed.*, 59 F.3d 175 (9th Cir. 1995)).

In the present case, it is alleged that in 2015, Avera moved for summary judgment on all of the Sossan Lawsuits. Avera's motions for summary judgment were denied and Judge Anderson ruled that the negligent credentialing claims would be presented to a jury. It is alleged that after five years of litigation, as advocated by MMCI, an opportunity arose to enter into a global settlement of all 36 individual plaintiffs' cases in the Sossan Lawsuits. At the time of the mediation, it is alleged that special damages and prejudgment interest exceeded $22 million plus general damages exposure. Plaintiffs allege that MMCI offered $2 million to settle on behalf of Plaintiffs even though Avera's policy limit in excess of its $6 million self-insured retention limit was $10 million, LCSH's primary coverage limit was $1 million per claim and $3 million in the aggregate, and LCSH's excess coverage limit was $2 million per claim and $2 million in the aggregate. Furthermore, on the second day of mediation, MMCI made its $2 million settlement

contribution conditioned on a waiver of any bad faith claims against MMCI. When Plaintiffs refused to waive their bad faith claims, it is alleged that MMCI refused to participate or consider further settlement discussions. Plaintiffs allege that the ultimate settlement amount of $10.675 million was within policy limits and less than the internal global reserves MMCI set aside for the Sossan Lawsuits. The Court finds that these allegations are sufficient state a claim that did not give equal consideration to the interests of Plaintiffs during settlement negotiations. At trial, a factfinder will need to determine, based on the totality of the circumstances whether MMCI's conduct was in breach of its implied duty to settle. *See Kunkel*, 168 N.W.2d at 726, 730 (stating the good faith is a fact issue for the jury and whether an insurer has adhered to it usually depends upon circumstances and elements involved in a particular case).

**2. Is a judgment in excess of liability limits an element of a claim for breach of good faith duty to settle?**

In their Amended Complaint, Plaintiffs have each pleaded a cause of action for bad faith. MMIC argues that Plaintiffs have failed to state a claim for bad faith under South Dakota law because Plaintiffs did not allege that they obtained a judgment in excess of policy limits, but rather settled the Sossan Lawsuits.

Whether or not a judgment on the merits is a prerequisite to a cause of action for breach of the insurer's duty to settle is a subject of division among courts. Some courts have held that an excess judgment is a prerequisite to a cause of action for breach of an insurer's duty to settle. *See Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 611 (6th Cir. 1995) ("[I]mplicit in bringing an action against an insurer for bad faith with respect to settling a claim within policy limits, is a requirement that there be an excess judgment against the insured."); *Jarvis v. Farmers Ins. Exchange*, 948 P.2d 898, 902 (Wyo. 1997) ("A cause of action by an insured against the insurer for a failure, in bad faith, to settle a claim will not accrue prior to the entry of a judgment against the insured in excess of policy limits."); *Med. Mut. Liability Ins. Soc. of Maryland v. Evans*, 622 A.2d 103, 114 (Md. 1993) ("[T]he measure of damages in a bad faith failure to settle case is the amount by which the judgment rendered in the underlying action exceeds the amount of insurance coverage."); *Scroggins v. Allstate Ins. Co.*, 393 N.E.2d 718, 720 (Ill. Ct. App. 1979) (stating that the fact that an excess judgement was entered against the insured constitutes the damage that permits the insured to recover for the breach of the duty owed). These cases "presuppose[] that the insurer's breach of implied duties of good faith and fair dealing is not complete unless an excess judgment

has been entered." *Camelot by the Bay Condominium Owners' Ass'n v. Scottsdale Ins. Co.*, 27 Cal.App.4th 33, 46-47 (Cal. Ct. App. 1994). For example, in *Doser v. Middlesex Mut. Ins. Co.*, the California Court of Appeals held that a judgment in excess of liability limits was a condition precedent to a bad faith claim. 101 Cal.App.3d 883, 892-93 (Cal. Ct. App. 1980). The court reasoned that if, in litigating a breach of duty to settle claim, no judge or jury was ever required to consider the facts of the underlying case and render a verdict on which a judgment could be based, it would invite collusion between the claimants and the insured. *Id.* at 893. The court stated that "[w]e are concerned here not only with the fact of damages being clearly established, but the certainty of the amount thereof as well." *Id.* at 892.

In contrast to *Doser*, in *Camelot by the Bay Condo. Owners' Ass'n v. Scottsdale Ins. Co.*, the California Court of Appeals acknowledged that although an actual excess judgment, if any, is highly relevant in any bad faith damages determination, it concluded that there was no explicit requirement for bad faith liability that an excess judgment was actually suffered by the insured. 27 Cal.App.4th 33, 48-49 (Cal. Ct. App. 1994). In so holding, the court noted that under California law, in deciding whether to settle a claim, "the insurer must conduct itself as though it alone were liable for the entire amount of judgment." *Id.* at 36. The court said that the reasonableness analysis of the settlement decision is thus performed in terms of the probability or risk that such judgment may be forthcoming in the future in light of the information available to the insurer at the time of the proposed settlement. 27 Cal.App.4th 33, 48-49. In making this determination, the finder of fact must take into account that information available to the insurer at the time of the proposed settlement. *Id.* at 48. In doing so, the court ultimately found that the insurer did not breach its implied covenant and fair dealing by failing to meet its insured's settlement demands. *Id.* at 54.

Although all the South Dakota Supreme Court cases involving a bad faith failure to settle have involved damages in excess of policy limits resulting from a judgment after trial on the merits, the court has not explicitly stated that a judgment in excess of policy limits is an element of a claim for bad faith failure to settle. *See, e.g. Luke v. American Family Mut. Ins. Co.*, 476 F.2d 1015, 1018-19 (1972); *Kunkel v. United Sec. Ins. Co. of N.J.*, 168 N.W.2d 723, 725 (S.D. 1969); *Crabb v. Nat'l Indemn. Co.*, 205 N.W.2d 633 (S.D. 1973) (approving damage award equal to the amount of the judgment taken against the insured that exceeded the policy limits); *Helmbolt v. LeMars Mut. Ins. Co.*, 404 N.W.2d 55, 60 (S.D. 1987) ("The justification for imposing liability upon the

insurance company equal to the amount in which the judgment exceeded policy limits was that the company's bad faith failure to settle resulted in its insured being subject to liability for this excess amount.").

This Court anticipates that the South Dakota Supreme Court would not require a judgment in excess of policy limits to prove a bad faith claim. In South Dakota "in making the decision whether to settle or try a case, the insurer must in good faith view the situation as it would if there were no policy limits applicable to the claim." *Kunkel*, 168 N.W.2d at 726. As in *Camelot*, in South Dakota cases, the reasonableness of a settlement decision is determined in terms of the probability or risk that such judgment may be forthcoming in the future. As the South Dakota Supreme Court noted in *Kunkel*, "cases are virtually unanimous in holding that when a claimant has a strong case on the issue of liability and the injuries are serious, both of these matters may have some tendency to show an insurer's rejection of an offer to settle was not in good faith." 168 N.W.2d at 731-31. The court further explained that "[w]here the insurer recognized liability and the probability of a verdict in excess of policy limits circumstances constituting a failure to exercise good faith may weigh in favor of the insured." *Id.* at 726. The court in *Kunkel* looked to the information that the insurer had at the time the insurer made its settlement decision and concluded that the insurer (United) had committed bad faith and reasoned as follows:

> The record establishes that United recognized great danger of a verdict exceeding policy limits. It hardly allows any other reasonable analysis. When we consider the comparative hazards; that is, settling the case for $25,000 within policy limits, or exposing the insured to a possible verdict nearly three times in excess of that amount, we believe a jury could find that United did not exercise its duty of good faith and did not give equal consideration to its own and Kunkel's comparative hazards.

*Id.* at 731; *see also Rupp v. Transcontinental Ins. Co.*, 627 F.Supp.2d 1304, 1323 (D. Utah 2008) ("A judgment after trial certainly is good evidence of damages. But it need not be the only form of evidence a court will accept in a bad faith action against the insurer."); *Crawford v. Infinity Ins. Co.*, 64 Fed. Appx. 146, 151 (Wyo. 2003) ("[A] consent judgment suffices under Wyoming law for a third-party bad faith tort claim."); *SwedishAmerican Hosp. Ass'n of Rockford v. Illinois State*, 916 N.E.2d 80 (Ill. Ct. App. 2009) (citing *Rupp*, 627 F.Supp.2d 1304) (concluding that when an insured is facing the significant likelihood of an excess judgment, it is not required to take the case to trial before a cause of action for bad faith accrues); *Campbell v. State Farm Mut. Auto. Ins. Co.*,

840 P.2d 130, 140 (Utah Ct. App. 1992) ("If the insurer's decision to reject offers of settlement and go to trial is unreasonable, it is at that time that the breach of duty occurs, which is the crux of the insured's cause of action for bad faith."); *Farr v. Transamerica Occidental Life Ins. Co.*, 699 P.2d 376, 381 (Ariz. Ct. App. 1984) (holding that attorney's fees and consequential damages may be recovered).

Ultimately, Plaintiffs will be required to prove causation and damages in order to recover damages for their bad faith claims, but these are issues for the factfinder. However, the fact that there was not a judgment in excess of liability limits in this case does not mean that Plaintiffs have failed to state a claim of bad faith under South Dakota law.

**3. Duty of equal consideration when no duty to defend**

The Court acknowledges that unlike with LCSH, MMCI did not have a duty to defend Avera until Avera exhausted its self-insured retention limits and there are no allegations in the Amended Complaint that MMCI exercised its right under Avera's primary policy to defend Avera. (*See* Doc. 44-1 at 415) ("MMIC shall have the right but not the duty to defend, or associate in the defense and control of any covered claim or suit made or brought against the insured that is likely to involved MMIC."). Even though MMCI did not control Avera's defense, it retained control over settlement since the terms of the liability policy provided for MMCI's consent to settlement.

In this case, as in other cases involving an excess insurer, "even when [an excess insurer] has not assumed the defense or control of settlement negotiations, an excess insurer has the right under the policy to consent to any settlement reaching its coverage level." *Assoc. Wholesale Grocers, Inc. v. Americold Corp.*, 261 Kan. 806, 806 (Kan. 1997). Courts have held that "an excess insurer has an implied obligation to exercise that right in good faith" so as to not deprive an insured of the benefit of their bargain. *Id.* (citing 1 Windt, Insurance Claims & Disputes, § 5.26 at 350 (3d ed. 1995) ("The duty [of an excess insurer] to settle exists independently of the duty to defend."); Ashley, Bad Faith Actions—Liability and Damages § 6.21 (1992) ("When an insured has both primary and excess liability insurance coverage, he can expect the excess carrier to respond to settlement offers with the same good faith required of primary carriers.")); *see also Schwartz v. Twin City Fire Ins. Co.*, 492 F.Supp.2d 308, 318-19 (S.D.N.Y. 2007) (stating that excess carrier cannot act unreasonably in withholding consent to settle); *N. Am. Van Lines, Inc. v. Lexington Ins. Co.*, 678 So.2d 1325, 1332 (D. Fla. 1996) (finding that excess insurer could not arbitrarily reject a

reasonable settlement offer without breaching its policy provisions, thus entitling the insured to settle the case and seek reimbursement); *Diamond Heights Homeowners Assn. v. Nat'l Am. Ins. Co.*, 227 Cal.App.3d 563, 566 (Cal. Ct. App. 1991) ("[A]ny insurer, whether excess or primary, is subject to an implied duty of good faith and fair dealing that requires it to consider the interests of the insured equally with its own interests and evaluate settlement proposals as though it alone carried the entire risk of loss."); *Kelley v. British Coml. Ins. Co.*, 221 Cal.App.2d 554 (Cal. Ct. App. 1963) (holding that in an action against a liability insurance company for failure to settle a claim within policy limits of its excess liability policy, the fact that the company occupied the position of an excess carrier and took no active part in the defense of the action did not relieve it of the duty of good faith toward its insured where its control over settlement negotiations was separate and distinct from its right to take over the defense of the action, where the excess policy prohibited the insured from settling the claim in excess of its coverage under the primary policy without the excess insurer's written consent, where the primary insurer offered the full amount of its coverage prior to trial, and the excess insurer choose not to take an active part in the defense); *Diamond Heights Homeowners Assn v. Nat'l Am.*, 227 Ca.App.3d 563, 578-81 (Cal. Ct. App. 1991) ("Any insurer, whether excess or primary, in conducting settlement negotiations, is subject to an implied duty of good faith and fair dealing which requires it to consider the interests of the insured equally with its own and evaluate settlement proposals as though it alone carried the entire risk of loss. . . [An] insurer is deemed to have waived its rights under the "no action" clause by such conduct . . . when it violates its own contractual obligations to the insured."). The purpose of liability insurance is to protect the insured from liability within the limits of the contract. *Bowers v. Camden Fir Ins.* Ass'n, 237 A.2d 857, 861 (N.J. 1968). An insurer may not frustrate that purpose by a selfish decision as to settlement which exposes the insured to . . . a judgment beyond the specific monetary protection which his premium purchased." *Id.*

Failure by an excess insurer to exercise good faith in settlement will expose an excess insurer to liability in tort because of the fiduciary-like relationship that exists between an excess insurer and its insured. *See Central Flying Serv., Inc. v. StarNet Ins. Co.*, 150 F.Supp.3d 1038, 1042 (E.D. Ark. 2015) (quoting *S. Farm Bureau Cas. Inc. Co. v.* Parker, 341 S.W.2d 36, 41 (Ark. 1960) ("When a liability company by the terms of its policy obtains from the insured a power . . . to determine whether an offer of compromise of a claim shall be accepted or rejected, it creates a fiduciary relationship between it and the insured with the resulting duties that group out of such a

relationship.")); *Walters Wholesale Electric Co. v. Nat'l Union Fire Ins. Co.*, 247 F.R.D. 593, 597 (C.D. Cal. 2008) (stating that there exists a "fiduciary relationship" between a primary insurer, an excess insurer, and an insured); *Allstate Ins. Co. v. Am. S. Home Ins. Co.*, 680 So.2d 1114, 1116 (Fla. Ct. App. 1996) (stating that the relationship of an excess insurer to its insured is fiduciary in nature, requiring the insurer to excess good faith). The Court predicts that the Supreme Court of South Dakota would adopt this approach. Courts in South Dakota have recognized that "the relationship of the insurer to the insured is akin to that of a fiduciary since it must give at least as much consideration to the insured's interest as it does its own. *Trouten v. Heritage Mut. Ins. Co.*, 632 N.W.2d 856, 864 (S.D. 2001). "Because of this fiduciary duty to the insured, the insurer stands in the shoes of the insured and has an adversarial relationship to the victim." *Id.* This Court finds that the fact that an insurer is an excess insurer does not change the nature of this relationship.

Unlike with a primary insurer, however, an excess insurer does not owe a duty to its insured to participate in the defense or initiate settlement negotiations until the primary policy limits are exhausted. *See Certain Underwriters of Lloyd's v. Gen. Acc. Ins. Co. of Am.*, 699 F.Supp. 732, 740 (S.D. Ind. 1988) (stating that an excess carrier owes no duty to the insured nor to the primary carrier either to defend the insured or to enter into settlement negotiations); *Continental Cas. Co. v. Royal Ins. Co.*, 219 Cal.App.3d 111, 119 (Cal. Ct. App. 1990) (stating that an excess carrier has no duty or right to participate in the defense, absent contract language to the contrary, until the primary policy limits are exhausted); 14A Couch on Ins. § 203:21 (citing *St. Paul Fire & Marine Ins. Co. v. Liberty Mutual Ins. Co.*, 353 P.3d 991, 998 (Haw. 2015) ("An excess liability carrier owes no duty to the insured or to the primary carrier to enter into settlement negotiations."); 14 Couch on Ins. § 200:42. An excess insurer may participate in litigation to protect its own interests, but has not obligation to do so. *See* 14 Couch on Ins. § 200:39 (citing *General Motors Acceptance Corp. v. Nationwide Ins. Co.*, 828 N.E.2d 959, 961 (N.Y. 2005) ("An excess carrier may [ ] voluntarily participate in the insured's defense but has no obligation to do so.").

Most courts have held that an excess insurer's duty vis-à-vis settling a claim does not arise until the excess insurer has been made aware that the primary insurer has tendered its policy limit. Allan D. Windt, *1 Insurance Claims and Disputes, Excess insurer's duty to settle*, § 5:26 (6th ed.). Once a primary insurer tenders its full policy limits, excess insurers can, at their discretion "agree to undertake the defense." *Monarch Plumbing Co. v. Ranger Ins. Co.*, Civ. No. 06-1357, 2006

WL 2734391, at *4 n.6 (E.D. Cal. Sept. 25, 2006). In the present case, Avera's liability policy provided that MMCI had the right to defend any covered claim or suits against Avera that is likely to involve MMCI. Regardless of whether an excess insurer exercises its right to defend, it is still obligated to exercise good faith in making settlement decisions when, in a situation such as this, the excess insurer has the complete discretion to settle.

> When a primary insurer and/or the insured with a self-insured retention is willing to contribute its limit of liability to settlement and makes that fact known to an excess insurer, the excess insurer's coverage is triggered. The excess insurer must then evaluate whether the settlement value of the case warrants a further contribution by it to a settlement. In other words, under the foregoing circumstances, the excess insurer should be subject to the same duty to settle principles as a primary insurer. The fact that the excess insurer should have no duty to defend, since the primary insurer should still be provided a defense, is irrelevant. The duty to settle exists independently of the duty to defend.

Allan D. Windt, *1 Insurance Claims and Disputes, Excess insurer's duty to settle* § 5:26 (6th ed.); *see also Teleflex Med. Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 851 F.3d 976 (9th Cir. 2017) (applying California law) (Primary insurer tendered limits to a settlement, but excess insurer refused to contribute to a settlement. Insured settled without the excess insurer's consent and sued the excess for reimbursement. The excess insurer denied coverage on the ground that it had not authorized the settlement. The court held against the excess insurer, explaining that, at a minimum, the excess insurer should have agreed to undertake the defense). A variety of cases, each with their own facts, state the general principle that excess insurers have no obligation to the insured until the primary insurer tenders its policy limits. *Berglund v. State Farm Mut. Auto. Ins. Co.*, 121 F.3d 1225, 1228 (8th Cir. 1997) (dicta applying Iowa law); *Noonan v. Vermont Mut. Ins. Co.*, 761 F.Supp.2d 1330, 1335 (M.D. Fla. 2010); *Employers Nat'l Ins. Co. v. Gen. Acc. Ins. Co.*, 857 F.Supp. 549, 551 (S.D. Tex. 1994); *Hilco Capital, LP v. Ed. Ins. Co.*, 978 A.2d 174, 179 (Del. 2009); *Keck v. Mahin & Cate v. Nat'l Union Fire Ins. Co.*, 20 S.W.3d 692, 701 (Tex. 2000); *New Jersey Mfrs. Ins. Co. v. Nat'l Cas. Co.*, 992 A.2d 837, 842 (N.J. Super. Ct. App. Div. 2010); *Assoc. Wholesale Grocers, Inc. v. Americold Corp.*, 261 Kan. 806, 830 (Kan. 1997); *Signal Co's, Inc v. Harbor Ins. Co.*, 27 Cal.3d 359, 370 (Cal. 1980).

In the present case, Avera's primary policy which provided for a self-insured retention of $2 million per event and $6 million in the aggregate. Avera had paid $4,129,363 in claims toward the $6 million of self retention and at mediation offered the Sossan plaintiffs $1,870,637, thus

meeting the $6 million retention. Plaintiff LCSH had no self-insured retention with a primary policy limit of $1 million per claim and $3 million in aggregate with the excess policy liability limit of $2 million per claim and $2 million in aggregate.

Avera alleges that during the mediation at which MMCI representatives and counsel were in attendance, it tendered its self-insured retention limits under its liability policy. MMCI had the sole discretion to accept or reject settlement under the terms of the policy. Accordingly, MMCI had a duty to exercise its discretion in good faith and to give equal consideration to the interests of its insureds when making settlement decisions. This duty is separate and distinct from MMCI's duty to defend. *See Luke v. American Family Mut. Ins. Co.*, 476 F.2d 1015, 1020 (8th Cir. 1972) (stating that while good faith is the central issue to be decided when determining whether a carrier breached its duty to settle within policy limits, good faith is not relevant to an insurer's wrongful breach of its duty to defend). None of the parties have cited a case which parallels the present case where the insurer entered into the settlement negotiations and subsequently imposed a new condition when had been no condition attached to the two million put in toward settlement and then withdrew all amounts and left the mediation. For the foregoing reasons, the Court declines to dismiss Avera's breach of duty to indemnify claim. If Plaintiffs prove that MMCI breached its duty to settle in good faith, then MMCI is entitled to indemnification under the policy.

## III. Is an insured excused from compliance with the "cooperation," "no voluntary payments," and "no action" clauses when an insurer defends subject to a reservation of rights.

Plaintiffs argue that the South Dakota Supreme Court would also conclude that when an insurer defends subject to a reservation of rights, so long as coverage applies, it is obligated to reimburse an insured for a fair and reasonable settlement entered into in good faith despite an insurer's objection pursuant to a "cooperation" or "no voluntary payments" clause.

### A. *United Services Automobile Association v. Morris*, 741 P.2d 246 (Ariz. 1987)

The case that Plaintiffs urge the Court to follow is *United Servs. Auto. Ass'n v. Morris*, 741 P.2d 246 (Ariz. 1987). In *Morris*, the insureds faced the possibility of a jury verdict greater than $100,000 policy limit, and even if within the limit, one that might not be covered given that the insurer was defending subject to a reservation of rights. *Id.* at 251. The policy provided that "the insured shall not, except at the insured's own cost, voluntarily make any payment, assume any

obligation or incur any expense other than for first aid to others at the time of bodily injury." *Id.* at 249 n.4. The insurer informed the insured that it would consider any settlement by the insured to be a material breach of the policy conditions, thereby releasing the insurer from its duty to indemnify and stated in a letter the following:

> Please be advised that USAA does not agree to either insured (Taylor or Waltz) allowing or in any way encouraging a judgment in any amount to be taken against them by the plaintiff . . . . Whereas we appreciate the advantages accruing to the insureds as a result of such a maneuver, it would deprive USAA of what I consider to be a very substantial probability of obtaining a defense verdict in the tort action.

*Id.* at 248. Despite that, the insured stipulated to a $100,000 judgment to be collected solely from the insurer in exchange for a covenant not to execute their assets. *Id.*

The court in *Morris* analyzed whether an insurer may assert a policy's cooperation clause to prevent insureds who are being defended under a reservation of rights from protecting themselves by settling. The court noted that in defending subject to a reservation of rights, the insured did not breach any of its policy obligations. *Id.* at 251. The court stated that "while [the insurer] did not 'abandon' its insureds by breaching any policy obligation, neither did it accept full responsibility for their liability exposure." *Id.* The court stated further that:

> As a consequence of USAA's reservation of rights, Taylor and Waltz were placed in a precarious position. At trial, they faced the possibility of a jury verdict greater than their $100,000 policy limits or, even if within the limit, one that might not be covered. We therefore agree with Morris that the insureds had the need to act reasonably to protect themselves from "the sharp thrust of personal liability." Naturally, USAA also realized that it was in its insureds' best interest to enter into a *Damron*-type agreement. However, USAA's position was that the cooperation clause gave it a right to force the insureds to reject any settlement, no matter how reasonable, risk trial, and place themselves at danger of a judgment larger than the policy limits or one that might not be covered.
>
> In effect, such an interpretation of the cooperation clause hamstrings the insured while granting the insurer a double bite at escaping liability. Only one trial outcome would be beneficial to both USAA and its insureds: a verdict against the claimant, Morris. If the verdict were in favor of Morris, however, USAA would have another chance at escaping the obligation to indemnify because it would be able to relitigate the intentional act exclusion coverage issue in a declaratory judgment action such as this. In addition, absent bad faith conduct, USAA will never be at risk for more than its $100,000 policy limit. Thus, the insureds risk financial catastrophe if they are held liable, while the insurer may save itself by

litigating both issues—the insured's liability and the coverage defense—and winning either.

*Id.* at 251. The court in *Morris* noted that the majority to courts resolve this type of conflict by permitting an insured to reject a defense offered under a reservation of rights. The insured thus forces the insurer to elect either to defend unconditionally or to refuse to defend at its peril. *Id.* The court noted that such a solution "puts an insurer honestly attempting to perform its duties between a Scylla and Charybdis. The insurer must either give up its right to raise tenable coverage defenses or its right to insist on full application of the cooperation clause." *Id.* at 251-52. The court stated that "[t]he better result would permit the insurer to raise the coverage defense, and also permit an insured to protect himself from the risk of noncoverage or excess judgment, while at the same time protecting the insurer from unreasonable agreements between the claimant and the insured." *Id.* at 252. It concluded that an insured being defended under a reservation of rights may enter into a *Damron* agreement without breaching the cooperation clause so long as the agreement is made fairly with notice to the insurer, and without fraud or collusion on the insurer. *Id.*

The court acknowledged, however, that "[a]n insured's settlement agreement should not be used to obtain coverage that the insured did not purchase" and concluded that the insured may litigate unresolved coverage issues on remand. *Id.* at 253. The court rejected the insurer's argument that the settlement agreement should not binding on USAA because it would have won the liability case at trial. *Id.* The insurer in *Morris* urged an absolute right to relitigate all aspects of the liability case, including liability and amount of damages. *Id.* The court stated that such a position would "destroy the purpose served by allowing insureds to enter into *Damron* agreements because claimants would never settle with insureds if they never could receive any benefit. *Id.* The court recognized however, "that an insured being defended under a reservation might settle for an inflated amount or capitulate to a frivolous case merely to escape exposure or further annoyance." *Id.* (citing to *Miller v. Shugart*, 316 N.W.2d 729, 733 (Minn. 1982)). The court stated that to resolve this concern, "neither the fact nor amount of liability to the claimant is binding on the insurer unless the insured or claimant can show that the settlement was reasonable and prudent." *Id.* The test as to whether the settlement was reasonable and prudent, the court said, "is what a reasonably prudent person in the insureds' position would have settled for on the merits of

the claimant's case." *Id.* at 254. This involves evaluating the facts bearing on the liability and damage aspects of claimant's case, as well as the risks of going to trial." *Id.*

The court in *Morris* held as follows:

> [T]he trial court erred in holding that the mere making of the settlement agreement between Morris and the insureds was a breach of the cooperation clause. Finding themselves in a position of economic peril because the insurer had raised the coverage defense, the insureds had the right to make a reasonable, non-collusive settlement to protect themselves. On remand, the insurer is not bound by any factual stipulations and . . . is free to litigate the facts of the coverage defense. If the insurer wins on the coverage issue, it is not liable for any part of the settlement. If it loses, it may or may not be bound by the amount of the judgment taken by Morris against Taylor and Waltz. Morris will have the burden of showing that the judgment was not fraudulent or collusive and was fair and reasonable under the circumstances. If Morris cannot show that the entire amount of the stipulated judgment was reasonable, he may recover only the portion that he proves was reasonable. If he is unable to prove the reasonableness of any portion of the judgment, USAA will not be bound by the settlement.

*Id.* at 254.

At the outset, this Court notes that the Arizona Supreme Court has concluded that *Morris* does not apply when, as in this case with regards to Avera, an insurer does not have a duty to defend. *Apollo Educ. Group, Inc. v. Nat'l Union Fire Ins.*, 480 P.3d 1225 (Ariz. 2021). In *Apollo*, the directors and officers of Apollo Education Group, Inc. were insured up to $15 million under a directors and officers liability policy. *Id.* at 1227. Under the policy, the insurer had no duty to defend the insured if sued and the policy did not contain a cooperation clause. The policy included a consent-to-settle provisions that stated "[t]he Insureds shall not . . . enter into any settlement agreement . . . without the prior written consent of the Insurer." *Id.* at 1228. That provision also provided that "[o]nly those settlements . . . which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy." *Id.* The provision further stated that "[t]he Insurer's consent shall not be unreasonably withheld." *Id.*

A class action lawsuit was filed against the insured in *Apollo* after its stock dropped 22.9% following a *Wall Street Journal* article detailing an industry practice of backdating stock options for corporation executives and an investigation of the insured by the U.S. Attorney's office, followed by an internal investigation and a public disclosure by the insured that it had used

incorrect dates for accounting purposes and admitting various deficiencies in the process of granting and documenting stock options. *Id.* The district court dismissed the complaint against the insured with prejudice for failure to particularly allege falsity as required by Rule 9(b) of the Federal Rules of Civil Procedure, denied a request for leave to amend and a motion to reconsider. *Id.* The plaintiffs filed an appeal. *Id.* While the appeal was pending, the plaintiffs and the insured entered into mediation which resulted in an agreement to settle for $13,125,000. *Id.* Given costs incurred to that point, the D&O policy was down to $13,500,000 to cover a settlement. *Id.*

The insurer in *Apollo* refused to consent to settlement. *Id.* The insured entered into the settlement agreement, paying the plaintiffs out of pocket. The insured then sued the insurer to recover the settlement amount, alleging both breach of contract and bad faith. *Id.* The district court granted summary judgment to the insurer and the insured appealed. The Ninth Circuit certified the following question to the Arizona Supreme Court: "What is the standard for determining whether National Union unreasonably withheld consent to Apollo's settlement with shareholders in breach of contract under a policy where the insurer has no duty to defend?" The court clarified its question by asking" "Would the federal district court assess the objective reasonableness of the insurer's decision to withhold consent from the perspective of an insurer or an insured?" *Id.* at 1226.

On certification, the Arizona Supreme Court concluded that the test of reasonableness applied by it in *Morris*—whether a reasonably prudent person in the insured's position would have settled for on the merits of the claimant's case—did not apply because unlike in *Morris*, the insurer in *Apollo* did not have a duty to defend. The court stated that:

> Crucially, the central feature giving rise to the Court's departure from the policy language and the exception to the duty to cooperate in *Morris* was based on who had the "advantage of exclusively controlling the litigation." In *Morris*, the insurer possessed that control; here, absent a duty to defend, the insured does.
>
> In a D&O policy like the one here, no reason exists to not enforce the consent-to-settlement provision as plainly written and agreed to by the parties. The danger in *Morris* was leaving the insured at the insurer's mercy; here, the risk is that the insured will use the insurer's coverage to assure it will escape liability that exceeds policy limits. Thus, unlike in *Morris,* where the insured was powerless to avoid a "precarious position," there is no need to protect the insured here from an unfair allocation of risk, such as by implying a duty to accept settlements that are reasonable from the insured's perspective. Rather, as the contract provides, courts must determine whether consent was reasonably withheld.

*Id.* at 1230. The court stated that when the insured controls the litigation, an equal consideration requirement might force an insurer to accept a settlement, controlled entirely by the insured, for the full policy limit, even if the insurer fairly valued the claim at zero or an amount below the policy limit." *Id.* at 1231. The court said that where the insurer lacks control over the litigation and settlement, reasonableness of the settlement must be viewed from the insurer's perspective. *Id.* However, as the dissent observes, the test that the majority adopted was very much like the duty of equal consideration standard.

Judge Gould authored a dissent of the majority's opinion in *Apollo* which was joined by Judge Lopez and which this Court finds to be compelling and more pertinent to this case given the facts of this case. The dissent agreed with the majority that *Morris* did not apply, reasoning that the insured never entered into a *Morris* agreement and as a result, the unique circumstances involved in examining the reasonableness of such an agreement were not present. *Id.* at 1234. Where the dissent diverged from the majority was the standard imposed on an insurer's duty to act reasonably in withholding its consent. *Id.* The dissent stated that instead, the court should have applied the duty of equal consideration standard. *Id.* Thus, if the insurer withheld its consent to the settlement without giving equal consideration to the interests of the insured, the dissent contends that the insurer breached the insurance contract, and the insured was free to enter the settlement agreement without the insured's consent. *Id.* (citing *Safeway Ins. Co. v. Guerrero*, 106 P.3d 1020, 1024 (Ariz. 2005)); *Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme*, 735 P.2d 451, 459 (Ariz. 1987)). The dissent emphasized that the "duty to give equal consideration to offers of settlement exists separate and apart from the duty to defend." *Id.* at 1235 (quoting *Equity Gen. Ins. CO. v. C&A Realty Co.*, 715 P.2d 768, 772 (Ariz. Ct. App. 1985)). The dissent noted that despite the absence of a duty to defend, the insurer did have a great deal of control over the litigation by virtue of its authority to accept or reject any settlement agreement negotiated. *Id.* The court stated that because there is no standard set forth in the policy itself, the insurer was required to give equal consideration to the interests of its insured in deciding whether to consent to the settlement agreement.

The majority criticized the dissent's approach, stating that it ignores the contract language requiring that consent not be unreasonably withheld and displaces the policy terms with the implied covenant of fair dealing. *Id.* at 1230. The majority held that "where there is no duty to

defend, and the contract requires an insured to not unreasonably withhold consent to a settlement proposed by the insured and a third party, [it] will examine whether the insurer's decision to withhold consent to a settlement is reasonable from the insurer's perspective." *Id.*

This Court notes that as in *Apollo*, MMCI did not have a duty to defend Avera and thus the *Morris* standard does not apply to Avera's claims even though MMCI had the authority under the policy to consent to settlement. The Court finds the analysis conducted by the dissent in *Apollo* to be compelling given that absent from Avera's liability policy is any requirement that MMCI's consent not be unreasonably withheld. The South Dakota Supreme Court has stated that "[a] covenant is implied in an insurance contract that neither party will do anything to injure the rights of the other in receiving the benefits of the agreement." *Helmboldt v. LeMars Mut. Ins. Co.*, 404 N.W.2d 55, 57 (S.D. 1987). As the dissent stated in *Apollo*, "one of the benefits that flow from the insurance contract is the insured's expectation that his insurance company will not wrongfully deprive him of the very security for which he bargained or expose him to the catastrophe from which he sought protection." 480 P.3d at 1233 (quoting *Rawlings v. Apodaca*, 726 P.2d 565, 571 (Ariz. 1992)). There is no standard of care explicitly detailed in either Avera's or LCSH's liability policies. Consistent with South Dakota law, the Court concludes that implied in the policies is MMCI's "duty to give equal consideration to the interests of its insured[s] when making a decision to settle a case brought against it by a third party." *See Bertelsen*, 796 N.W.2d at 700. If it is found that MMCI breached this duty of equal consideration, Avera and LCSH are permitted to settle and seek reimbursement under their liability policies.

**B. Miller-Shugart settlements and South Dakota law on reservation of rights**

Plaintiffs primarily give two reasons why the South Dakota Supreme Court would likely conclude that an insured does not forfeit its rights to indemnification under a policy containing "cooperation," "no voluntary payments" and "no action" provisions when settling without the consent of an insurer defending its insured subject to a reservation of rights. First, Plaintiffs note that the South Dakota Supreme Court has approved the use of *Miller-Shugart* settlements which "permit[ ] an insured to settle a claim against it by admitting to a judgment and then assigning its rights under its insurance policy to its judgment creditor." *Western Agricultural Ins. Co. v. Arbab-Azzein*, 940 N.W.2d 865, 867 n.2 (S.D. 2020) (citing *Miller v. Shugart*, 316 N.W.2d 729, 734-35 (Minn. 1982)). The court stated that the settlement, however, it not binding on the insurer unless

the claim was actually covered and the amount of the settlement is reasonable and not the product of fraud or collusion." *Id.*

In *Miller-Shugart*, plaintiff Lynette Miller was injured in an automobile accident when a car owned by Barbara Locoshonas and driven by Mark Shugart in which Miller was a passenger struck a tree. 316 N.W.2d 729, 731-32 (Minn. 1982). Locoshonas had an auto liability policy with Milbank. *Id.* at 732. Milbank, however, contended that Shugart, the driver of the car, was not an agent of the owner and was thus not covered on the policy. *Id.* Milbank Insurance commenced a declaratory judgment action shortly after the accident to determine the coverage question. *Id.* Judgement was entered on the declaratory judgment action adjudging that Milbank's policy afforded coverage to both Locoshonas and Shugart. *Id.* Miller commenced her personal injury action against Locoshonas and Shugart and Milbank appealed the declaratory judgment action. *Id.*

Twice while Milbank's appeal was pending, counsel for Locoshonas and Shugart advised Milbank they were negotiating a settlement with plaintiff's attorney and invited Milbank to participate in the negotiations. *Id.* Milbank refused, stating that it could not do so while the coverage question was unresolved. *Id.* There was no reservation of rights agreement. Milbank provided separate counsel at its expense to represent the insured and the driver. Milbank refused to participate on the basis that the coverage question was unresolved.

Approximately 7 months before the Court of Appeals issued its opinion affirming the trial court's declaratory judgment decision, the plaintiff and the two defendants in *Miller* signed a stipulation for settlement of the plaintiff's claim in which defendants confessed judgment in the amount of $100,000 which was twice the limit of Milbank's policy. *Id.* The stipulated judgment further provided that it could be collected only from proceeds of any applicable insurance with no personal liability to defendants. *Id.* Milbank was advised of the stipulation and judgment on the stipulation was entered. *Id.*

The liability policy with Milbank contained a cooperation clause that is similarly worded to the cooperation clause in Plaintiffs' policies in the present case which provided in pertinent part that "The insured shall cooperate with the company and, upon the company's request, assist in making settlements . . . . The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for the first aid of others at the

time of the accident." *Id.* at 733, n.1. Milbank argued that by entering into the stipulated settlement, the insureds breached the duty under the policy to cooperate and that the indemnity agreement of the policy had thus been voided. *Id.*

In analyzing this issue, the Minnesota Supreme Court acknowledged that Milbank had a right to determine if its policy afforded coverage for the accident claim and that Milbank had not abandoned its insured nor, but seeking a determination of its coverage, had it repudiated its policy obligations. *Id.* The court stated, however, that while Milbank did not abandon its insureds, neither did it accept responsibility for the insureds' liability exposure. *Id.*[5]

Ultimately, the court held that the insureds did not breach their duty to cooperate with the insurer that was contesting coverage by settling directly with the plaintiff. *Id.* at 734. The court reasoned as follows:

> While the defendant insureds have a duty to cooperate with the insurer, they also have a right to protect themselves against plaintiff's claim. The attorneys hired by Milbank to represent them owe their allegiance to their clients, the insureds, to best represent their interests. If, as here, the insureds are offered a settlement that effectively relieves them of any personal liability, at a time when their insurance coverage is in doubt, surely it cannot be said that it is not in their best interest to accept the offer. Nor, do we think can the insurer who is disputing coverage compel the insureds to forego a settlement which is in their best interests.

*Id.* at 733-34.

The court in *Miller Shugart* acknowledged that permitting the insured to make a settlement relieving them of liability places the insurer in a difficult position. *Id.* at 734.

> If the insurer ignores the "invitation" to participate in the settlement negotiations, it may run the risk of being required to pay, even within its policy limits, an inflated judgment. On the other hand, if the insurer decides to participate in the settlement discussions, ordinarily it can hardly do so meaningfully without abandoning its policy defense. Nevertheless, it seems to us, if a risk is to be borne, it is better to have the insurer who makes the decision to contest coverage bear the risk. Of course, the insurer escapes the risk if it should be successful on the coverage issue, and, in that event, it is plaintiff who loses.

*Id.* at 734. The court acknowledged that the "judgment" was not an adjudication on the merits of the underlying claims, but rather reflected the settlement agreement and that "in arriving at the

[5] In the present case there is a claim that the insurer abandoned its insureds, another way to not accept responsibility.

settlement terms, the defendants would have been quite willing to agree to anything as long as plaintiff promised them full immunity." *Id.* at 735. The court stated that to address insurer's concerns that a settlement agreement is not the product of fraud or collusion, in order to bind the insurer to the agreement, the plaintiff must prove that the settlement is reasonable and prudent. *See id.* The test as to whether the settlement is reasonable and prudent is "what a reasonably prudent person in the position of the defendant would have settled for on the merits of plaintiff's claim." *Id.* This invôlves consideration of the facts bearing on the liability and damages aspects of plaintiff's claim, as well as the risks of going to trial. *Id.*

MMIC argues that although the South Dakota Supreme Court has approved of the use *Miller-Shugart* settlements, it has not done so in a situation such as this where the insurer was defending subject to a reservation of rights as is the situation with LCSH but not Avera. There are two cases in which the South Dakota Supreme Court has recognized the validity of *Miller-Shugart* settlements, *Western Agricultural Insurance Co. v. Arbab-Azzein*, 940 N.W.2d 865 (S.D. 2020) and *Western National Mutual Insurance Co. v. TSP, Inc.*, 904 N.W.2d 52 (S.D. 2017), *overruled on other grounds re: attorneys fees*, *Sentell v. Farm Mut. Ins. Co. of Lincoln County*, 956 N.W.2d 826 (S.D. 2021). Neither case mentions whether there was a "cooperation" or "no voluntary payments" clause contained in the insurance policies, but those are commonly present in automobile liability policies. *See id.* at 56 n.1 (citing Abrams, Jerome, *Failure to Allocate? Nobody Pays: Using Miller Shugart Settlements in Cases of Questionable Insurance Coverage*, 4 Wm. Mitchell J.L. & Prac. 2, 5-6 (2010)). As in *Miller Shugart,* both cases involved no reservation of rights but with the insurers bringing declaratory judgment actions to determine coverage. *See Western Ag.*, 940 N.W.2d at 867. ("After Western Ag denied coverage and refused to defend, Arbab-Azzein and Mussa entered into an agreement for a stipulation judgment. . . ."); *Western Nat'l*, 904 N.W.2d at 54 ("BHI forwarded the suit to Western National for defense, which it refused to provide."). In both cases, a declaratory judgment action ultimately determined there was no coverage. The refusal to defend was not a factor in those decisions, but both decisions approved of the *Miller Shugart* agreements.

This Court recognizes that in *Miller Shugart*, the Minnesota Supreme Court concluded that when an insurer is providing separate defense counsel, but with no reservation of rights and with a refusal to participate in settlement discussions, and a declaratory action pending as to coverage,

an insured may settle despite policy provisions requiring an insurer's consent. However, there is no South Dakota case that has considered the validity of *Miller Shugart* agreements when a reservation of rights is present. As stated above, both *Western Ag. Ins. Co. v. Arbab-Azzein*, 940 N.W.2d 865, 867 (S.D. 2020) and *Western Nat'l Mut. Ins. Co. v. TSP, Inc.*, 904 N.W.2d 52 (S.D. 2017) involved an insurer refusing to defend. There was, however, no finding of breaching a duty to defend in *Western Agricultural Insurance v. Arbab-Azzein* nor in *Western National Mutual Insurance Company*. In both cases, the court determined there was no coverage. In *Western National Mutual Insurance Company*, the attorney fees were awarded pursuant to SDCL 58-33-46.1 (later overruled on other grounds by *Sentell v. Farm Mut. Ins. Co. of Lincoln County*, 956 N.W.2d 826 (S.D. 2021)) for breach of statutory insurance obligations, not for breach of duty to defend.

The *Western Agricultural Insurance Company* and *Western National Mutual Insurance Company* cases do permit the Court to determine that South Dakota law would allow Avera to settle the plaintiffs' claims against it but Avera will have to prove that the settlement was reasonable and not the subject of fraud or collusion. As *Western National Mutual* points out in footnote 1, the insured will have to show that the claim was actually covered. In this case, it appears that some of the claims were covered and some were not covered. Those complexities are what cause lawsuits and require a reasoned approach for resolution.

LCSH presents an additional question as there is a reservation of rights agreement that is not in the record. It may be that agreement is a mutual agreement that could alter the above Avera result for LCSH. The Court will not speculate on whether a different result would come about because of a reservation of rights agreement. As will be discussed shortly, if insureds prove bad faith, then this question would make no difference as the insurer would have forfeited its cooperation and no voluntary payments provisions.

The Court acknowledges that a conflict of interest can be created if an insurer is defending subject to a reservation of rights. As stated by the court in *Kansas Bankers Sur. Co. v. Lynass*,

> It is clear how a conflict of interest can develop in a situation like this. Kansas Bankers could conceivably offer only a token defense if it knows that it can later assert non-coverage. If an insurer does not think that the loss on which it is defending will be covered under the policy, the insurer may not be motivated to achieve the best possible settlement or result. Furthermore, the insurer may be

> tempted to devote more effort into the non-coverage issue than into defending its insured.

920 F.2d 546, 549 (8th Cir. 1990) (applying South Dakota law). The South Dakota Supreme Court has held that an insurer does not "have the right without consent of the insured to retain control of the defense and at the same time reserve the right to disclaim liability." *See Connolly v. Standard Casualty Co.*, 73 N.W.2d 119, 122 (S.D. 1955); *Kansas Bankers*, 920 F.2d at 548. In *Kansas Bankers*, the court said that an insurer engages in bad faith conduct if it insists on retaining control of its insured's defense over the insured's objection to the insurer defending subject to a reservation of rights. *Id.* at 549. Avera was in control of its own defense at the time of settlement and there are no allegations in the Amended Complaint that LCSH objected to MMCI's defending it subject to a reservation of rights.

As in *Miller Shugart*, the "no action" clause does not prevent the insureds from entering into the settlement agreement with plaintiffs. *Miller*, fn. 7.

This Court predicts that the South Dakota Supreme Court would hold that an insurer waives its rights under the "cooperation" and "no voluntary payments" clauses if it breaches its recognized duty to settle in good faith. However, the Court does not find under South Dakota law that an insured may settle solely because its insurer defends subject to a reservation of rights. The reservation of rights must be a mutual agreement, not a unilateral decision by the insurer. Defending subject to a reservation of rights agreement is an accepted procedure under South Dakota law and is not considered a breach of an insurer's obligations under a liability policy. *See St. Paul Fire & Marine Ins. Co. v. Engelmann*, 639 N.W.2d 192, 201 (S.D. 2002) (stating that acting under a "reservation of rights" is an established procedure in South Dakota). A reservation of rights agreement that is mutually agreed to by the parties is different from the unilateral provisions in an insurance contract providing for cooperation and no voluntary payment. When the actual agreement is presented, the Court will predict what South Dakota law would hold. But it is not that simple. South Dakota has a substantial body of insurance bad faith law. A reservation of rights agreement cannot give an insurer license to act in bad faith with regard to its insureds. A central question in this case is whether the insurer acted in bad faith with regard to both Avera and LCSH. There are allegations that if proven could support a bad faith determination. If the insureds are found to have acted in bad faith, South Dakota law would hold that an insurer has forfeited its rights under the "cooperation" and "no voluntary payments" clauses. The same is true for

Avera. The Court does not address what happens when an insured refuses to agree to a reservation of rights agreement as the facts do not present that issue.

## IV. Breach of contract claim based on withdrawal of unconditional offer to contribute $2 million to global settlement

MMIC has moved to dismiss Plaintiffs' breach of contract claim on the basis that there exists no contract because there was no consideration for MMIC's promise to contribute $2 million to settlement and on the basis that Plaintiffs suffered no damage from any alleged breach. (Doc. 50 at 569-70). Plaintiffs allege that they relied on MMIC's promise to their detriment and gave consideration for MMIC's enforceable promise by "agreeing to attend the mediation, agreeing to offer the amount remaining under the 2014 self-insured aggregate retention limit of $6 million, agreeing to offer the $2 million promised by MMIC, and agreeing to settle the Sossan Lawsuits at the mediation without any contribution from MMIC." (Doc. 44, ¶ 177).

"Consideration is an essential element of a contract both under common law and by statute in South Dakota." *Central Monitoring Serv., Inc. v. Zakinski*, 553 N.W.2d 513, 516 (S.D. 1996); SDCL § 53-1-2(4). Under South Dakota law, "[a]ny benefit conferred or agreed to be conferred upon the promiser by any other person to which the promiser is not lawfully entitled, or any prejudice suffered or agree to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer as an inducement to the promiser, is a good consideration for a promise." SDCL § 53-6-1. To constitute consideration, a performance or a return promise must be bargained for. *Baker v. Masco Builder Cabinet Group, Inc.*, 912 F.Supp.2d 814, 822 (D.S.D. 2012) (citing Restatement (Second) of Contracts § 71); *Meyer v. S.D. Dept' of Soc. Servs.*, 581 N.W.2d 151, 155 (S.D. 1998) (citing 3 Williston on Contracts *Consideration* § 7.2 (4th ed. 1992) ("Nothing can be treated as consideration . . . that is not intended as such by the parties.")); *Richter v. Indus. Fin. Co.*, 221 N.W.2d 31, 34 (S.D. 1974) ("It is a recognized principle of law that nothing is consideration for a contract that is not accepted or regarded as such by both parties."). A performance or return promise is bargained for it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." *Baker*, 912, F.Supp.2d at 822 (citing Restatement (Second) of Contracts § 71). Whether or not valid consideration existed to support the alleged contract in this case is a question of fact that may not be determined by the Court on a Motion to Dismiss. *See Mittleider v. Dakota, Minnesota, E.R.R.*, Civ. No. 11-4054,

2014 WL 1093812, at *5 (D.S.D. Mar. 19, 2014) (holding that the plaintiff brought forth sufficient facts to show that valid consideration existed to support the alleged contract, and that the defendant bargained for the same).

Whether or not Plaintiffs suffered damages that were "proximately caused [by] . . . or which, in the ordinary course of things, would be likely to result [from]" the breach is also a question of fact that the Court may not address at this stage of the litigation. SDCL § 21-2-1; *Weitzel v. Sioux Valley Heart Partners*, 714 N.W.2d 884, 894 (S.D. 2006).

Accordingly, MMCI's Motion to Dismiss Plaintiffs' breach of contract claim as alleged in Count V of the Amended Complaint is denied.

## V. Promissory Estoppel Claim

Plaintiffs allege that MMIC promised to contribute at least $2 million toward the global settlement of the Sossan Lawsuits with no other conditions attached. (Doc. 44, ¶ 182). Plaintiffs allege that they reasonably relied on MMIC's promise to their detriment by "agreeing to attend the mediation, agreeing to offer the amount remaining under their 2014 self-insured aggregate retention limit of $6 million, agreeing to offer the $2 million promised by MMIC, and agreeing to settle the Sossan Lawsuits at the mediation without any contribution from MMIC." (Doc. 44, ¶ 183).

MMCI argues that Plaintiffs have failed to state a claim for promissory estoppel under *Martz v. Hills Materials*, 857 N.W.2d 413, 417-18 (S.D. 2014) because the Amended Complaint fails to allege a clear promise by MMIC to offer $2 million without requiring a release. (Doc. 50 at 570). In addition, MMCI argues that Plaintiffs fail to allege that that they relied on MMIC's unconditional offer to their detriment. (Doc. 50 at 571). MMIC argues that the Amended Complaint acknowledges that before the settlement was reached, Plaintiffs were well aware that MMIC would not offer the $2 million without a release and that only after learning of MMIC's position, did Plaintiffs settle the cases by themselves. (Doc. 50 at 571).

Promissory estoppel may be invoked where a promisee alters his position to his detriment in the reasonable belief that a promise would be performed. *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 848 (S.D. 1990). To apply the doctrine of promissory estoppel, the trial court must find: 1) the detriment suffered in reliance must be substantial in an economic sense; 2) the loss to the

promisee must have been foreseeable by the promisor; and 3) the promisee must have acted reasonably in justifiable reliance on the promise made. *Id.* Estoppel depends on the facts of each case and ordinarily present a question for the jury. *Id.*

The Court does not find *Martz v. Hills Materials* to be applicable to this case. There, a workers' compensation claimant injured his shoulder during the course of his employment after injuring the same shoulder a couple of years prior while working for a previous employer. *Id.* at 416. While one physician opined that the claimant's original injury was a "major contributing cause" of the claimant's then-existing pain and need for treatment, the claimant's treating physician opined that the claimant's second injury contributed independently to his need for treatment. *Id.* at 416. The claimant's second employer agreed to be responsible for the claimant's 5% impairment rating, for certain identified medical expenses, and for other medical bills that had not been paid and continued to pay for the treatment of the claimant's shoulder for 3 years. *Id.* After that time, his employer's workers' compensation carrier discontinued benefits after an IME performed by a physician retained by the second employer found that the claimant's current condition was related to an original injury he suffered to the same shoulder at his previous place of employment. *Id.* at 416-17.

The claimant brought a claim against his second employer for promissory estoppel in which he alleged that his employer promised to continue to pay his medical bills and that based on that promise, he altered his position to his detriment by allowing the statute of limitations to run on his claim against his first employer. *Id.* at 417. On appeal, the South Dakota Supreme Court held that the claimant did not prove by clear and convincing evidence the insurer's commitment to pay future medical benefits in perpetuity. *Id.* at 418. The court noted that the letters relied upon by the claimant for the alleged promise contained the words of the claimant's attorney, not the insurer. *Id.* The court noted that the letter also referred to then-existing medical bills, not future medical bills. *Id.* at 419. The court concluded that the second employer was not estopped from denying liability for the claimant's condition and need for treatment several years after the injury.

Here, Plaintiffs allege in their Amended Complaint that MMIC agreed to contribute $2 million to a global settlement of the Sossan Lawsuits; and that making the $2 million contribution contingent on Plaintiffs' waiver of their bad faith claims against MMCI was a "new condition;" and that in internal emails, MMIC acknowledged that it gave Plaintiffs $2 million "without

strings." (Doc. 44, ¶¶ 68, 75, 89). The Court is bound to take these allegations as true at this stage. If there are questions regarding the exact nature of the representations made to Plaintiffs and the reasonableness of Plaintiffs' reliance on these representations, these are questions that should be presented to a factfinder. *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 848 (S.D. 1990).

The Court acknowledges that it can be inferred from the facts alleged that Plaintiffs settled the Sossan Lawsuits after having been made aware that the $2 million contribution was contingent upon Plaintiffs' waiver of bad faith claims. However, Plaintiffs allege that after five years of litigation, they entered into the mediation with all 36 individual plaintiffs in reliance upon MMCI's alleged promise to cover $2 million of any global settlement achieved. It is alleged that on the second morning of the 2-day mediation, Plaintiffs were informed for the first time that this $2 million contribution was conditional on Plaintiffs executing a waiver of bad faith claims. Even though Plaintiffs had been informed of this alleged new condition before they ultimately reached a settlement agreement, a reasonable inference can be made that Plaintiffs could not walk away from the mediation at this point without suffering further harm because, as Plaintiffs argue, this mediation represented their best and likely only opportunity to resolve all of the cases at one time prior to trial. (Doc. 52 at 731). Plaintiffs allege that because they were unwilling to waive their bad faith claims, they ultimately had to pay the entire settlement amount without any contribution from MMCI. Based on these facts, the Court finds that a reasonable inference can be made that Plaintiffs relied on MMIC's unconditional offer to their detriment. Accordingly, Plaintiffs have stated a claim for promissory estoppel.

## VI. Deceit Claim

Under South Dakota law, "one who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." SDCL § 20-10-1. Acts constituting deceit within the meaning of § 20-10-1 are either:

> (1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
> (2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;
> (3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or
> (4) A promise made without any intention of performing.

SDCL § 20-10-2.

In support of Plaintiffs' deceit claim, Plaintiffs allege that MMIC suppressed the fact that it would not be contributing funds to a settlement of the Sossan Lawsuits beyond the $2 million in "seed money" to get the negotiations started despite being duty bound to disclose that fact is liable for deceit under SDCL § 20-10-2(3). Plaintiffs allege further that in characterizing its contribution as "seed money" to get the negotiations started, MMIC was likely to mislead Plaintiffs into believing that MMIC would be starting its contribution at $2 million and moving up from there to work toward a settlement of the Sossan Lawsuits. (Doc. 44, ¶¶ 200, 202). Plaintiffs also allege that MMIC suppressed the fact that the $2 million it promised to contribute would be conditioned upon Plaintiffs' waiver of all bad faith claims against MMIC despite being duty bound to disclose that fact and alleges that MMIC is thus liable for deceit under SDCL § 20-10-2(3). (Doc. 44, ¶ 201). Plaintiffs allege that MMCI had no intention of contributing more than $2 million nor to contributing $2 million to a global settlement without obtaining a waiver from Plaintiffs and is thus liable for deceit under SDCL § 20-10(4). It also could be that MMCI changed its position internally, and that it only came up with the waiver of bad faith claims idea at the time of the mediation and it could also be that until that time, MMIC was open to paying more than $2 million in settlement. But Plaintiffs' claims on those possibilities must be accepted for the purpose of this Motion to Dismiss. The actual facts will be determined by a jury.

As discussed above, as an excess insurer for Avera, MMCI had no duty to settle or contribute to settlement until it was made aware that Avera had tendered its policy limits. Therefore, any allegations that MMCI was duty bound to disclose whether or not it would be contributing in excess of $2 million may not serve as the basis for Plaintiffs' deceit claim. That being said, as this Court has already discussed, an excess insurer's control over settlement creates a fiduciary-like relationship to its insured and the Court concludes that even though MMCI did not have a duty to contribute to settlement prior to Avera tendering its policy limits, MMCI did in fact, agree to pay $2 million towards a global settlement and it is alleged that Plaintiffs relied on this promise in entering the mediation. The Court concludes that based on the special relationship that existed between Plaintiffs and MMCI, MMCI had a duty to disclose prior to mediation that its $2 million settlement contribution was contingent on Plaintiffs (MMCI's insureds) waiving their bad faith claims. *See Taggart v. Ford Motor Credit Co.*, 462 N.W.2d 493, 499 (S.D. 1990) ("Cases

where this court has found a duty to disclose have all involved an employment or fiduciary relationship."). In order to prove a claim of deceit, Plaintiffs must allege:

(1) MMCI had a duty to disclose a material fact to Plaintiffs;
(2) MMCI willfully concealed a material fact or willfully gave information of other facts which were likely to mislead because of Plaintiffs' failure to communicate the material fact;
(3) MMCI acted with intent to induce Plaintiffs to alter their position to their injury or risk;
(4) The undisclosed information was something Plaintiffs could not discover by acting with reasonable care;
(5) Plaintiffs relied on the lack of information to their detriment; and
(6) Plaintiffs suffered damage as a result.

*Dziadek v. Charter Oak Fire Ins. Co.*, 213 F.Supp.3d 1150, 1161 (D.S.D. Sept. 30, 2016) (citing SDCL §§ 20-10-1 to 20-10-2); South Dakota Pattern Jury Instructions: Civil 20-110-25. Under South Dakota law, questions of deceit are generally questions of fact to be determined by the jury. *Sporleder v. Van Liere*, 569 N.W.2d 8, 11 (S.D. 1997). Based on the facts alleged: 1) that MMCI's $2 million contribution was always going to be contingent on a waiver even though it is alleged that MMIC never disclosed this fact; 2) that Plaintiffs relied on their lack of knowledge of the contingency of MMIC's offer in entering into settlement negotiations; and 3) that Plaintiffs ultimately paid the $2 million in the global settlement that they believed would be covered by MMCI's contribution because they refused the comply with the new condition to performance, the Court concludes that Plaintiffs have stated a claim for deceit under SDCL § 20-10-2(3). Additionally, the Court notes that these allegations state a cause of action under SDCL § 20-10-2(4)—that MMCI made a promise (a non-conditional offer to contribute $2 million to a global settlement) without any intention of ever performing.

## VII. Piercing Corporate Veil

In their Amended Complaint, Plaintiffs have named MMCI's parent corporation, Constellation Inc., as a Defendant in this matter. Defendants have moved to dismiss the claims against Constellation, arguing that Plaintiffs' allegations do not state a claim for piercing the corporate veil. (Doc. 50 at 573-74). Under South Dakota law, the corporate veil may only be pierced if two elements are met:

(1) the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former; and

(2) adherence to the rule of corporate separateness would produce injustices and inequities.

*Glanzer v. St. Joseph Indian Sch.*, 438 N.W.2d 204, 207 (S.D. 1989). Defendants argue that Plaintiffs' allegations are insufficient to satisfy the second *Ganzer* requirement—that adherence to the rule of corporate separateness would produce injustices and inequities. (Doc. 53 at 791).[6]

The court in *Glanzer* stated that the "second leg of the instrumentality exception is established where the wrong alleged is a result of fraudulent, unjust or illegal acts." *Id.* The Court finds informative Judge Schreier's opinion in *Burke v. Ability Ins. Co.*, 926 F.Supp.2d 1056 (D.S.D. 2013). There, the court held that plaintiffs had established a prima facie case of personal jurisdiction based on piercing the corporate veil or alter ego. The court stated that:

> There is evidence to suggest that all entities were potentially engaging in unjust conduct through their handling of the claimant's or Hermsen's policies. If those defendants were involved in the alleged fault or harm caused against Hermsen and the noncontracting defendants were dismissed or liability could not be apportioned to them, then an injustice or inequity could result. Although fault must first be established by a jury, the jury should be allowed to apportion fault as it sees fit to prevent injustice and to properly distribute liability. *See Kansas Gas & Elec. Co. v.* Ross, 521 N.W.2d 107, 112 (S.D. 1994) (asking whether "adherence to the fiction of separate corporate existence [would] sanction fraud, promote injustice or inequitable consequences or lead to an evasion of legal obligations.").

*Id.* at 1065.

In Plaintiffs' claim for deceit, they allege that Nick Ghiselli, Chief Legal Officer for Constellation made the unconditional offer to contribute $2 million to a global settlement. (Doc. 44, ¶¶ 20, 191). It is alleged that in a September 27, 2019, letter, MMIC admitted through its coverage counsel Mark Malloy, that "a mutual release was always going to be a contingency of any MMIC contribution toward settlement." (Doc. 44, ¶ 99). Plaintiffs also allege that MMIC, through Giselli, suppressed the fact that MMIC promised to contribute $2 million unconditionally toward a global settlement without any intention of performing in violation of SDCL § 20-10-2(4). (Doc. 44, ¶¶ 201-05).

[6] Defendants do not argue that Plaintiffs' allegations do not satisfy the first prong of the *Glanzer* test.

Based on the direct involvement of Ghiselli, an officer of Constellation, in the alleged deceit and bad faith conduct, the Court will, at this stage, allow Plaintiffs' claims to proceed against Constellation. Further discovery may show that Constellation's involvement in the alleged unjust conduct is insufficient to warrant piercing the corporate veil and the Court reserves the right to revisit this issue. However, further discovery may also show that Constellation's involvement was even greater than that alleged. The Court notes as an aside that in the emails attached to the Declaration of Laura Hansen in her Motion to Dismiss show that President and Chief Executive Officer of Constellation, Inc., William J. McDonough, was kept abreast of the developments in the litigation and settlement of the Sossan Lawsuits and had approved of Ghiselli's letter to Avera affirming MMIC's commitment to contribute $2 million to a global resolution of the Sossan Lawsuits. (Doc. 51-4 at 618-19).

Accordingly, it is hereby ORDERED that Defendants' Motion to Dismiss (Doc. 49) is GRANTED IN PART and DENIED IN PART as follows:

1) GRANTED as to Avera's claim for breach of duty to defend;
2) DENIED as to LCSH's claim for breach of duty to defend;
3) DENIED as to Avera and LCSH's claims for bad faith;
4) DENIED as to Avera and LCSH's claims for breach of duty to indemnify;
5) DENIED as to Avera and LCSH's Count V breach of contract claim;
6) DENIED as to Avera and LCSH's claims for promissory estoppel;
7) DENIED as to Avera and LCSH's claim for deceit; and
8) DENEID as to Avera and LCSH"s claim for piercing the corporate veil.

Dated this 24th day of November, 2021.

BY THE COURT:

[signature]

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

[signature]