UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| SACRED HEART HEALTH SERVICES d/b/a AVERA SACRED HEART HOSPITAL, AVERA HEALTH and LEWIS & CLARK SPECIALTY HOSPITAL, LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> MMIC INSURANCE, INC. d/b/a MMIC AGENCY, INC. and CONSTELLATION, INC. f/k/a MMIC GROUP, INC., <br><br> Defendants. | **4:20-CV-4149-LLP** <br><br> **MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Pending before the Court is Defendants' Motion for Summary Judgment. (Doc. 77). For the following reasons, Defendants' Motion it granted in part and denied in part.

**BACKGROUND**

**I.      The Insureds**

Avera Health is a regional health care system based in Sioux Falls, South Dakota. (Docs. 82, ¶ 1; 89, ¶ 1). Avera owns and operates Avera Sacred Heart Hospital in Yankton, South Dakota (collectively, "Avera"). (Docs. 82, ¶ 1; 89, ¶ 1). Lewis & Clark Specialty Hospital ("LCSH") was a specialty hospital and surgery center owned by physicians operating in Yankton, South Dakota. (Docs. 82, ¶ 1, 89, ¶ 1).

**II.      The MMIC Policies**

MMIC Insurance, Inc. issued two separate policies to Avera and LCSH. (Docs. 82, ¶ 3; 89, ¶ 3; 104, ¶ 3). To LCSH, it issued a combined Healthcare System Umbrella/Excess Liability Policy and Healthcare System Liability Protection Policy, No. MHP000220, which was in effect from April 1, 2013, through April 1, 2014. (Docs. 82, ¶ 3; 92, ¶ 3). LCSH had a total of $5 million in available coverage under its medical professional liability policy purchased from MMIC[1].

---

[1] LCSH's policy was subject to a primary coverage limit of $1 million per claim and $3 million in aggregate limit and an additional $2 million per claim in aggregate excess limit. (Docs. 82, ¶ 4; 89, ¶ 4).

(Docs. 90, ¶ 5; 102, ¶ 5).  LCSH Policy's primary coverage contains the following coverage grant with respect to medical professional liability:

> MMIC agrees to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages . . . arising out of the performance of medical professional services . . . .
>
> MMIC shall have the right and duty to defend any suit against the insured alleging such damages, even if any of the allegations of the suit are groundless, false, or fraudulent, and may make such investigation or such settlement of any claim or suit at it's sole discretion, but MMIC shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of MMIC's liability hereunder has been exhausted by payment of judgments or settlements.

(Doc. 82, ¶ 5; 89, ¶ 5).  The Policy also includes a prohibition against "voluntary payments" by LCSH, and a "no action" clause that prohibits suits against MMIC unless there is a final judgment or a settlement with MMIC's consent.  (Doc. 82, ¶ 6; 89, ¶ 6).  The LSCH excess coverage follows form to the primary coverage.  (Docs. 82, ¶ 7; 89, ¶ 7).

To Avera, MMIC issued a combined Healthcare System Umbrella/Excess Liability and Healthcare System Liability Protection (Excess of Self Insured Retention) Policy, No. SIR000002, which was in effect from January 1, 2014 through January 1, 2015.  (Doc. 82, ¶ 8; 89, ¶ 8; 104, ¶ 8).  Avera had a total of $10 million in available coverage under its MMIC policy after the limits of its $6 million self-insured retention policy were exhausted.  (Docs. 90, ¶ 4; 102, ¶ 4).  The Avera Policy contains the following coverage grant with respect to primary medical professional liability:

> MMIC agrees to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages . . . arising out of the performance of medical professional services . . .
>
> MMIC shall have the right but not the duty to defend, or associate in the defense and control of any covered claim or suit made or brought against the Insured that is likely to involve MMIC.  However, MMIC shall have no duty to defend any claim or suit or perform other acts or services in connection with any claim or suit.  MMIC shall have the right to investigate any covered claim or suit to the extent that MMIC believes is proper.  MMIC shall also have the right to settle any claim or suit covered under this Policy within the available limits of liability.

(Docs. 82, ¶ 12; 89, ¶ 12).  The self-insured retention sections of the Avera primary coverage provide that MMIC has a right, but not a duty to defend unless and until the self-insured retention is exhausted.  (Doc. 82, ¶ 13; 89, ¶ 13).  Under the policy, MMIC also has the right to settle

claims, but Avera must also consent to any settlement. (Docs. 82, ¶ 14; 89, ¶ 14). Like the LCSH Policy, the Avera Policy includes a prohibition on "voluntary payments" by Avera and a "no action" clause that prohibits suits against MMIC unless there is a final judgment or a settlement with MMIC's consent. (Docs. 82, ¶ 15; 89, ¶ 15). The Excess Medical Professional Liability coverage in the Avera Policy requires MMIC to defend Avera once the underlying self-insured retention and primary coverage limits are exhausted. (Docs. 82, ¶ 16; 89, ¶ 16). The Avera excess coverage includes substantively the same provisions as the primary coverage with respect to actions against MMIC and "voluntary payments" by the insured. (Docs. 82, ¶ 17; 89, ¶ 17).

Both the LCSH and the Avera policies includes the following definitions:

"Medical professional services" means only the following:

. . .

(e) evaluating, or responding to an evaluation of, the professional qualifications or performance of any provider of health care professional services, when done by or for any of the insured's formal review boards or committees;

(f) communicating, or failing to communicate, any information to any of the insured's formal review boards or committees; or

(g) carrying out, or failing to carry out, any decision or directive of any of the insured's formal review boards or committees.

"Formal Review Board or Committee" means any formal review board or committee of the named insured while performing the following activities:

(a) evaluating the professional qualifications or clinical performance of any provider of medical professional services; or

(b) promoting and maintaining the quality of medical professional services being provided

(Docs. 82, ¶ 18; 89, ¶ 18). Both policies excluded "any willful, fraudulent, dishonest, criminal or malicious act or omission, by or with the knowledge or consent of, or at the direction of, any insured. (Docs. 82, ¶ 19; 89, ¶ 19).

Under the Avera Policy, Avera is responsible for the first $6 million in aggregate coverage, then MMIC's policy provides $10 million in coverage excess of the $6 million. (Docs. 82, ¶ 20;

3

89, ¶ 20).  Avera also purchased an excess policy from Allied World Insurance that provided another $25 million in coverage above the MMIC layer.  (Docs. 82, ¶ 21; 89, ¶ 21).

The individual physicians sued by the Sossan plaintiffs, who were members of LCSH, had a total of $25 million under their individual policies purchased from MMIC that MMIC had informed LCSH would be available on an excess basis for the claims in the Sossan lawsuits.  (Docs. 90, ¶ 6; 102, ¶ 6).  The limits of coverage for the physicians individually insured by MMIC were as follows: Dr. Johnson - $12 million; Dr. Abbott - $4 million; Dr. Boudreau - $3 million; Dr. Hicks - $3 million; Dr. Swift - $3 million.  (Docs. 90, ¶ 7; 102, ¶ 7).

### III.    The Underlying Litigation against Avera and LCSH

Beginning in 2014, former patients of spine surgeon Dr. Allen Sossan filed lawsuits ("the underlying lawsuits") against Sossan, Avera, LCSH, and individual doctors in South Dakota state circuit court alleging negligent and intentional conduct in the credentialing, retention, and supervision of Sossan.  (Docs. 82, ¶ 22; 89, ¶ 22; 90, ¶ 1; 102, ¶ 1).  MMIC did not insure Dr. Sossan.  (Docs. 82, ¶ 23; 89, ¶ 23).  The underlying lawsuits alleged that Dr. Sossan performed unnecessary or inappropriate surgeries on the underlying plaintiffs.  (Docs. 82, ¶ 25; 89, ¶ 25). They alleged that Avera and LCSH knew or should have known of Dr. Sossan's conduct but continued to allow him to perform the surgeries.  (Docs. 82, ¶ 26; 89, ¶ 26).  The Sossan plaintiffs brought the following causes of action: Deceit and Unfair Trade Practices, Fraudulent Misrepresentation, Fraudulent Concealment, Respondeat Superior/Agency, Conspiracy, RICO (later dismissed), Negligence, Unjust Enrichment, and Loss of Consortium.  (Docs. 82, ¶ 27; 89, ¶ 27).

MMIC acknowledged that the lawsuits' negligence claims potentially implicated coverage under the Avera and LCSH Policies.  (Docs. 82, ¶ 28; 89, ¶ 28).  MMIC issued to LCSH a reservation of rights letter agreeing to defend LCSH under is Medical Professional Liability policy, but advising LCSH that "not all of the damages that may be awarded against LCSH are covered under the policy." (Docs. 78-6; 82, ¶ 30; 89, ¶ 30).  The letter informed LCSH that the "MMIC policy does not cover damages awarded against [LCSH] based on a finding of intentional, dishonest, or fraudulent conduct. The policy does not provide coverage for any punitive damages, declaratory relief, or injunctive relief.  Allegations of negligent credentialing are covered to the extent the credentialing was done by a committee at Lewis & Clark." (Doc. 78-6).  In an updated

reservation of rights letter issued on August 1, 2017, to LCSH, MMIC provided that any damages awarded against the hospital for unjust enrichment or other ill-gotten gains do not qualify as "damages" and are not covered under the policy. (Doc. 78-7). The letter provided that the exclusions for "any willful, fraudulent, dishonest, criminal or malicious act or omission, by or with the knowledge or consent of, or at the direction of, any insured," "preclude coverage for all of Plaintiffs' claims except for the negligence claim." (Doc. 78-7).

MMIC chose not to defend Avera because the self-insured retention had not yet been exhausted. (Docs. 82, ¶ 31; 89, ¶ 31). On November 19, 2018, MMIC issued a reservation of rights letter to Chris Specht at Avera. (Doc. 84-4). Therein, MMIC stated that "it is questionable whether there is an initial grant of coverage . . . because some of the claims may not arise out of 'medical professional services' as that term is defined by the policy." (Doc. 84-4 at 2527). MMIC explained that there is a question whether the offending acts which form the basis for those claims were performed by a 'formal review board' as required by the policy in order to constitute "medical professional services." (Doc. 84-4 at 2533). Given the allegations in the complaints and the intentional tort claims, MMIC also informed the insureds the policy would not provide coverage for any "willful, fraudulent, dishonest, criminal or malicious act or omission, by or with the knowledge or consent of, or at the direction of, any insured." (Docs. 82, ¶ 33; 89, ¶ 33). Specifically, MMIC provided that "it is questionable whether claims asserted against the Avera Defendants are barred by exclusion (d), which precludes coverage for any willful, fraudulent, dishonest or malicious act done at the direction of any insured." (Doc. 84-4 at 2527). MMIC provided that "six of the eight causes of action asserted against the Avera Defendants—deceit and unfair trade practices, fraudulent misrepresentation, fraudulent concealment, conspiracy, RICO violations, unjust enrichment, and bad faith review—require conduct barred by that exclusion. Moreover, if Plaintiffs prove (as alleged) that the extension of privileges to Sossan and/or the allowance of performance of unnecessary surgery was a knowing and direct result of an intentional scheme to increase profit, then said claims may be barred by exclusion d." (Doc. 84-4 at 2534). MMIC provided that "there is a question as to whether some or all of the claims asserted by Plaintiffs seek 'damages' as the term is defined by the MMIC policy. . . ." (Doc. 84-4 at 2533). MMIC provided that some of the claims asserted by plaintiffs "do not seek 'amounts of money . . . . payable for loss because of injury' as required by the policy." (Doc. 84-4 at 2533). MMIC

provided that claims for punitive damages are not covered by the MMIC policy.  (Doc. 84-4 at 2534).

The cases were assigned to Circuit Court Judge Bruce Anderson.  (Docs. 82, ¶ 29; 89, ¶ 29)[2].  MMIC retained attorneys John Gray and Jeff Wright to represent LCSH and the doctors in the Sossan cases in which they were defendants.  (Docs. 90, ¶ 15; 102, ¶ 15).  MMIC retained attorney Mark Haigh to represent Dr. Swift in the Sossan cases in which he was a defendant. (Docs. 90, ¶ 16; 102, ¶ 16).  Avera retained attorneys Roger Sudbeck and Matt Murphy to represent it in the Sossan cases in which it was a defendant before Avera's self-retention amount in its SIR policy with MMIC was exhausted.  (Docs. 90, ¶ 18; 102, ¶ 18).  Dr. Swift personally hired attorney Clint Sargent to represent his individual interests regarding the Sossan lawsuits.  (Docs. 90, ¶ 19; 102, ¶ 90).  Dr. Abbott, Dr. Boudreau, and Dr. Hicks personally hired attorneys Mike Marlow and Sheila Woodward to represent their individual interests regarding the Sossan lawsuits.  (Docs. 90, ¶ 20; 102, ¶ 20).   Dr. Trail was represented by attorney Greg Bernard and attorney Reed Rasmussen.  (Docs. 90, ¶ 21; 102, ¶ 21).  There was a common defense agreement between Avera, LCSH, and the individually insured physicians named in the 36 Sossan lawsuits.  (Docs. 90, ¶ 22; 102, ¶ 22).  Mark Malloy, an attorney in Wisconsin, was MMIC's outside counsel on the issue of insurance coverage for the 36 Sossan lawsuits under the MMIC policies purchased by Avera, LCSH, and the individually insured physicians.  (Docs. 90, ¶ 23; 102, ¶ 23).

In 2015, Avera and LCSH moved for summary judgment based on the statute of limitations in the underlying cases.  (Docs. 82, ¶ 35; 89, ¶ 35).  On November 10, 2015, Judge Anderson denied the motions.  (Docs. 82; ¶ 36; 89, ¶ 36; 90, ¶ 26; 102, ¶ 26; 79-3).  Defendants, citing to *Bruske v. Hille*, 567 N.W.2d 872, 876-77 (S.D. 1997), had argued that under the "Nebraska Rule," the two-year medical malpractice statute of limitations barred plaintiff's claims.  (Doc. 79-3, ¶¶ 2, 10).  Judge Anderson rejected this argument, finding that in *Masloskie v. Century 21 Am. Real Estate, Inc.*, 818 N.W.2d 798 (S.D. 2012), the South Dakota Supreme Court concluded that the "Nebraska Rule" is inapplicable in South Dakota "because the foundation for that rule is not followed in South Dakota."  (Doc. 79-3, ¶ 5).  The reason for this, Judge Anderson stated, is because "'Nebraska declines to give separate consideration to allegations of misrepresentation and

---

[2] Three cases were in this Court and they were dismissed on jurisdictional grounds and then brought before Judge Anderson.

negligence, or to the different aspects of professional relationship.' On the other hand, South Dakota 'separately considers allegations of negligence and fraud, as well as the different aspects of the professional relationship to determine the gravamen of the cause of action.'" (Doc. 79-3, ¶ 6) (quoting *Masloskie*, 818 N.W.2d 798). Judge Anderson stated that South Dakota "recognizes that the same transaction [may give] rise to two causes of action having different statutes of limitations." (Doc. 79-3, ¶ 7). The court stated that "[w]hen one of two statutes of limitations may be applicable, such application should always be tested by the nature of the allegations in the complaint, and if there is any doubt as to which statute applies, such doubt [shall] be resolved in favor of the longer limitations period." (Doc. 79-3, ¶ 8) (quoting *Masloskie*). The court stated that "[w]here two causes of action are 'inextricably intertwined,' South Dakota courts apply the longer statute of limitations even where one of the causes of action is malpractice." (Doc. 79-3, ¶ 9) (quoting *Masloskie*).

Judge Anderson found that the gravamen of the causes of action was fraud, that the longer 6-year statute of limitations applied, and that the underlying plaintiff's claims were timely. (Doc. 79-3). The court found that even if the 2-year medical malpractice statute of limitations applied, there was evidence that the hospital defendants knowingly concealed material facts that constitute plaintiffs' causes of action, such as to toll the statute of limitations. (Doc. 79-3, ¶¶ 20-23) ("Fraudulent concealment tolls the statute of limitations until the claim is discovered or might have been discovered with reasonable diligence."). Additionally, Judge Anderson found that a fiduciary relationship existed between the plaintiffs and the defendants and that there was a dispute of material fact regarding whether defendants, as fiduciaries, knowingly remained silent and failed to disclose those facts despite a duty to do so. (Doc. 79-3, ¶¶ 14, 25).

During discovery, a dispute arose over the underlying plaintiffs' right to discover peer-reviewed information regarding Dr. Sossan's credentialing (the *Novotny* case). (Docs. 82, ¶ 37; 89, ¶ 37). After the circuit court ruled, the defendants appealed that ruling on an interlocutory basis to the South Dakota Supreme Court. (Docs. 82, ¶ 38; 89, ¶ 38). The underlying litigation was stayed during the pendency of the appeal. (Docs. 82, ¶ 39; 89, ¶ 39).

## IV.    The *Pitt-Hart* Decision

On April 13, 2016, while the underlying lawsuits were stayed, the South Dakota Supreme Court issued its decision in *Pitt-Hart v. Sanford USD Med. Ctr.*, 878 N.W.2d 406 (S.D. 2016). (Doc. 82, ¶ 40; 89, ¶ 40; 90, ¶ 27; 102, ¶ 27). In *Pitt-Hart*, the Supreme Court held that South Dakota imposes a two-year statute of repose on "[a]n action against a . . . hospital . . . for malpractice, error, mistake, or failure to cure, whether based upon contract or tort." (Docs. 82, ¶ 41; 89, ¶ 41). The court clarified that SDCL 15-2-14.1 is a statute of repose rather than limitation. (Docs. 82, ¶ 42; 89, ¶ 42). Accordingly, the two-year period expressed in SDCL 15-2-14.1 begins to run "from the date of the last culpable act or omission of the defendant." 878 N.W.2d at 413. The court also stated that unlike a statute of limitations, "a repose period is fixed and its expiration will not be delayed by estoppel or tolling." (Docs. 82, ¶ 43; 89, ¶¶ 43). The court provided, however, that if the tort is continuing, and "the cumulative result of continued negligence is the cause of the injury, the statute of repose cannot start to run until the last date of negligent treatment." (Docs. 82, ¶ 43; 89, ¶¶ 43, 47; 104, ¶ 47; 878 N.W.2d at 415).

Immediately after the *Pitt-Hart* decision came out, attorneys for Avera and LCSH, including the attorneys retained by MMIC, discussed that decision and its potential effect on the Sossan litigation among each other and with MMIC and its representatives. (Docs. 90, ¶ 29; 102, ¶ 29). In general, defense counsel communicated amongst themselves that *Pitt-Hart* was favorable to their case and would potentially serve as a defense to the negligent credentialing claims. (Docs. 79-5; 74-18; 79-9; 79-10). Matt Murphy, counsel for Avera admitted, however, that *Pitt-Hart* did not change the gravamen analysis conducted by Judge Anderson, but did provide support to an argument that "a plaintiff cannot call malpractice other things to simply get around the statute of limitations." (Doc. 79-5 at 1435). Mr. Murphy proposed to attorney Ed Evans that they draft a renewed motion for summary judgment when the cases (which had been up on interlocutory appeal with the South Dakota Supreme Court) were remanded. (Docs. 82, ¶ 51; 89, ¶ 51). Mr. Murphy proceeded to draft a motion for summary judgment in October 2016. (Docs. 82, ¶ 54; 89, ¶ 54).

## V.     Asset purchase agreement

In March 2017, Avera entered into an asset purchase agreement to acquire all of the assets of LCSH and required that Avera indemnify LCSH and its doctors for their liability arising out of the Sossan litigation other than that arising out of fraud or illegal conduct. (Docs. 82, ¶ 59; 89, ¶ 59; 104, ¶ 59; 90, ¶ 32; 102, ¶ 32). The indemnification clause provided that "Buyer shall be

responsible for, and indemnify and hold harmless the Seller and its members and agents, for present and future litigation pertaining to Sossan, except to the extent Seller or Sellers are found liable for their fraudulent or illegal conduct." (Docs. 80-5; 82, ¶ 59; 89, ¶ 59;).  MMIC had knowledge of Avera's indemnification obligation before the mediation was held on September 5 and 6, 2019. (Doc. 80-11 at 1852; 83-6 at 2244).

## VI.     Peer Review Issue is Addressed by South Dakota Supreme Court and Discovery in the Cases Continues Thereafter

On October 26, 2016, the South Dakota Supreme Court issued its decision *Novotny v. Sacred Heart Health Servs.*, 887 N.W.2d 83 (S.D. 2016) and the case was remanded. (Doc. 82, 65; 89, 65). Thereafter, counsel for the defendants determined that all underlying plaintiffs should be deposed before a renewed motion for summary judgment on the statute of repose is filed. (Doc. 82, ¶ 65; 89, ¶ 65). Matt Murphy, counsel for Avera testified that the biggest reason for taking the underlying plaintiffs' depositions was to "develop the record because a bad record full of all the salacious allegations that were present risked undermining *Pitt-Hart* and not having a favorable outcome for the clients on all the claims being pled." (Docs. 82; ¶ 66; 89, ¶ 66; 79-14, Murphy Dep. 100:4-20).

In 2018, Avera, LCSH, and MMIC decided to conduct an initial expert review on Sossan's care on each case. (Docs. 82, ¶ 67; 89, ¶ 67; 79-15, Sudbeck Dep. 124:10-125:7). The initial review was made by a non-testifying expert who was largely critical of the care provided by Sossan. The expert found that 24 of the 36 cases were not defensible on the medicine. (Docs. 82, ¶ 68; 89, ¶ 68; 79-20).  By the Spring of 2019, all the underlying plaintiffs had been deposed. (Doc. 79-21 at 1780). Jeff Wright testified that "for the most part, the fact discovery had been done." (Docs. 82, ¶ 74; 89, ¶ 74; 104; ¶ 74; 79-17, Wright Dep. 86:14-87:7). Wright testified that plaintiffs' counsel had started on a course of deposing everyone he can find that has a negative thing to say about Sossan, with specific focus on any testimony linking these negative views to the physicians in the Yankton community. (Docs. 79-21 at 1780).  Representatives of Avera and LCSH had not yet been deposed, nor had the doctor defendants in the underlying lawsuits. (Docs, 82, ¶ 70; 89, ¶ 70; 104, ¶ 70; Wright Dep. 86:14-87:7). Motions in the Circuit Court related to use of peer review material were pending. (Docs. 81, ¶ 71; 89, ¶ 71).  No scheduling orders had been issued. (Docs. 82, ¶ 72; 89, ¶ 72). Expert witness disclosures had been made on the care provided

by Dr. Sossan in one case only. (Docs. 82, ¶ 73; 89, ¶ 73). In a July 6, 2018, memo to Dawn Domsten, Roger Sudbeck, counsel for Avera stated that:

> In the future, we anticipate renewing our motion for summary judgment based upon the statute of limitations, however, at this juncture we feel that filing a renewed motion for summary judgment would be premature as Plaintiff's counsel will argue that they have not had an opportunity to complete discovery. We believe that Judge Gienapp and Judge Anderson will allow them to complete the discovery that they claim is necessary before entertaining a renewed motion for summary judgment. Again, based upon the rulings of Judge Anderson to date, we do not believe that we will be successful in obtaining summary judgment based upon the medical malpractice statute of limitations. Assuming we will lose a renewed motion in front of Judge Anderson, we would have to request an intermediate appeal to the South Dakota Supreme Court. This would be a discretionary appeal by the Supreme Court as the denial of a motion for summary judgment is not a final appealable order. Typically, the Supreme Court does not accept denials of summary judgment on intermediate appeal, however, given the overwhelming number of cases and the profound expenses and public policy issues that will be associated with allowing these cases to proceed, we think there is at least a reasonable chance that the South Dakota Supreme Court would entertain allowing an intermediate appeal.

(Docs. 82, ¶ 55; 89, ¶ 55; 79-7).

## VII.    MMIC sets reserves for the Sossan lawsuits

In December 2018, MMIC set a loss reserve of $3 million for LCSH and the individual doctor defendants on the underlying lawsuits. (Docs. 90, ¶ 38; 102, ¶ 38). Tim Schultz, then VP of Claims with MMIC, testified that he had initially suggested that reserves be set at $4-5 million, but after speaking with Shelly Davis, they decided to set reserves at $3 million. (Doc. 80-23, Schultz Dep. 99:16-101:12; 106:2-11). Mr. Schultz testified that factors MMIC considered in establishing loss reserves were verdict potential, potential chance to succeed at trial, liability, damages and any other factors that might be important. (Doc. 80-23, Schultz Dep. 99:9-15). Bill McDonough, CEO of MMIC, testified that reserves reflect what is the likely outcome of cases. (Doc. 85-11, McDonough Dep. 86:1-24). Dawn Domsten, MMIC claims representative for Avera, testified that "reserves are a reflection of what MMIC believes may happen at trial based upon its experience and evaluation of the case in looking at a potential verdict range or probable verdict range for that matter." (Doc. 101-2, Domsten Dep. 98:1-5). Ms. Domsten stated that they are determined based upon many factors, including MMIC's evaluation of the case, including expert reviews, "review of damages, assessment of defense counsel, assessment of the venue, assessment

of the insureds as witnesses, assessment of plaintiff as a witness." (Doc. 85-2, Domsten Dep. 94:1-17).  The reserve amount for LCSH was never adjusted.  (Docs. 90, ¶ 39; 102, ¶ 39).

No reserves were set by MMIC for claims against Avera in the Sossan lawsuits.  (Docs. 90, ¶ 37; 102, ¶ 37).

### VIII.   MMIC pushing for mediation

In the summer of 2018, MMIC indicated that it wanted to get the cases resolved in mediation.  (Docs. 79-14, Murphy Dep. 171:23-172:12; Doc. 85-1, Davis Dep. 65:23-66:2).  In an email to Tim Schultz approximately a year before mediation, Ms. Davis stated that "[w]e know generally, that most the plaintiffs are unsophisticated, have chronic pain issues, and are making fair witnesses." (Doc. 80-23, Schultz Dep. 127:21-128:1).  She further stated that "I do not want to wait another two months to request a demand." (Doc. 80-23, Schultz Dep. 129:14-15).  On February 18, 2019, Ms. Davis also inquired again about the status of moving forward with a global mediation of the cases.  (Doc. 83-44 at 3699).

### IX.   The Settlement Demands

By Spring 2019, all the underlying plaintiffs had been deposed.  (Doc. 79-19, Ghiselli Dep. 117:13-118:22).  Shortly after April 2019, the plaintiffs had issued individual settlement demands in each of the 36 underlying cases.  (Docs. 82, ¶ 75; 89, ¶ 75; 104, ¶ 75).  The collective settlement demands exceeded $31 million.  (Docs. 82, ¶ 76; 89, ¶ 76).  Defense counsel, the insureds, and MMIC planned to meet to discuss the settlement demands and the status of the cases.  (Docs. 82, ¶ 77; 89, ¶ 77).

In advance of the meeting, claims representatives for Avera and LCSH, Dawn Domstem and Shelly Davis sent emails to Ghiselli summarizing their conversations with defense counsel Roger Sudbeck and Jeff Wright regarding the defensibility of the credentialing claims.  (Docs. 82, ¶ 78; 89, ¶ 78; 80-3).  Jeff Wright, defense counsel for LCSH, provided Shelly Davis of MMIC with his analysis of the negligent credentialing claims.  His comments regarding her notes of their previous conversations are in italics below:

1. there is nothing in Dr. Sossan's file, or any file that supports this claim; *We believe Dr. Sossan's credentialing file sufficiently documents LCSH's investigation and that nothing in it supports a claim of negligent credentialing.  The Plaintiffs' complaint, however, is*

*that it lacks any confirmation regarding criminal convictions, and that LCSH was aware or should have been aware that Sossan was doing unnecessary surgeries in Norfolk, NE, before coming to Yankton.*

2.  While Sossan was a convicted felon, there is nothing in the L&C bylaws that would preclude L&C for granting privileges to Sossan for this reason:

    *The LCSH Bylaws do not preclude privileges if an applicant has a prior felony conviction. I have attached the Qualifications for Membership parts of the Bylaws.*

3.  Sossan's conviction was due to lying on his medial school application; *I have attached the two orders regarding Sossan's criminal acts in Florida, in the early 1980s. He was charged with Forgery for writing bad checks in Pinellas County in 1982. The Court entered an Order Withholding Adjudication of Guilt and Placing Defendant on Probation. In 1983, he plead guilty to Burglary for breaking into the St. Petersburg Junior College science department to steal the answers to a biology test. Plaintiffs have alleged that Sossan changed his name from Sossan to avoid discovery of these charges.*

4.  The SD Board of Medical Examiners credentialed Sossan and L&C relied on the same; *Sossan was granted a medical license by SDBMOE and LCSH relied on that.*

5.  Twice L&C sent Sossan cases out for review relative to practicing with the SOC- both reviews were supportive of Sossan—no red flags; *Neither review of medical cases performed by Sossan raised any red flags.*

6.  L&C did not make a lot of $$ as a result of these surgeries due to the patients being Medicare patients & the costs related to these surgeries; *That is our understanding. Dr. Schindler has told us this, and business documents we finally secured from LCSH's old files appear to confirm this. It appears particularly true where Dr. Sossan was doing spine surgeries requiring hardware that he continually was using and then replacing. That hardware is expensive and the reimbursement rate was not very good.*

(Docs. 82, ¶ 80; 89, ¶ 80).

### X.    June 10, 2019 MMIC's Large Loss Committee Meeting

MMIC held a large loss committee meeting for the Sossan cases on June 10, 2019, one day before the pre-mediation meeting with its insureds, at which Shelly Davis and Dawn Domsten presented to the group. (Docs. 90, ¶ 50; 102, ¶ 50; 83-1). In addition to Ms. Davis, the other members of the large loss committee were Nick Ghiselli (Chief Legal Officer), Tim Schultz (Vice-President Claims), Bill McDonough (President and CEO), Laurie Drill-Mellum, and Angie Griffith. (Doc. 90, ¶ 51; 102, ¶ 51). MMIC stated that the only allegations with MMIC coverage

are the alleged negligence claims against Dr. Swift for referring patients to Dr. Sossan and the alleged negligent credentialing claims. (Doc. 83-1 at 3476).

On liability, the report provided:

> We have pursued reviews of Sossan's surgeries via NorthGuage. Of the 37 suits, this expert was supportive of Sossan's surgeries in 12 suits. We have not secured expert reviews with respect to the negligent credentialing claims, but feel these claims have little, if any merit due to the fact there is nothing in Sossan's employment file that supports this claim; the facilities' bylaws do not preclude privileges due to prior felony convictions; the SD Board of Medical Practice credentialed Sossan and Defendants relied on the same; two independent outside reviews of Sossan's surgeries were performed w[ith] no red flags. In addition, most of the patients were Medicare patients, obviating the financial gain argument. Finally, the negligent referral claim brought against Dr. Swift seems to have little merit, as once Dr. Sossan came to Yankton he was the sole spine surgeon in town. Thus, it would be reasonable to make referrals for evaluation of the spine issues to him.

(Doc. 83-1 at 3477). The report stated that "while many claims were filed well outside of the 2-year statute of limitations in South Dakota for medical negligence, the Judge presiding over these cases ruled that the causes of action were "inextricably intertwined" and the 6 year statute of limitations for fraud would apply." (Doc. 83-1 at 3478). The report provided a $3 million global indemnity reserve which includes LCSH and Dr. Swift. (Doc. 83-1).

The report indicated that the underlying plaintiffs would claim economic damages based on medical bills in the amount of $7.5 million, or if just considering the cases without expert support, approximately $3.75 million, and prejudgment interest of approximately $7.5 million to $13 million. (Doc. 83-1 at 3477). Prejudgment interest would continue to accrue at 10% a year. (Doc. 83-1). The report indicated that there was merit for compensation for non-economic damages in cases where the surgeries were unnecessary. (Doc. 83-1 at 3477). The report provided that "[w]hile there are numerous issues with these suits, the covered claims (negligent credentialing and negligent referral claims against Dr. Swift) appear defensible to date. . . . Nonetheless, these cases should be resolved, if possible, and for an amount relative to the exposure." (Doc. 83-1 at 3477). The report stated the MMIC asked the Sossan plaintiffs to mediate the cases globally, but that the request was denied and that Avera would like the cases globally resolved. (Doc. 83-1 at 347-78).

**XI.    Strength of underlying cases**

13

On June 11, 2019, there was a pre-mediation meeting at the Boyce Law Firm between all of the attorneys representing Avera, LCSH, and the physicians and representatives of MMIC. (Doc. 90, ¶ 67; 102, ¶ 67). By the time of this pre-mediation meeting:

> The cases had been in litigation and defended by experienced South Dakota trial counsel for approximately five years;

> All of the plaintiffs and their spouses had been deposed and their medical records had been obtained;

> An expert had found that only 12 of the 36 cases were defensible medicine by Dr. Sossan;

> The Sossan plaintiffs' global demands totaled $32 million;

> The Sossan plaintiffs' economic damages (medical bills) and accrued interests totaled more than $20 million with pre-judgment interest accruing at a rate of ten percent per year.

> Exposure on non-economic damages was at least $18 million (assuming the $500,000 non-economic damages cap would apply, which was unknown);

> The uncovered RICO claims had been dismissed;

> The case had been the subject of an interlocutory appeal to the South Dakota Supreme Court on the peer review issue; and

> The circuit court had already denied a motion for summary judgment prior to the issuance of the *Pitt-Hart* based on the South Dakota statute of limitations.

(Docs. 90, ¶ 68; 102, ¶ 68).

Nick Ghiselli, Tim Schultz, Dawn Domsten, and Shelly Davis attended the pre-mediation meeting on behalf of MMIC. (Doc. 90, ¶ 72; 102, ¶ 72). Chris Specht, Director of Risk Management for Avera, attended the pre-mediation as a corporate representative for Avera. (Doc. 90, ¶ 73; 102, ¶ 73). Attorneys Roger Sudbeck, Matt Murphy, and Justin Clark attended the meeting as counsel for Avera. (Docs. 90, ¶ 74; 102, ¶ 74). Attorney Brett Lovrien attended the meeting as a corporate attorney representing LCSH. (Doc. 90, ¶ 75; 102, ¶ 75). Attorneys John Gray and Jeff Wright attended the meeting as counsel for LCSH and the individually insured physicians. (Docs. 90, ¶ 76; 102, ¶ 76). Attorney Mark Haigh attended the meeting as counsel for Dr. Swift. (Docs. 90, ¶ 77; 102, ¶ 77). Attorneys Mike Marlow and Sheila Woodward attended the meeting representing the individual interests of Dr. Abbott, Dr. Boudreau, and Dr. Johnson. (Docs. 90, ¶ 78; 102, ¶ 78). Individually insured physicians Dr. Boudreau and Dr. Schindler

attended personally. (Docs. 90, ¶ 79; 102; ¶ 79). Attorneys Greg Bernard and Reed Rasmussen attended the meeting as counsel for Dr. Trail. (Docs. 90, ¶ 80; 102, ¶ 80).

At this time, there was a consensus among the attorneys who were working on the cases, including those retained by MMIC, that the South Dakota Supreme Court would recognize a claim for negligent credentialing. (Doc. 90, ¶ 82; 102, ¶ 82). However, there were concerns about whether the circuit court would find that the standard of repose articulated by the Supreme Court in *Pitt-Hart* applied to bar plaintiff's negligent credentialing claims. There was a discussion of filing a summary judgment motion based on the statute of repose, but Roger Sudbeck stated that the circuit court would deny it based on Rule 56(f) in order to allow plaintiffs to complete discovery and depose defendants, and that the court would not reverse its prior decision. (Docs. 82, ¶ 83; 89, ¶ 83; 79-15, Sudbeck Dep. 60:20-61:1). Matt Murphy, counsel for Avera, also had concerns that the circuit court may not apply the statute of repose to the negligent credentialing claims. (Doc. 79-14, Murphy Dep. 89:19:23). Matt Murphy testified that there was a lot of uncertainty because the statute of repose had never been applied to a case like this. (Doc. 79-14 at 106:2-10). For example, "did the mistake occur at the initial credentialing decision? Did they have an ongoing duty to credential? Did they have a fiduciary duty to go out and tell the plaintiff, hey, we know this about your surgeon?" (Doc. 79-14 at 106:2-10). Mark Haigh, attorney for Dr. Swift, testified that it was unclear whether the circuit court would hold that the negligent credentialing claims were medical negligence cases subject to the statute of repose and the $500,000 cap on non-economic damages. (Docs. 79-8, Haigh Dep. 92:7-92:24). Shelly Davis, claims representative for MMIC, testified that they had asserted there being merit for compensation for non-economic damages in the cases where the surgeries were unnecessary. (Doc. 85-1 at 88:11-15). Counsel discussed at the meeting that medical expenses plus interest, that would be recoverable if found liable on the negligent credentialing claims, exceeded $20 million. (Docs. 82, ¶ 86; 89, ¶ 86).

The hospital defendants in the underlying cases had received favorable rulings on the peer review issue and all discussions by the formal peer review committee were not discoverable. (Doc. 83-1 at 3478). However, there was a concern how the hospital would defend a negligent credentialing claim without waiving peer review. (*See* Doc. 83-13) (Mike Marlow, personal counsel for Drs. Dan Johnson, Dave Abbott, and Joe Boudreau stating in a letter that "I have

reviewed the credentialing file and there are many facts and circumstances to rebut claims of negligence and fraud against my clients. It seems to me MMIC and my clients have diverging interests regarding the admissibility of the credentialing materials."); 101-1, Schaffer Dep. 121:8-17; 79-21 at 1783)). MMIC stated in its large loss report issued to the large loss committee that convened in June 2019 that the peer review privilege would not extend to personal observations of Dr. Sossan's interactions and procedures by individuals on any formal peer review committee. (Doc. 83-1 at 3478; 85-1 at 80:21-24). In a letter to attorney Joe Farchione on June 28, 2019, Matt Murphy also indicated that neither the hospital defendants nor the underlying plaintiffs would be able to use peer-reviewed information at trial. (Doc. 79-21 at 1783). He stated that "[c]redentialing claims in this lawsuit will come down to original source information. This includes information gathered outside of the peer review files and first-hand observations of those who witnessed Sossan related issues or incidents." (Doc. 79-21 at 1783). Additionally, defense counsel had concerns regarding liability on the "re-credentialing" of Dr. Sossan. (Doc. 83-44 at 3673, 3680; 79-21 at 1783).

If Judge Anderson ruled against them on the renewed motion for summary judgment, then it was left to the South Dakota Supreme Court's discretion whether to take up the issue on intermediate appeal. If it did not, then the hospital defendants would be forced to litigate the cases before they could seek review of the issue. Mark Haigh, counsel for Dr. Swift, did not believe that the Supreme Court would take the issue up on intermediate appeal because it had already done so in the case, causing significant delay, and because the issue did not involve a peer review issue like the first appeal had. (Doc. 79-8, Haigh Dep. 98:6-15). Matt Murphy, counsel for Avera, testified as well that "[o]ur Court takes privilege issues on interlocutory appeal, not much else." (Murphy Dep. Doc. 79-14, 102:7-18). Roger Sudbeck testified that he while he was initially more optimistic that the Supreme Court may take an intermediate appeal if Judge Anderson denied their motion for summary judgment, he changed his mind when experienced attorneys Ed Evans and Mark Haigh began to think there was no chance the Supreme Court would take it up on intermediate appeal. (Docs. 79-15, Sudbeck Dep. 62:20-64:19, 81:11-82:5). On August, 12, 2019, Farchione had a phone call with John Gray, counsel for LCSH and Sudbeck. (Doc. 80-22, Farchione Dep. 156:20-157:1). Farchione testified that he had no reason to dispute his notes from the call indicating that John Gray opined that the circuit court would likely deny the motion for summary judgment and that there would not be an automatic appeal. (Doc. 80-22, Farchione Dep.

156:10-157:1).  John Gray testified that it was unknown at the time whether the South Dakota Supreme Court would take the issue up on direct appeal and that "there were too many other factors involved to make that decision." (Doc. 79-16, Gray Dep. 74:9-19).

Mark Haigh testified that at the June 11, 2019, pre-mediation meeting he told Shelly Davis that MMIC should try and settle these cases, that he thought it was a high-risk case as to his client, Dr. Swift.  (Doc. 79-8, Haigh Dep. 82:9-16, 107:18-108:2).  At the meeting, Mr. Ghiselli asked for thoughts on global value.  (Docs. 82, ¶ 87; 89, ¶ 87).  Chris Specht opined it "will take $20M-25M to resolve." (Docs. 82, ¶ 89; 89, ¶ 89; 90, ¶ 98; 102, ¶ 98).  Attorney Mark Haigh further stated at the pre-mediation meeting that he thought the case could be settled for $15 million, that he "would pay more to get it done," although he admitted in his deposition that his global estimate was based on limited information since he was only handling seven cases. (Docs. 79-20; 79-8, Haigh Dep. 107:18-109:10, 130:14-133:12; 82, ¶ 93; 89, ¶ 93).  Mr. Haigh testified that Shelly Davis thought his estimate was too high and that they could settle for a lot less. (Doc. 79-8, Haigh Dep. 108:13-18).  Attorney Mark Marlow stated that he believed that it could be settled for "even less than $15M," for around $10 million.  (Docs. 82, ¶ 90; 89, ¶ 90; 90, ¶ 97; 102, ¶ 97; 83-6 at 2244).  Roger Sudbeck, counsel for Avera, said defendants "may need at least $15M to resolve." (Docs. 82, ¶ 91; 89, ¶ 91; 90, ¶ 95; 102, ¶ 95).  Matt Murphy, counsel for Avera, testified that he had agreed with Mr. Haigh that the settlement value was $12 million to $15 million.  (Docs. 90, ¶ 96; 102, ¶ 96).  In their June 10, 2019, large loss report, Ms. Davis and Ms. Domsten indicated that they favored efforts at settlement "for an amount relative to MMIC's exposure" on covered claims.  (Doc. 85-1, Davis Dep. 89:12-25)

It was estimated that it would cost $500,000 to try one case, or $250,000 per firm. (Doc. 80-23, Schultz Dep. 161:6-9, 164:11-22).  Mark Haigh stated at the meeting that plaintiffs would bring in credentialing guru Arthur Shore.  (Docs. 80-23, Schultz Dep. 163:18-164:1).  It was understood at the meeting that if mediation was not successful, the attorney for the Sossan plaintiffs may bring in a large national law firm to handle the 36 Sossan lawsuits. (Docs. 90, ¶ 103; 102, ¶ 103).

Chris Specht asked MMIC what it would pay to settle, and Ghiselli responded that there was not enough discovery to establish whether credentialing was done in the context of a formal review board.  (Docs. 82, ¶ 94; 89, ¶ 94).  Specht asked Ghiselli to have a private conversation in

a separate room and then asked him to contribute $2 million to get the mediation started.  (Docs. 82, ¶ 95; 89, ¶ 95; 90, ¶ 106; 102, ¶ 106).  They agreed that Avera and MMIC would each contribute $2 million to a global settlement to get the mediation started, contingent on a "global resolution of all claims[3]."  (Docs. 90, ¶ 107; 102, ¶ 107).  Avera and many of the attorneys representing Avera, LCSH, and the physicians testified that they understood the $2 million to be an opening amount that would be offered by MMIC after Avera offer up its remaining self-insured retention amount, and had no idea that $2 million was the maximum that MMIC would agree to pay toward a settlement.  (Docs. 79-15, Sudbeck Dep. 195-200; 78-3, Specht Dep. 123:7-15, 140:10-141:20; 79-2, Lovrien Dep. 157:4-19).

## XII.   Farchione's Retention

At the pre-mediation meeting on June 11, 2019, MMIC's chief legal counsel Nick Ghiselli said that "we need more discovery to determine the facts to determine coverage." (Doc. 90, ¶ 101; 102, ¶ 101).  Shortly thereafter, MMIC retained Joe Farchione, an attorney in Denver, Colorado, to be MMIC's attorney and to represent MMIC's interests regarding the Sossan lawsuits.  (Docs. 90, ¶ 123; 102, ¶ 123).  In a June 19, 2019, email, Ghiselli introduced Mr. Farchione to Mark Malloy, who was coverage counsel for MMIC.  (Docs. 80-11 at 1851).  It was clear from Mr. Ghiselli's email that he wanted further discovery to determine whether the credentialing claims were covered claims.  (Docs. 80-11) ("Avera wants MMIC to pay 15-25 million dollars with little

---

[3]     Although MMIC now contends that "global resolution of all claims" would include its insured's waiving any bad faith claims against it, there is no evidence in the record that this was communicated to Plaintiffs before the mediation, and Nick Ghiselli testified that a waiver of bad faith claims was not common.  (Doc. 80-6, Ghiselli Dep. 24:15-26:8; 28:20-29:6).  In fact, Nick Ghiselli testified that he could not ever remember requiring an insured to waive bad faith claims as a condition to settlement previously.  (Doc. 80-6, Ghiselli Dep. 35:7-36:8).  Joe Farchione also testified that the first time he found out that MMIC's position was Avera and the other insureds had to waive bad faith in order to have the $2 million paid toward settlement was sometime after Specht threatened it—likely either the first or second day of the mediation.  (Doc. 80-22, Farchione Dep. 101:14-102:3).  Farchione testified that it was his understanding that MMIC offered the $2 million to a global settlement with "no strings."  (Doc. 80-22, Farchione Dep. 183:9-23, 243:11-22; 83-46).  Tim Schultz, the VP of risk management at MMIC at the time, also testified that he had never remembered requiring an insured to waive its bad faith claims as a condition of MMIC contributing to settlement.  (Doc. 80-23, Schultz Dep. 64:24-65:17).  In an email from Tim Schultz on September 6, 2019 to Chris Specht, Schultz made clear that "When the original $2M was offered, it was offered as part of a global effort to resolve all of the cases and at that time, there was no threat of bad faith by anyone against MMIC. . . . As we discussed this morning, we are willing to allow you to continue to use our $2M for global negotiations of all matters but only if there is confirmation that there will be no bad faith action."  (Doc. 83-18).

to no facts. Further discovery could void coverage or prove the other non-covered claims . . . To have coverage, the credentialing must be part of a 'formal review board'"). Mr. Ghiselli believed that Avera and MMIC had a "conflict of interest," that Avera was asking MMIC to pay $15-25 million "with little to no facts," and stated that "[i]t is apparent to me that defense counsel will cater to Avera's requests to maximize coverage to the detriment of MMIC." (Doc. 80-11). Mr. Ghiselli expressed that "[i]t is arguable whether these are medical negligence claims or simple negligence claims . . . I am guessing the defense attorneys do not want to aggressively pursue dismissal of the negligence claims because it would void coverage." (Docs. 90, ¶ 127; 102, ¶ 127; 80-11). Ghiselli stated "We agreed to initially offer two million dollars at a future mediation. We tentatively agreed to contribute our quota share of liability. In general, across all claims, our policy only covers one out of nine or ten claims." (Docs. 90, ¶ 128; 102, ¶ 128). Ghiselli requested that Farchione and Malloy "coordinate the coverage and liability analysis between each other" for settlement contribution purposes. (Doc. 80-11).

Ghiselli emailed MMIC claims representatives for Avera and LCSH, Dawn Domsten and Shelly Davis, stating that Farchione "will now take the lead in managing these cases, including defense counsel. Of course, you will need to be involved, but please direct all requests through Joe. And Joe, please copy Shelly and Dawn so they can maintain their respective claims files." (Doc. 79-19 at 171:17-172:4; 83-22).

On June 17, 2019, Ghiselli sent Chris Specht an email stating that:

> MMIC agreed to contribute two million dollars to a mediation sometime in the future. In our subsequent conversation, we explored the possibility of agreeing to percentages for the respective parties. To help us with the evaluation and allocation of responsibility, we have retained, at our expense, Joe Farchione from the firm of Wheeler Trigg O'Donnell. Joe has extensive expertise in these types of claims and can hopefully guide us in the resolution of these cases.

(Docs. 80-7 at 1839). Ghiselli sent a follow-up email to Specht on June 21, 2019, stating:

> As you know, we retained Joe Farchione, at our expense, to help us determine our liability after we committed to mediation. Joe is connecting with Mark Malloy on Tuesday to discuss the claims and coverage.
>
> MMIC initially committed two million dollars to start a mediation. We will stand by that commitment. However, we need to completely understand the liability and allocation of responsibility among the parties. To date, MMIC does

not have enough information.  I do not believe we can gather the information in time to responsibly participate in a mediation by July 22, 2019.

From a broad view, MMIC needs to know:

Who was part of the formal credentialing boards?

What did the physicians on the formal credentialing boards know at the time the physicians credentialed Dr. Sossan?

Were the physicians negligent and if so, how?

Do the other claims have any merit?

If the negligence claims are covered, what percentage of fault, globally, is allocated to the negligence claims?

Joe and his team will diligently work the Roger Sudbeck and John Gray to get these answer as soon as we can.  I hope to have a better time frame next week.  Once we have these answers, we can schedule a mediation.

(Docs. 80-7 at 1834).

After MMIC retained Farchione, MMIC postponed the global mediation that, following the June 11 meeting, had been scheduled with plaintiffs' counsel in the 36 Sossan lawsuits for July 22, 2019.  (Docs. 90, ¶ 139; 102, ¶ 139).  On July 8, 2019, Mr. Ghiselli sent an email to Farchione and coverage counsel Mark Malloy, relating that Chris Specht expected MMIC to "meaningfully" contribute to settlement or that MMIC would have a problem.  (Doc. 80-13).  Ghiselli relayed his response to Specht, that he could not meaningfully participate in mediation without adequately understanding MMIC's exposure.  (Doc. 80-13).  Ghiselli had indicated that he told Mr. Specht that the cases were not "adequately worked up," and were "woefully prepared."  (Doc. 80-13 at 1858).  Ghiselli stated that MMIC still did not know whether the credentialing claims were barred by the statute of repose, whether the physicians on the formal reviewed board followed the bylaws or procedures when credentialing, nor did he claim to know anything about damages.[4]  (Doc. 80-13 at 1858).  Ghiselli further stated:

---

[4] Contrary to Ghiselli's assertion, the parties had a fairly good idea of the medical expenses and prejudgment interest that the plaintiffs were owed if the hospital defendants were found liable on the credentialing claims.  Ghiselli admitted that the defense lawyers had accumulated all the medical bills and had deposed the 36 plaintiffs and thus knew the damages that were being claimed.  (Doc. 79-19, Ghiselli Dep. 117:13-118:22).  Shelly Davis and Dawn Domsten provided those damage numbers in their June 10, 2019 large loss report.  Ms. Davis and Ms. Domsten also indicated in the report that non-economic damages would be recoverable especially on cases where surgeries were found to be unnecessary. Ghiselli testified, however, that he did not believe MMIC had enough information at that point to evaluate liability on the credentialing claims.  (Doc. 79-19, Ghiselli Dep. 117:13-118:22).

Chris and Avera are focusing on the medical negligence of the cases. We need to focus on the claims we cover which is the negligent credentialing. MMIC needs to know who was on the formal credentialing committees, what did they know at the time of credentialing, did they follow the bylaws and hospital procedures, and did they breach that duty. . . Additionally, I want to focus on the statute of limitations and repose for these claims. The covered claims are past the statute of limitations and repose, but for the fraud claims. . . .

Joe, I need a well-reasonable articulated answer for Chris for why we can or cannot contribute to mediation. If your team finds weak evidence of negligent credentialing, MMIC will be limited to its already committed two million. If your team finds strong evidence of negligent credentialing, we will contribute in proportion to our exposure. As we all know, we cover one of nine claims. Avera is willing to contribute above its SIR. I would like to give Chris and answer when you are ready in percentage of fault, if any. For example, if we think we have 10% exposure, MMIC would be willing to commit two million to a twenty million dollar number.

(Doc. 80-13 at 1859). On July 8, 2019, MMIC's coverage counsel advised Ghiselli and Tim Schultz, incorrectly, that under South Dakota law a claim for third-party bad faith "requires proof that the insurer deceived, defrauded or made misrepresentations to the third-party claimant or the insured during settlement negotiations." (Docs. 90, ¶ 141; 102, ¶ 141; 83-11 at 2253). The mediation was set for September 5 and 6, 2019, in order to give Farchione a chance to get up to speed on the lawsuit which had been ongoing for approximately five years. (Docs. 90, ¶ 139; 102, ¶ 139).

Mr. Farchione asked defense counsel for relevant evidence regarding the credentialing of Dr. Sossan. (Doc. 90, ¶ 137; 102, ¶ 137). It appears that defense counsel was unclear as to who Farchione was representing. In response to Farchione's request, Roger Sudbeck and Matt Murphy, counsel for Avera, sent their entire file, including privileged peer review materials to Farchione. (Doc. 79-21). Mr. Murphy also detailed in a June 28, 2019, memo to Farchione an overview of the case and its strengths and weaknesses as he and Mr. Sudbeck saw it. (Doc. 79-21). Sudbeck testified that he gave Farchione his whole file because he believed he was hired to help Avera and LCSH to defend the cases. (Doc. 79-15, Sudbeck Dep. 137:17-139:19, 192:6-10). Brett Lovrien, personal counsel for LCSH, sent a letter to Shelly Davis on August 30, 2019, stating that it was his "understanding that [Farchione] was hired by MMIC to review all the cases though [he] ha[d] no particular information as to the scope of his services or who he actually represents. In fact, during our last call, [Farchione] was asked if he'd be filing a notice of appearance and said he

needed to speak to his people but didn't say who they were or who he is representing. Illumination as to this question would be greatly appreciated." (Doc. 83-12 at 2257). Attorney Mike Marlow, personal attorney for some of the physician defendants, also indicated inquired in an August 30, 2019, letter to Ms. Davis "who Mr. Farchione represents" and whether he "intend[s] to enter an appearance on behalf of [Marlow's] clients." (Doc. 83-13 at 2261).

### XIII.   Avera planning for mediation

The day after the June 11, 2019 meeting, Chris Specht, Roger Sudbeck, and Matt Murphy met with several executives of Avera to discuss the Sossan cases and settlement authority. (Docs. 82, ¶ 101; 89, ¶ 101). In May, Chris Specht sent an agenda to those attending the meeting. (Docs. 82; ¶ 102; 89, ¶ 102). He specifically noted that an item for discussion was "Avera Sacred Heart exposure beyond insurance coverage and what amount [Avera Sacred Heart] may be willing to contribute to resolve these claims." (Docs. 82, ¶ 103; 89, ¶ 103). Specht also stated that "I think it is unanimous among our team that we want these claims resolved and we agree that we resolve all of them or none of them. Resolving them may be financially painful, but we believe the risk in trying the cases would be substantial." (Docs. 82; ¶ 104; 89, ¶ 104). During the meeting, he informed Avera of his discussion with Nick Ghiselli about how to allocate settlement authority: "Avera/MMIC split – Indirectly suggested about 90/10 not well rec'd – I think we will need to go to 40-60 to 50-50 to get it done." (Docs. 82, ¶ 106; 89, ¶ 106). The meeting concluded with Avera authorizing $15 million to settle the cases. (Docs. 82, ¶ 109; 89, ¶ 109).

At this point, Avera's remaining amount on its self-insured retention was approximately $1.9 million. (Docs. 82, ¶ 110; 89, ¶ 110). MMIC's policy limit was $10 million, excess of Avera's retention. (Doc. 82, ¶ 111; 89, ¶ 111). Avera had an excess policy with Allied World Insurance with a policy limit of $25 million that provided coverage above MMIC's coverage. (Docs. 82, ¶ 112; 89, ¶ 112).

In regards to the June 12, 2019, meeting discussing the split of payment between Avera and MMIC, Roger Sudbeck testified that he recalled the meeting and:

> I think that's what led me into doing that mathematical thing because I think we were all trying to figure out what's fair. What a fair way to approach these. And I mean, we – I mean, we're not naïve to the fact there were lots of issues out there that MMIC had a reservation of rights out there which you know I've got no involvement with that. Everyone knew it was out there. Everybody knew there

were positions that were being taken on coverage and noncoverage and Lewis &
Clark was on the same boat. And so I think everybody was trying to be fair and
reasonable and figure out, okay, what's the best way to get these cases settled for
the most reasonable amount and how are we going to fairly allocate them?

(Docs. 82, ¶ 113; 89, ¶ 113). Leading up to mediation, Sudbeck suggested a framework for
settlement to Avera:

> Chris, I studied [Mike Bornitz's] medical expenses summary. In the 6
> Avera only cases, the total medicals, including Sossan's charges, with interest, are
> $3.04M. In the joint Avera and LC cases, the medical expenses incurred at Avera,
> including Sossan's charges, are about 5.2M with interest. Therefore, the Total
> charges arising from all surgeries at Avera, with interest, are about $8.25M. The
> grand total of all charges per Mike's summary is $22.3M. Therefore, about 37%
> of the total charge arose out of the surgeries performed at Avera [8.25M/22.3M].

> Avera ONLY is named in 16.6% of all cases (6/46), Avera is named in 52%
> of all cases (19/36). LC ONLY is named in 47.2% of all cases (17/36) and LC is
> named in 80.5% of all cases (29/36). By my calculation, the percentages of Avera
> to LC involvement by cases indicates a split of about 35% to Avera and 65% to LC.
> Consistent with that split, as outlined above, Avera's share of the total medical
> expenses is about 37%.

(Docs. 82, ¶ 139; 89, ¶ 139). Sudbeck wrote, "If a global settlement is possible, these percentages
provide some objective measures of equitable contribution." (Docs. 82, ¶ 140; 89, ¶ 140).

## XIV. Farchione & *Pitt-Hart*

Farchione and his firm came across the *Pitt-Hart* decision in their research. (Doc. 83-45
at 2350). There is evidence in the record suggesting that Farchione and MMIC believed that
defense counsel either did not know about *Pitt-Hart* or had deliberately failed to bring it to
MMIC's attention so as to not void coverage. In an email to Ghiselli on August 19, 2019, Mr.
Farchione, indicated that "when MMIC offered the $2M, we had not been made aware of the *Pitt-
Hart* decision." (Doc. 83-45 at 2442). On September 1, 2019, Nick Ghiselli emailed
representatives of MMIC, including CEO Bill McDonough and Tim Schultz, stating that
"[w]ithout Joe [Farchione], we would not have discussed the *Pitt-Hart* case . . . ." (Doc. 83-14 at
2263); *see also* (Doc. 80-11 at 1851-52) (Ghiselli stating that "I am guessing the defense attorneys
do not want to aggressively pursue dismissal of the negligence claims because it would void
coverage.").

23

All the South Dakota defense attorneys had in fact known about *Pitt-Hart* and had been factoring it into their analysis of potential liability on the credentialing claims. MMIC had been made aware of *Pitt-Hart* shortly after the decision was issued. John Gray, counsel for LCSH, sent a copy of the case to Dee Ledford, who was one of the previous adjusters for MMIC. (Doc. 79-8, Haigh Dep. 143:24-145:3). The case that Mr. Gray sent to Ms. Ledford was in LCSH's casefile and Ghiselli acknowledged in his deposition that Shelly Davis reviewed the case in July 2018. (Doc. 79-19, Ghiselli Dep. 143:3-18). On August 28, 2019, Roger Sudbeck responded to an email from Nick Ghiselli stating that "To say the defense team, including the MMIC reps, knew of and fully appreciated *Pitt-Hart* would be a profound understatement." (Doc. 79-14, Sudbeck Dep. 222:15-17). Mr. Sudbeck stated that after *Pitt-Hart* was issued, there were discussions about whether to renew summary judgment motions in light of *Pitt-Hart*, that Dee Ledford who was then the MMIC representative for LCSH, and Dawn Domsten, the MMIC representative for Avera, were part of these discussions and it was collectively decided that it would be premature to renew the motions until after they had deposed the plaintiff so they could not submit self-serving affidavits to defeat the motions. (Doc. 79-14, Murphy Dep. 222:15-223:3).

On August 16, 2019, Farchione convened a phone conference between MMIC and its insureds' representatives and attorneys. (Docs. 90, ¶ 144; 102, ¶ 144). On this call, Farchione presented his analysis of the case under *Pitt-Hart*. (Docs. 90, ¶ 145; 102, ¶ 145). MMIC erroneously claimed that it had not been aware of the *Pitt-Hart* decision before Farchione brought it to its attention. (Docs. 90, ¶ 146; 102, ¶ 146). All of the other attorneys had been aware of *Pitt-Hart* since it came out, had discussed it at length, and had brought it to the attention of MMIC. (Docs. 90, ¶ 147; 102, ¶ 147). Farchione advocated the immediate filing of another summary judgment motion in the Sossan cases, only on the covered negligent credentialing claims, based upon the statute of repose discussed by the South Dakota Supreme Court in *Pitt-Hart*. (Docs. 90, ¶ 148; 102, ¶ 148). Matt Murphy and Roger Sudbeck, counsel for Avera, testified that while they initially thought Farchione was brought in to help Avera and LCSH defend the cases, when Farchione recommended moving for summary judgment only on the covered negligent credentialing claims, he began to think that Farchione had "a different interest in mind." (Docs. 90, ¶ 153; 102, ¶ 153; 79-14, Murphy Dep. 182:2-183:10). Attorney Marlow was also alarmed when Farchione suggested a motion for summary judgment on only the negligent credentialing claims. (Doc. 83-13 at 2261). Avera's general counsel Rich Korman also expressed concerns that

MMIC was only looking out for itself by proposing a strategy to dismiss only covered claims. (Doc. 90, ¶ 154, 102, ¶ 154).

Ultimately, it was decided that the parties would file motions in a few select cases on all claims ahead of mediation. (Docs. 90, ¶ 156; 102, ¶ 156; 80-15 at 1877-78). The motions would move for summary judgment on all claims based on the statute of repose, not just the negligent credentialing claims. (Doc. 79-14, Murphy Dep. 183:23-184:9). The briefs were filed on the eve of mediation to remind the underlying plaintiffs of a potential *Pitt-Hart* defense and as a strategy to drive the settlement value of the cases down. (Docs 90, ¶¶ 156-58; 102, ¶¶156-58).

On August 19, 2019, Farchione wrote to Ghiselli about the mediation that "You gave him the $2M without strings . . . . [and that his] understanding is that Chris can offer the SIR and all or part of the $2M." (Docs. 90, ¶ 162; 102, ¶ 162; 83-25). "Once [Avera] offer[s] the SIR, do you then step in and control the defense? This will be very important for the mediation as this will dictate who is the spokesperson for the defense. In my opinion, the only way to salvage the mediation is to have me and you as the spokespeople. Unfortunately, given the covered versus the uncovered claims, even with the entire SIR out there, I think Chris [Specht] will still have a say. But Chris needs to understand that it is in his best interest for me to speak and argue for all (good luck with that)." (Docs. 90, ¶ 161; 102, ¶ 161).

On August 20, 2019, Ghiselli forwarded Farchione's email to MMIC's CEO, Bill McDonough, stating, "But it makes no sense to argue that *Pitt* case applies to fraud. It only applies to medical negligence and the statute of repose. I think we are at the point where we need to consider filing a declaratory action to determine coverage. I assume they will be upset by our two million dollar contribution." (Docs. 90, ¶ 164; 102, ¶ 164). That same day, Bill McDonough replied: "We can't let Chris screw this up. Hopefully Joe can bring Roger around to seeing the value of doing it the right way. If not, we will have to do what we have to do. And potentially save $2M in the process." (Doc. 90, ¶ 165; 102, ¶ 165).

### XV. Days leading up to mediation

On August 20, 2019, Nick Ghiselli stated in an email to Mr. Specht,

> As you requested, this email confirms MMIC's commitment to contribute up to two million dollars to the mediation for a global resolution on all claims. As

we discussed, MMIC believes the court should dismiss the negligence claims in 35 of the 36 cases based on the *Pitt-Hart* case which was reaffirmed by the *Halvorson* case. MMIC was not made aware of the recent case law supporting the dismissal of negligence claims when it made its commitment to contribute two million dollars at our defense counsel strategy meeting. Nevertheless, MMIC in good faith, reaffirms its decision to contribute two million dollars despite the lack of viable claims. We believe the remaining claims, including fraud, are weak and would fall shortly thereafter since they are realistically disguised as negligence claims.

(Doc. 80-12 at 1856). Mr. Specht responded the next day stating that:

During our call last Friday morning I specifically asked what MMIC was willing to contribute, in excess of our SIR, on behalf of Avera Sacred Heart. . . It has become painfully clear that MMIC is not interested in protecting the interests of its long time insured, Avera Sacred Heart. MMIC appears to be solely interested in protecting its own financial interest. Avera Sacred Heart believes that it has significant exposure related to credentialing and monitoring of Sossan's practice at Avera Sacred Heart. Given the facts and the results of the Bocholt case,[5] losses greatly in excess of our SIR and excess limits purchased are foreseeable and expected. You stated in our conversation Tuesday, that you are certain following Joe/MMIC's direction will result in the wrongful credentialing claims being dismissed in 35 of the 36 cases. Again, because of your certainty we ask that if MMIC is not willing to contribute excess policy limits toward resolution of these cases that MMIC indemnify Avera Sacred Heart for losses, related to the wrongful credentialing allegations, in excess of the 10m limit MMIC has at risk in the policy year 2014 and 2015. You advised on our call Tuesday that you would not do so and we are asking you to confirm that in writing.

We continue to expect MMIC to contribute significantly toward resolution of the 19 claims against Avera Sacred Heart at the mediation on September 5 and 6.

(Doc. 80-12 at 1855-56). On August 25, 2019, Mr. Ghiselli replied to Mr. Specht via email stating:

I am sorry you view Joe's assistance as adverse. He is here to help and brings national experience to these specific issues. When you asked MMIC to contribute significantly to a mediation, we asked Joe to help us analyze the claims and damages. His team has done an excellent job and demonstrated how these cases should be dismissed under the law. Joe's suggested strategy makes sense and if successful, would result in little to no indemnity payments by any parties. As we explained, the fraud issues are simply credentialing issues in disguise.

We are fortunate to have Joe's expertise. As a result of his thorough workup, we have a clear picture of where we stand and what needs to be done. Avera is asking MMIC to make a significant contribution for global mediation.

---

[5] Shortly before the mediation, a jury found Sossan liable for medical malpractice and had awarded the plaintiff a $950,000 verdict, although the case did not involve a negligent credentialing claim. (Doc. 90, ¶ 45; 102, ¶ 45).

While you would not give us a number, it appears the range is somewhere between 15-20 million. 15-20 million for one out of nine questionably covered claims which should be dismissed either at the trial court or certainly with the higher courts if they follow current law. Coverage is questionable as it seems legal counsel made the decision to continue Dr. Sossan's privileges despite the MEC's recommendation. Nevertheless, MMIC is standing by a gratuitous two million dollar offer for mediation.

. . .

With respect to our Friday morning call, MMIC agreed to contribute two million to get the mediation started for all parties including Lewis and Clarke. There was not an agreement to apportion two million dollars solely to Avera's interest. . . MMIC will not contribute two million dollars unless it achieves a global resolution. As we have explained, we are willing to contribute two million dollars despite the law supporting dismissal of the negligence claims.

. . .

As you requested, this email will also confirm that MMIC will not indemnify Avera for any excess losses. Mark Malloy will be sending you an updated reservation of rights letter.

Again, we hope to get all of these matters dismissed in the interests of all parties which protects everyone's financial interests. We believe settling these cases in the range of 15-20 million is pre-mature and non-sensical given the *Pitt-Hart* and *Halversen* cases along with the weak fraud claims.

(Doc. 80-12 at 1854).

On August 27, 2019, nine days before the scheduled mediation, MMIC sent Avera a new reservation of rights letter stating that: "In the past week Avera has rejected MMIC's request that Joe Farchione be involved in the briefing of dispositive motions, and a request that he be involved in pre-mediation discussions with the mediator. Further, we suspect that defense counsel has been instructed not to file the motions that Joe suggested being filed. All of these actions are directly contrary to MMIC's interests in this case." (Docs. 90, ¶ 168; 102, ¶ 168). On August 30, 2019, Brett Lovrien, the corporate attorney for LCSH, and Mike Marlow, the personal attorney for some of the individually insured physicians, wrote separately to MMIC about their concerns that MMIC was acting in its own interests at the expense of its insured and that its utilization of Farchione presented a conflict of interest. (Docs. 90, ¶ 169; 102, ¶ 169). In his letter, Attorney Marlow wrote to MMIC that,

I am also very concerned about internal conflicts of interest involving MMIC. As you are aware, MMIC issued reservation of rights letters to my clients early on in

this litigation. Moreover, during the joint strategy meeting held in Sioux Falls, one MMIC representative indicated a hesitancy to move forward with the mediation before coverage issues were more thoroughly explored. I recall a suggestion by MMIC to conduct discovery to flesh out whether the allegations of the plaintiffs actually involved peer review activities. This litigation has been going on for several years and to suggest that issue should now trump mediation and settlement discussions in very troublesome.

. . .

I also understand MMIC has retained Mr. Malloy as counsel to represent MMIC on the coverage issue. If that is true, it seems entirely inappropriate to me that he participated in our recent conference call where Mr. Farchione discussed his analysis of the cases and shared his thoughts on how to proceed with regard to the upcoming mediation. Why was Mr. Malloy allowed to participate in that strategy session? In my view, Mr. Malloy and every person at MMIC involved in the coverage dispute should be completely removed from the defense of the case and any settlement or mediation discussions.

. . .

Additionally, I am not sure why Mr. Farchione has been retained to offer his opinions and assistance at this later hour. Does MMIC think the defense provided to my clients at this point as not been adequate? I am also confused about who Mr. Farchione represents. If he has been retained to represent my clients, I request to be included on all discussions involving Mr. Farchione, current counsel, and/or MMIC. Does Mr. Farchione intend to enter an appearance on behalf of my clients?

(Docs. 90, ¶¶ 170-72; 102, ¶¶ 170-72).

On August 31, 2019, Ghiselli wrote to Farchione regarding the $2 million MMIC had committed to get the mediation started: "Joe, I will leave it up to you and your team to calculate how it should be apportioned among which defendants." (Docs. 90, ¶ 174; 102, ¶ 174). On September 1, 2019, Ghiselli wrote to Farchione, Malloy, and Shelly Davis, "Dear Team: As I see it, our attendance is largely irrelevant with the exception of providing legal guidance and educating the mediator. We agreed to pay two million dollars to get the mediation started—that was the totality of the agreement—no other terms." (Docs. 90, ¶ 175; 102, ¶ 175). On September 2, 2019, outside coverage counsel Mark Malloy wrote to Ghiselli and Schultz that "at the mediation, it needs to be made very clear that this contribution is free of any consideration of coverage, and relates to exposure for both LCSH and Avera." (Docs. 90, ¶ 176; 102, ¶ 176). In that same letter, Malloy also suggested that "To that end, I think having me as coverage counsel attending the mediation and sitting in a room with just Tim [Schultz] just opens us up to an argument that this

offer and Joe's analysis were being done with coverage in mind. It's an argument that has no basis, but why even given them the opening? If I don't attend, I don't see how that argument could ever be made." (Docs. 90, ¶ 177; 102, ¶ 177).

## XVI.   September 5, 2019 - First Day of Mediation

A mediation was held in Sioux Falls beginning on September 5, 2019, with attorney Lon Kouri serving as the mediator. (Docs. 90, ¶ 178; 102, ¶ 178). Attorney Sudbeck, attorney Murphy, Chris Specht, and Mary Tow attended the mediation on behalf of Avera. (Docs. 90, ¶ 179; 102, ¶ 179). Attorney Gray attended the mediation as an attorney retained by MMIC to represent LCSH and the individual physicians but did not attend the mediation on the second day because he had surgery to repair a broken wrist. (Docs. 90, ¶ 180; 102, ¶ 180). Gray's partner, Jeff Wright, did not attend the mediation at all. (Docs. 90, ¶ 181; 102, ¶ 181). Brett Lovrien attended the mediation as a corporate representative for LCSH. (Docs. 90, ¶ 182; 102, ¶ 182). Mark Haigh attended the mediation as an attorney retained by MMIC to represent Dr. Swift. (Docs. 90, ¶ 183; 102, ¶ 183). Clint Sargent attended the mediation as an attorney retained by Dr. Swift personally to represent his interests. (Docs. 90, ¶ 184; 102, ¶ 184). Mike Marlow attended the meeting to represent several of the individual physicians: Dr. Boudreau, Dr. Abbott, and Dr. Johnson. (Docs. 90, ¶ 185; 102, ¶ 185). Attorneys Greg Bernard and Reed Rasmussen attended the mediation on behalf of Dr. Trail. (Docs. 90, ¶ 186; 102, ¶ 186). An attorney also was present on behalf of The Doctors Company which represented Dr. Trail in some of the cases. (Docs. 90, ¶ 187; 102, ¶ 187). Two attorneys from Washington, D.C. were there to represent Allied World (Avera's excess liability insurer). (Docs. 90, ¶ 188; 102, ¶ 188). The MMIC representatives at the mediation were its senior-level claims employees Tim Schultz (Vice President of Claims), Dawn Domsten, the claims representative for Avera, and Shelly Davis, the claims representative for LCSH and Dr. Swift. (Docs. 90, ¶¶ 189-90; 102, ¶¶ 189-90; 82, ¶ 142; 89, ¶ 142). Joe Farchione also attended the mediation on behalf of MMIC. (Docs. 90, ¶ 190; 102, ¶ 190; 82, ¶ 142; 89, ¶ 142).

Prior to the mediation, MMIC's Vice President of Claims, Tim Schultz, had never worked with Farchione before and testified, "I don't know his exact purpose for being there, other than he was representing us." (Docs. 90, ¶ 193; 102, ¶ 193). Shortly before the mediation, Ghiselli had informed Tim Schultz that he had $2 million in settlement authority. (Docs. 90, ¶ 194; 102, ¶ 194). At some point before the mediation, MMIC internally had allocated the $2 million it had

committed as $1 million to settle the claims against Avera, and $1 million to settle the claims against LCSH and the doctor defendants. (Docs. 90, ¶ 195; 102, ¶ 195).

At the mediation, the Sossan plaintiffs collectively began with a $40 million demand for a global settlement of all claims, but within the first few hours, returned to their pre-mediation offer of $32 million for a global resolution. (Docs. 90, ¶ 196; 102, ¶ 196). On the first day of mediation, September 5, 2019, Avera offered and submitted the remainder owed under the limits of its self-insured retention policy with MMIC, approximately $1.9 million. (Docs. 90, ¶ 197, 102, ¶ 197). MMIC's insured collectively made a global offer to the Sossan plaintiffs to settle the cases which included $1.9 million from Avera for its remaining SIR, the $2 million that MMIC had agreed to contribute to get the mediation started, and $50,000 from Dr. Trail's insurance carrier. (Docs. 90, ¶ 198; 102, ¶ 198; 82, ¶ 143; 89, ¶ 143). That offer was not accepted and the Sossan plaintiffs responded with an offer to settle all of the cases in a global settlement for $26 million. (Docs. 90, ¶ 199; 102, ¶ 199; 82, ¶ 144; 89, ¶ 144).

The mediator, Lon Kouri, informed MMIC and its insureds of his sense from plaintiffs' counsel that it would take at least $10 million to achieve a global settlement. (Docs. 90, ¶ 204; 102, ¶ 204). Avera asked MMIC to contribute an additional $3 million to a global settlement offer. (Docs. 90, ¶ 209; 102, ¶ 209; 82, ¶ 145; 89, ¶ 145). Tim Schultz from MMIC relayed the request to Nick Ghiselli and other MMIC representatives who were not in attendance at the mediation and MMIC refused to increase its offer above $2 million. (Doc. 90, ¶ 210; 102, ¶ 210; 82, ¶ 145; 89, ¶ 145). Clint Sargent and Mike Marlow, personal counsel for some of the individual physicians, stated that their clients faced significant exposure in these cases and that MMIC was acting in bad faith. (Docs. 82, ¶ 146; 89, ¶ 146; 78-3, Specht Dep. 162:11-15; 83-34 at 2306).

At the end of the first day of mediation, MMIC instructed John Gray—the attorney retained by MMIC to represent LCSH and the individual physicians—that neither he nor his partner Jeff Wright need attend the second day of mediation and that Joe Farchione would be taking over their role.[6] (Docs. 90, ¶ 205; 102, ¶ 205). Other than Mark Haigh, who was retained by MMIC to

---

[6] Attorney Wright was unable to attend the first day of mediation because he had depositions in another case scheduled that day. (Docs. 79-16, Gray Dep. 169:25-170:4). Attorney Gray was the sole attorney hired by MMIC to represent LCSH who was present on the first day of mediation. (Docs. 79-16, Gray Dep. 169:25-170:4). Gray was scheduled to have wrist surgery on the second day of mediation and Jeff Wright planned to attend the second day of mediation if he was needed. (Docs. 79-16, Gray Dep. 169:25-170:4).

represent Dr. Swift, that left no one there retained by MMIC to represent LCSH and the other physicians. (Docs. 90, ¶ 206; 102, ¶ 206). Gray testified that it was his understanding when he was told not to return on the second day of the mediation that "as far as MMIC representing his [clients], that would be Joe [Farchione]." (Docs. 90, ¶ 207; 102, ¶ 207). When asked if it was his understanding "that the next day of the mediation no defense lawyer hired by MMIC would be there to represent the interests of [his] clients," Gray testified that "there would be no one there other than Joe Farchione." (Docs. 90, ¶ 208; 102, ¶ 208).

## XVII. September 6, 2019 – Second Day of Mediation

On the afternoon of the second day of the mediation, September 6, 2019, MMIC informed its insured and their attorneys that it would not contribute any more than the $2 million it previously had agreed to contribute to get the mediation started on a global settlement of the 36 Sossan cases. (Docs. 90, ¶ 211; 102, ¶ 211). Avera, LCSH, and their attorneys were surprised to learn that MMIC would not pay anything beyond its initial $2 million commitment and testified that MMIC had not made that clear before the mediation. (Docs. 90, ¶ 213, 102, ¶ 213; 85-12, Murphy Dep. 226:4-229:22; 85-14, Specht Dep. 162:2-165:11). Rodger Sudbeck testified that "The only thing I can tell you is that there wasn't anybody, anybody, that thought that MMIC was showing up on September 5th with 2 million and no more. . . . it wasn't the way it was discussed all summer long. . . ." (Doc. 85-15, Sudbeck Dep. 202:8-24). Ghiselli testified that the fact that there were legitimate coverage issues was a factor in why MMIC's $2 million settlement contribution was not increased. (Doc. 79-19, Ghiselli Dep. 116:17-24).

On the second day of mediation, September 6, 2019, MMIC also informed its insured and their attorneys that the $2 million it previously had agreed to contribute to a global settlement of the 36 Sossan cases would only be made if the insureds waived and released their bad faith claims against MMIC. (Docs. 90, ¶ 216; 102, ¶ 216). MMIC's Vice President of Claims, Tim Schultz, testified that he's been involved in "tens of thousands of cases" over his career and can never remember an insurer conditioning its payment to settle a claim brought against one of its insureds on the insured waiving its bad faith claim against the insurer. (Docs. 90, ¶ 217; 102, ¶ 217). Ghiselli also admitted that, to his knowledge, MMIC had never done such a thing before. (Docs. 90, ¶ 218; 102, ¶ 218). Dawn Domsten testified that when she came to the mediation, she did not know that the $2 million was conditioned upon a waiver of bad faith. (Docs. 90, ¶ 220; 102, ¶

220). According to Ghiselli, the requirement that MMIC's insureds waive their bad faith claims against MMIC before it would pay anything to settle the 36 Sossan lawsuits was always a condition of its offer to pay the $2 million it initially committed to a "global resolution of all claims." (Docs. 90, ¶ 219; 102, ¶ 219). Ghiselli admitted, however, that he did not tell Plaintiffs that the only way MMIC would contribute $2 million was if the insureds waived all bad faith claims against MMIC. (Doc. 80-6, Ghiselli Dep. 25:7-18).

Mr. Specht testified that Avera had been advised by its attorneys that it was illegal or improper for MMIC to condition its payment under the liability policy on Avera waiving its bad faith claims against MMIC. (Docs. 90, ¶ 222; 102, ¶ 222). John Gray, LCSH's attorney who had been retained by MMIC and was instructed by MMIC that neither he nor his partner Jeff Wright needed to attend the second day of mediation, testified that he was not aware until approximately a year after the mediation that MMIC conditioned its $1 million contribution on behalf of his client on a waiver of bad faith. (Doc. 79-16, Gray Dep. 167:15-168:21).

Chris Specht requested that Tim Schultz provide MMIC's position in writing, which Schultz did, stating:

> By way of history, when the original $2M was offered, it was offered as part of a global effort to resolve all of the cases and at that time, there was no threat of bad faith by anyone against MMIC. After originally offering $2M for global negotiations, we have learned of the Pitt-Hart decision and the Halverson decision applying Pitt-Hart. Pitt-Hart changes the dynamics of the viability of the negligence claims and there has been no substantive disagreement with that. The only potential viable claim is Kim Andrews and that is for only 2 of her procedures/surgeries. Even so, we did not withdraw the money and instead, yesterday, we proceeded with the negotiations globally and with $1M attributed to Avera and $1M to Lewis & Clark. After exhausting the $2M as part of a global effort to resolve all claims, a bad faith threat was implied if MMIC did not contribute any further money. As we discussed this morning, we are willing to allow you to continue to use our $2M for global negotiations of all matters but only if there is confirmation that there will be no bad faith action. We, of course, do not believe that there is any viable basis for any extracontractual claim, including "bad faith" and in fact MMIC has been transparent on both coverage, defense and indemnity issues at every stage of this case. However, the money committed to the global settlement offer yesterday was done with the understanding that the contribution would resolve the case entirely and that all parties, including MMIC and Avera, would put all aspects of this lawsuit behind them. If that is not the case, and if Avera is truly contemplating legal action against MMIC (no matter how meritless this action may be), then there is simply no reason for MMIC to continue

> to contribute to a global settlement offer with Avera. If there is no confirmation that there will be no bad faith action taken, we would be withdrawing the $1M attributed to Avera and we would pursue negotiations to resolve only the Andrews matter. Chris stated he would not forego any bad faith action and stated that he "did not need our money." If our understanding of your position is inaccurate please advise immediately and in writing.

(Docs. 82, ¶ 152; 89, ¶ 152). Chris Specht responded, stating "Avera is left with no option but to proceed with settlement discussions on its own to protect its interests." (Docs. 82, ¶ 152; 89, ¶ 152).

MMIC then attempted to negotiate the Andrews case which was a non-Avera case that MMIC deemed as being timely or partially timely. (Doc. 82, ¶ 153; 89, ¶ 153). Counsel for the Sossan plaintiffs was unwilling to negotiate individual cases. (Docs. 82, ¶ 153; 89, ¶ 153). At approximately 1:00 p.m. on the second day of mediation, Tim Schultz, Dawn Domsten and Joe Farchione left the mediation and did not return.[7] (Docs. 90, ¶ 224; 102, ¶ 224; 80-10 at 1846). At that point, MMIC was not going to increase its offer. (Docs. 80-23, Schultz Dep. 70:16-71:7). Tim Schultz testified that the mediator told them there was no reason for them to stick around. (Docs. 80-23, Schultz Dep. 70:16-71:7). Joe Farchione then told Mark Haigh who had been retained by MMIC to represent Dr. Swift, and who had been sitting in a room alone during the mediation that day, that the parties were too far apart and that they were going to discontinue mediating and that Mr. Haigh could go home. (Docs. 90, ¶ 225; 102, ¶ 225). Haigh testified that he had not been aware that MMIC was requiring that all of the defendants sign a waiver of bad faith claims against MMIC as a condition to its $2 million settlement contribution. (Doc. 79-8, Haigh Dep. 146:18-147:3).

MMIC specifically was told by its insureds that they were going to keep negotiating to try to settle the 36 Sossan Lawsuits. (Docs. 90, ¶ 232; 102, ¶ 232). Avera began to explore settling just the cases where it was a party. (Docs. 82, ¶ 155; 89, ¶ 155). The last offer was $5.5 million and the last demand was $6.25 million. (Docs. 82, ¶¶ 155-56; 89, ¶¶ 155-56). Avera then changed its strategy and gathered $750,000 from LCSH, its doctor-owners, and The Doctor's Company to settle the cases globally. (Docs. 82, ¶ 157, 89, ¶ 157).

---

[7] Shelly Davis, LCSH's claims representative, was travelling on September 6, 2019, and did not attend the mediation.

Once MMIC and its representatives left the mediation, it was not actively involved in any further settlement negotiations. (Docs. 90, ¶ 232; 102, ¶ 232; 85-13, Schultz Dep. 120:2-121:13). MMIC and Farchione, however, had sources telling him the offers exchanged between the insured and the Sossan plaintiffs and Farchione sent emails detailing the numbers being exchanged. (Docs. 90, ¶ 233; 102, ¶ 233). Upon learning of the offers and demands being exchanged by the insureds, Farchione's response was "I am a bit surprised by the numbers," and the reaction of MMIC's Nick Ghiselli, was "I am also surprised the plaintiffs went so low." (Docs. 90, ¶ 234; 102, ¶ 234).

## XVIII. Global Settlement

All 36 Sossan lawsuits were resolved and all claims against all defendants were released and dismissed in a global settlement with a payment of $10,675,000. (Docs. 90, ¶ 235; 102, ¶ 235). The settlement contributions were: Avera $9,925,000; LCSH - $150,000; LCSH doctor-owners - $350,000 (7 owners x $50,000), The Doctors Company (insurer for Dr. Trail) - $250,000. (Docs. 82, ¶ 162; 89, ¶ 162). MMIC did not contribute at all to the settlement that resolved all of the 36 claims against its insureds. (Docs. 90, ¶ 236; 102, ¶ 236). The settlement payments were divided among the underlying plaintiffs by the underlying plaintiffs' counsel. (Docs. 82, ¶ 163; 89, ¶ 163). The settlement payments were not allocated between the various claims, except that the release specifically states that no portion of the payment was for punitive damages. (Docs. 82, ¶ 164; 89, ¶ 164). The settlement payment was less than approximately 50 percent of the medical bills, including prejudgment interest incurred by the 36 plaintiffs. (Docs. 90, ¶ 238; 102, ¶ 238).

On September 20, 2019, Avera and LCSH wrote separately to MMIC requesting that MMIC pay $1 million for each of them based on MMIC's previous agreement to contribute $2 million towards a global settlement. (Docs. 82, ¶ 166; 89, ¶ 166). On September 21, 2019, MMIC's outside coverage counsel, Mark Malloy emailed Ghiselli stating: "The question that we need to decide is, strategically, is the payment of the $2 million that we committed before the mediation going to help us defend the bad faith claim down the line . . . My first blush is to tell them to pound sand, but we should discuss and have a measured response." (Docs. 90, ¶ 246, 102, ¶ 246). MMIC refused to pay the $2 million it had agreed to contribute toward a global settlement unless Avera and LCSH released any bad faith claims against MMIC—an offer which was not accepted by Avera and LCSH. (Docs. 82, ¶ 167; 89, ¶ 167).

34

Farchione testified that given the strength of the defenses, the case could have settled in the $2-3 million range. (Doc. 80-22, Farchione Dep. 250:7-11). From a trial standpoint, Farchione said that he would have fought the cases based on the statute of repose. (Docs. 80-22, Farchione Dep. 251:2-6). Ghiselli testified on behalf of MMIC that that a $2 million contribution was "gratuitous" and more than reasonable to settle the covered claims. (Doc. 80-6, Ghiselli Dep. 88:3-16). MMIC CEO, Bill McDonough, testified that he did not share Ghiselli's view that MMIC's $2 million offer was gratuitous. (Doc. 85-11, McDonough Dep. 113:22-114:4).

## XIII.   This Lawsuit

In this case, Plaintiffs brought an action against MMIC for breach of contract, bad faith, deceit, and promissory estoppel. (Docs. 82, ¶ 170; 89, ¶ 170). MMIC served discovery on Plaintiffs to find out the facts and circumstances of the settlement payments. (Docs. 82, ¶ 171; 89, ¶ 171). When asked about how the settlement payments were allocated between the claims asserted in each lawsuit as follows:

> 11. For each of the Underlying Lawsuits identify what portion of the settlement payments made by or on behalf of you were allocated to each of the claims alleged in that lawsuit.
>
> ANSWER: See Settlement Agreements produced with Plaintiffs' document production.

(Docs. 82, ¶ 172; 89, ¶ 172). The settlement agreement contains no allocation between the claims. (Docs. 82, ¶ 173; 89, ¶ 173). Additionally, the release for each plaintiff only included those defendants sued in the case – Avera was not released in the LCSH-only cases. (Docs. 82, ¶ 174; 89, ¶ 174). The settlement payments were divided as follows:

For the cases where only Avera was a defendant:

| Plaintiff | Amount of Settlement |
| --- | --- |
| Audrey Smith | 204,241.95 |
| Mary & Owen Weibel | 219,952.87 |
| Bernadine Pinkelman | 219,952.87 |
| Edward Janak | 235,663.79 |

| | |
|---|---|
| Larry Lieswald | 204,241.95 |
| Susan Sherman | 345,640.22 |
| Jesse Robinett | 157,109.19 |
| **TOTAL AVERA ONLY CASES** | **1,586,802.84** |

For cases where both Avera and LCSH were defendants:

| **Plaintiff** | **Amount of Settlement** |
|---|---|
| Jean Wildermuth | 298,507.46 |
| Metha Wildermuth | 408,483.90 |
| Shari Larea Neilan | 565,593.09 |
| Leo and Shirley Payer | 502,749.41 |
| Dawn and Anthony Anderson | 267,085.52 |
| Ryan and Amanda Novotny | 408,483.90 |
| Thomas Hysell | 345,640.22 |
| Melvin and Mary Birger | 298,507.46 |
| John and Valarie Viers | 109,976.43 |
| Kristi Lamers | 363,874.74 |
| Richard and Maureen Fizsimmons | 345,640.22 |
| Reneee and Randy Praeuner | 345,640.22 |
| **TOTAL BOTH** | **4,260,182.67** |

For cases where only LCSH was a defendant:

| **Plaintiff** | **Amount of Settlement** |
|---|---|
| Kim Andrews | 557,796.54 |
| Judy & Clyde Robertson | 125,687.35 |

| | |
|---|---|
| Donald Bowens | 282,796.54 |
| Kelli & Harlan Tjeerdsma | 188,531.03 |
| Rodney Hrdlicka | 172,820.11 |
| Vanessa Callahan | 298,507.46 |
| Cathy & David Kumm | 282,796.54 |
| Shelly Jones-Hegge & Jason Hegge | 290,652.00 |
| Bridget & Mark Zweber | 172,820.11 |
| Christ and Dean DeJong | 395,296.54 |
| Laurie State n/k/a Laurie Ragan | 235,663.79 |
| Brett McHugh | 260,663.79 |
| Brian Leyden | 141,398.27 |
| Clair & Diane Arens | 471,327.57 |
| Suzann & Gary Bloomquist | 141,398.27 |
| Samanda & James Pickenpaugh | 188,531.03 |
| Christine Hentges | 621,327.57 |
| **TOTAL LEWIS & CLARK** | **4,828,014.51** |

(Docs. 82, ¶ 175, 89, ¶ 175).

The settlement contributions were: Avera $9,925,000; LCSH - $150,000; LCSH doctor-owners - $350,000 (7 owners x. $50,000), The Doctors Company (insurer for Dr. Trail) - $250,000. (Docs. 82, ¶ 162; 89, ¶ 162). When asked to explain why Avera paid 93% of the settlement, which included payments for lawsuits where it was not a party, Chris Specht, Avera's corporate representative testified:

Q:     And am I correct that it was Avera's position that aside from any obligation
it had taken on in an indemnity provision in an asset purchase agreement that Avera

had no legal responsibility for procedures that were performed only at LCSH, correct?

A:      Correct.

Q:      Okay. And that for procedures that were performed both at Avera and at LCSH, and, again, aside from any indemnity obligation subsequently taken on in an asset purchase agreement, that Avera only had responsibility for those procedures that were performed at Avera Sacred Heart and if those same plaintiffs also had procedures performed at LCSH, whatever damages arose out of the LCSH procedures were LCSH's responsibility, correct?

A:      No. And I need to correct my prior answer as I sit here and think about it. There's – there was always the possibility of use being responsible for each other's behavior, I would say, with regard to LCSH and Avera. There could have been cross-claims, there could have been joint tortfeasor obligations. I'm no lawyer, but our counsel had routinely advised us of the potential for those actions.

Q:      Okay. My question, however, didn't ask whether someone with a word processor and a filing fee could make a claim. My question was: Avera's position as to whether it believed it had legal responsibility aside from which it subsequently assumed in the asset purchase agreement for damages arising out of procedures performed at a location other than at Avera Sacred Heart?

A:      And my response would be, we could have.

Q:      You believed you could have or it was a threat there like there's any other threat of litigation? I'm asking what Avera's position was with regard to its liability for procedures not performed at Avera. Did Avera deny it had any responsibility for those procedures?

A:      As I have stated, there was exposure associated with all claims. And as we evaluated those claims and that exposure, we were concerned that as the cases moved forward, if they move forward, there would be those actions that I previously mentioned. And counsel advised us of those risks.

. . .

Q:      Okay. And was there some determination as to what that [$15 million settlement authority] represented? I mean, was all of it on behalf of Avera? Was some of it considered payment – available as payment of the indemnity under the asset purchase agreement? Or was it just undelineated funds?

A;      It was essentially undelineated. It was undelineated funds. There was a discussion about needing the resolution to be global, to include all allegations that had been made or could be made, and to the extent necessary, to extinguish any cross-claim opportunities or exposure to joint tortfeasors kinds of claims. Frankly the indemnity of LCSH didn't come up.

(Docs. 82, ¶ 177; 89, ¶ 177).  At the time of the settlement, corporate counsel for LCSH, Bret Lovrien testified that LCSH had only $175,000 in the company account.  (Doc. 79-2, Lovrien Dep. 120:16-121:19).

## STANDARD OF REVIEW

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To meet this burden, the moving party must identify those portions of the record which demonstrate the absence of a genuine issue of material fact, or must show that the nonmoving party has failed to present evidence to support an element of the nonmovant's case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Once the moving party has met this burden, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. City of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)).  "[T]he mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . . Instead, the dispute must be outcome determinative under prevailing law." *Id.* at 910-11 (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992)).  In ruling on a motion for summary judgment, the facts, and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion" for summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## DISCUSSION

The summary judgment motion has been fully briefed by the parties.  The Court heard oral argument on the motion on May 2, 2023.  By letter dated May 3, 2023, counsel for Plaintiffs indicated that they do not intend to proceed with their breach of contractual duty to indemnify claims set forth in Counts 1 and 2.  Defendants have moved for summary judgment on all of the remaining claims.  The Court will address each remaining claim in turn.

I.    **Bad Faith Claims**

A. **Settlement demand within policy limits**

Defendants argue that it is well-settled law that to establish a bad faith failure to settle, the policyholder must prove its insurer had an opportunity to settle the case within the policy limits. (Doc. 81 at 2160). Defendants argue that all South Dakota bad faith failure to settle cases are cases where the insurer receive a settlement demand within limits and rejected it. (Doc. 81 at 2160) (citing *Kunkel v. United Security Ins. Co. of N.J.*, 168 N.W.2d 723, 725 (S.D. 1969); *N. River Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 600 F.2d 721, 724 (8th Cir. 1979); *Helmbolt v. LeMars Mut. Ins. Co.*, 404 N.W.2d 55, 56 (S.D. 1987); *Crabb v. Nat'l Indem. Co.*, 205 N.W.2d 633, 635 (S.D. 1973); *Luke v. Am. Fam. Mut. Ins. Co.*, 476 F.2d 1015 (8th Cir. 1972)). Defendants argue that Plaintiffs failed to present a settlement demand within policy limits to MMIC before they settled the cases and thus it is entitled to judgment as a matter of law on Plaintiffs' bad faith claims. (Doc. 81 at 2162).

In opposition, Plaintiffs argue that there is nothing in South Dakota's law of third-party bad faith that incorporates an "escape-hatch for insurance companies that requires a formal and futile presentation of the final settlement amount to an insurer who has already communicated its refusal to pay anything before it could ever be adjudged of violating its good faith duty to settle." (Doc. 91 at 3423). MMIC made clear that its final settlement contribution would be $2 million dollars conditioned upon Plaintiffs waiving any claims for bad faith.

It is true that MMIC was not presented with a settlement demand below policy limits before the parties settled in this case. At the mediation, after MMIC offered its $2 million and that amount was combined with contributions from Avera's remaining SIR, the Doctors Company (insurer for Dr. Trail) and LCSH, that combined amount was rejected by the Plaintiffs. Chris Specht with Avera requested that MMIC authorize an additional $3 million which MMIC refused. On the close of mediation of the first day, MMIC informed Avera that it would only pay the $2 million in exchange for a release of all claims, including bad faith. MMIC left the mediation. MMIC was informed a couple of weeks later that the parties had settled within policy limits. There is evidence that MMIC was aware the settlement negotiations were ongoing, but never participated further.

### 1. LCSH's bad faith claim

At the outset, it should be noted that the issue in this case is not that MMIC refused to consent to settlement. MMIC agreed to contribute $2 million to a global settlement of all claims. The issue in this case regards whether MMIC exercised good faith in giving equal consideration

to the insureds' interests when on the second day of mediation, it refused to contribute any more than $2 million to settlement, and only if the insureds waived any bad faith claims against MMIC.

Contrary to that argued by Defendants, the Court does not conclude that presenting an insurer with a settlement demand within policy limits is an essential element of a bad faith duty to settle claim under South Dakota law. In *Kunkel v. United Sec. Ins. Co. of N.J.*, 168 N.W.2d 723 (S.D. 1969), the South Dakota Supreme Court cited *State Automobile Ins. Co. of Columbus, Ohio v. Rowland*, 427 S.W.2d 30 (Tenn. 1968) and *Cernocky v. Indem. Ins. Co. of N.A.*, 216 N.E.2d 198 (Ill. App. 1966) with approval for the proposition that "an offer to settle within policy limits is *not* a prerequisite to an action to recover for excess liability." *Id.* at 731 (emphasis added). In *Rowland*, the defendant insurance company argued: 1) that until an injured party has offered to settle a case for an amount within the policy limits, the company is under no legal duty to attempt to effectuate a settlement; and 2) if the demand is in excess of the policy limits, the insurer has no authority to bind the insured by a settlement and therefore cannot be guilty of bad faith in failing to settle. *Id.* at 428. The court in *Rowland* rejected both arguments. *Id.* The court noted that under the terms of the insurance policy, the company undertook to "defend any suit alleging such bodily injury or property damage and seeking damages which are payable under the terms of this policy." *Id.* The policy also reserved to the defendant the right to "make such investigation and settlement of any claim or suit as it deems expedient." *Id.*

The court in *Rowland* stated that "[i]t is well established that an insurer having exclusive control over the investigation and settlement of a claim may be held liable to its insured for an amount in excess of its policy limits as a result of bad faith if it fails to effect a settlement within policy limits." *Id.* The court stated that:

> Such a rule is both necessary and practical. In return for the insurance company's agreement to cover losses occasioned by the negligent acts of the insured, the insured must surrender his right to control the defense of claims brought against him. . . .
>
> On-the-other-hand the insured assumes that the insurance company will act in good faith and in a diligent manner in its investigation, negotiation, defense and settlement of claims brought against the insured.

*Id.* at 429. The *Rowland* court noted that a possible conflict of interest exists between the insured and the insurer when a claim exceeds policy limits and that "the right to control investigation,

41

settlement and litigation of claims must be subordinated to the insurer's contractual duty to indemnify the insured against loss; that the insurer cannot escape liability by considering only what appears to be for its own interest." The court in *Rowland* noted that there was evidence that the plaintiff's attorney had made a remark indicating a willingness to settle within policy limits if the insurance company had chosen to pursue the matter instead of walking away. *Id.* at 433. The court held that:

> [T]o hold as a matter of law that an insurance company cannot be guilty of bad faith unless it has received an offer of settlement within the policy limits could most certainly lead to inequitable results. We see nothing, under such a holding, to prevent an insurance company, in a case where liability is certain and injury great, to simply decline negotiations with the injured party and later assert that there was no offer within the policy limits. We do not hold that the insurance company has an affirmative duty to negotiate with the injured claimant in all cases. We would only say that a refusal to discuss a settlement may be considered along with other evidence in determining the issue of bad faith.

*Id.* at 433-34.

As in *Rowland*, the *Cernicky* court also held that "[t]he fact that no offer was made [by the plaintiffs] to settle within the policy limits is merely one factor to be considered in light of the surrounding circumstances in determining whether the defendant was guilty of bad faith." 216 N.E.2d at 209. The court in *Cernicky* distinguished *Cotton States Mutual Insurance Co. v. Fields*, 106 Ga.App. 740 (Ga. Ct. App. 1962), finding that unlike in *Cotton* where there were no facts showing the defendant could have effected a settlement if it had attempted to do so, in *Cernicky*, the defendant refused to accept an invitation to negotiate and declined to disclose the limits of its coverage. *Id.* at 210-11.

As in *Rowland* and *Cernicky*, in the present case, MMIC was in control of LCSH's defense under the terms of LCSH's policy. LCSH's primary medical professional liability policy provided that "MMIC shall have the right and duty to defend any suit against the insured alleging such damages," and the MMIC "may make such investigation of such settlement of any claim or suit at it's sole discretion." Additionally, at all times, MMIC retained control over the outcome of the settlement because LCSH's policy prohibited "no voluntary payments" without the consent of MMIC.

Under these circumstances, *Kunkel* and *Rowland* plainly indicate that an insurer may be liable for bad faith even if it did not receive a demand to settle within policy limits. The MMIC claims representative for LCSH was not in attendance on the second day of mediation. MMIC told John Grey, attorney for LCSH, to not return for the second day of mediation and told and Mark Haigh, attorney for Dr. Swift, to leave the during the middle of the second day of mediation. MMIC representatives knew that settlement negotiations were ongoing and there is evidence that neither they, nor counsel retained by MMIC for its insureds, participated in further negotiations. As in *Rowland*, the South Dakota Supreme Court has expressed on numerous occasions that a refusal to discuss settlement may be considered, along with other evidence in determining the issue of bad faith. *See Kunkel*, 168 N.W.2d at 731; *Crabb v. Nat'l Indemnity Co.*, 205 N.W.2d 633, 637 (S.D. 1973).

### 2. Avera's bad faith claim

Although MMIC did not have a duty to defend Avera and chose not to exercise its right to defend when Avera offered up at mediation its remaining SIR, MMIC still retained the right under Avera's policy to consent to any settlement reaching its coverage level. Although the South Dakota Supreme Court had not yet examined this situation, in its opinion on the motion to dismiss, this Court looked to other jurisdictions that had imposed upon an excess insurer such as MMIC, a duty to exercise good faith in settling claims within policy limits. (Doc. 61 at 916). These courts have held that a fiduciary-like relationship is created between an excess insurer and the insured when, as in this case, the excess insurer has the right under the policy to consent to any settlement reaching its coverage level. (Doc. 61 at 915-16). Accordingly, an excess insurer has an implied obligation to exercise that right in good faith. (Doc. 915). The court noted that the purpose of liability insurance is to protect the insured from liability within the limits of the contract and the insurer may not frustrate that purpose by a settlement decision which exposes the insured to a judgment beyond the specific money protection which his premium purchased. (Doc. 61 at 916).

The Court noted that unlike with a primary insurer, an excess insurer did not owe a duty to its insured to participate in the defense or initiate settlement negotiations until the primary policy limits were exhausted. (Doc. 61 at 917). The Court examined cases from other jurisdictions which found that an excess insurer's duty vis-à-vis settling a claim does not arise until the excess insurer had been made aware that the primary insurer has tendered its policy limit. (Doc. 61 at 917). The

Court noted that as is standard under excess policies, the language of Avera's policy provided that when a primary insurer tenders its full policy limits, excess insurers can at their discretion, agree to undertake the defense. (Doc. 61 at 917). The Court noted, however, that whether an excess insurer exercises its right to defend, it is still obligated to exercise good faith in making settlement decisions when, like MMIC in this case, the excess insurer has the complete discretion to settle. (Doc. 61 at 918). The Court stated that when a primary insurer tenders its remaining policy limits in settlement and makes that fact known to the insurer, the excess insurer must then in good faith evaluate whether the settlement value of the covered claims warrants a further contribution by it to a settlement. (Doc. 61 at 918).

In this case, MMIC and Avera agreed in a June 11, 2019 pre-mediation meeting that each would offer up $2 million in the mediation to kick-start settlement negotiations. Prior to the mediation, Joe Farchione sent an email to MMIC discussing whether to take control of the defense when Avera offered the limits of its remaining SIR. MMIC representatives were present on the first day of mediation and per the agreement between MMIC and Avera, Avera offered up its $2 million, MMIC's $2 million contribution, along with $50,000 from Dr. Trail's insurance carrier. Avera's remaining SIR at that time was approximately $1.9 million. When Avera offered the remaining limits of its SIR, MMIC's duty as an excess insurer vis-à-vis settlement arose. MMIC's duty to engage in settlement in good faith was not contingent upon receiving a settlement demand within policy limits.

### B. Did MMIC place its interests ahead of Plaintiffs?

The South Dakota Supreme Court has acknowledged that "A covenant is implied in an insurance contract that neither party will do anything to injure the rights of the other in receiving the benefits of the agreement. This covenant includes a duty to settle claims without litigation in appropriate cases." *Helmboldt v. LeMars Mut. Inc. Co.*, 404 N.W.2d 55, 57 (S.D. 1987) (citation omitted). In considering what constitutes good or bad faith, the interests of the insured must be given "equal consideration" with those of the insurer, and in making a decision to settle or try a case, the insurer must in good faith view the situation as it would if there were no policy limits applicable to the covered claim, and that it would be required to pay the sum the plaintiff would likely recover. *See Crabb v. Nat'l Indem. Co.*, 205 N.W.2d at 635 (citing *Kunkel*, 168 N.W.2d at 726-27); *Kunkel*, 168 N.W.2d at 726-727.

44

Whether or not an insurer has adhered to the standard of good faith usually depends upon circumstances and elements involved in a particular case. *Kunkel*, 168 N.W.2d at 727. There is an array of factors to consider in determining whether an insurer's refusal to settle is equivalent to a breach of its good faith duty. *Helmboldt*, 404 N.W.2d at 57. These factors include:

(1) The strength of the injured claimant's case on the issues of liability and damages; (2) attempts by the insurer to induce the insured to contribute to a settlement; (3) failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured; (4) the insurer's rejection of advice of its own attorney or agent; (5) failure of the insurer to inform the insured of a compromise offer; (6) the amount of the financial risk to which each party is exposed in the event of a refusal to settle; (7) the fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and (8) any other factors tending to establish or negate bad faith on the part of the insurer.

*Id.* "The decision to settle must be thoroughly honest, intelligent, and impersonal. It must be a realistic decision tested by the expertise which an insurer necessarily assumes under the terms of its policy." *Kunkel*, 168 N.W.2d at 726. "[T]he character and extent of an insurer's negligence are [also] factors to be considered by the trier of fact in determining if there is bad faith." *Id.* at 725. "Where the insurer recognizes liability and the probability of a verdict in excess of policy limits circumstances constituting a failure to exercise good faith may weigh in favor of an insured." *Id.* Whether an insurance company acted in bad faith is typically a question of fact for the jury or other trier of fact. *Id.* at 730.

Defendants argue that bad faith does not exist as a matter of law in this case because the negligent credentialing claims that were covered under Plaintiffs' policies with MMIC were subject to dismissal under the statute of repose. Defendants argue that the Court should find as a matter of law that the South Dakota Supreme Court would have concluded that the Sossan plaintiff's negligent credentialing claims were barred by the statute of repose under *Pitt-Hart*. The Court is unwilling to do so as there is no reason to do so now. The law as it existed in 2019 is what is relevant. Whether an insurer engaged in bad faith must be based on the facts and law available to the insurer at the time of settlement. *See Kunkel*, 168 N.W.2d at 727; *see also Isaac v. State Farm Mut. Auto Ins. Co.*, 522 N.W.2d 752, 758 (S.D. 1994). The uncertainty regarding whether or not *Pitt-Hart* would apply to bar the negligent credentialing claims factored into the exposure that Plaintiffs faced on these claims.

At summary judgment, the Court is bound to view the facts in the light most favorable to Plaintiffs, the nonmoving party, and draw all inferences in their favor. In doing so, the Court finds that a reasonable juror could conclude that Plaintiffs faced significant exposure on the covered negligent credentialing claims. It is true that Joe Farchione believed that all but one of the negligent credentialing claims were subject to dismissal based on the statute of repose and the South Dakota Supreme Court's decision in *Pitt-Hart*. Although Joe Farchione was advising Plaintiffs on litigation strategy, he was hired to represent the interests of MMIC, not that of the insureds. Joe Farchione was hired by MMIC approximately 3 months before the mediation. He was not licensed to practice law in South Dakota and had never appeared in a court in the state.

There is evidence in the record suggesting that Nick Ghiselli and Farchione believed that the South Dakota lawyers that MMIC hired to represent its insureds, and counsel for Avera, had either overlooked *Pitt-Hart* or had not been forthcoming about the decision out of concern that it would result in dismissal of their covered claims, leaving them to litigate the uncovered claims on their own. Meanwhile, the record shows that the South Dakota attorneys made MMIC aware of *Pitt-Hart* when it was first issued and each of them testified that they had looked at *Pitt-Hart* extensively and analyzed its application to the Sossan cases. Mark Haigh, counsel hired by MMIC to represent Dr. Swift, testified that it was unclear whether the circuit court would hold that the negligent credentialing claims were medical negligence cases subject to the statute of repose and the $500,000 cap on non-economic damages. Roger Sudbeck, counsel for Avera, did not believe that the circuit court would reverse its decision. Matt Murphy, counsel for Avera, testified that there was a lot of uncertainty because the statute of repose had never been applied to a case like this. John Gray, counsel for LCSH, had told Farchione during a phone conversation that the circuit court would likely deny the motion for summary judgment and that there would not be an automatic appeal.

If the circuit court ruled against Plaintiffs on summary judgment, the South Dakota lawyers thought it was very uncertain whether the Supreme Court would take the issue up on immediate appeal given that it was not an issue relating to privilege, and given the Supreme Court had already taken an interlocutory appeal in the case. In this situation, Avera would be left to try 36 cases individually or perhaps in groups of three or four at a time as the circuit court had indicated early on in the litigation that it may do. With only $1.9 million remaining of its SIR, Avera would incur

significant litigation costs.[8]  Given the large number of cases, South Dakota attorneys had concerns that the medical malpractice cases and the negligent credentialing claims would be tried together. The expert hired by MMIC found that 22 of the 36 cases were completely indefensible on the medicine and there were concerns that with Dr. Sossan having fled to Iran and leaving an empty chair at trial, that it would reflect negatively on Plaintiffs with regard to the negligent credentialing claims. Shortly before the mediation, a jury found Sossan liable for medical malpractice and had awarded the plaintiff a $950,000 verdict, although the case did not involve a negligent credentialing claim. (Doc. 90, ¶ 45; 102, ¶ 45). While lawyers had less concern about the initial credentialing decision by the hospital, Mike Marlow, attorney for some of the individual doctors, testified that he was unsure how they would defend a credentialing claim without waiving peer review. Roger Sudbeck stated that he was concerned about information that plaintiffs obtained outside of peer review that showed that the hospitals knew or should have known about Sossan's negligent and fraudulent conduct before they recredentialed him.

At the pre-mediation meeting on June 11, 2019, Ghiselli asked for thoughts on global value. Chris Specht opined it "will take $20M-25M to resolve." Attorney Mark Haigh further stated at the pre-mediation meeting that he thought the case could be settled for $15 million, that he "would pay more to get it done," although he admitted in his deposition that his global estimate was based on limited information since he was only handling seven cases. Mr. Haigh testified that Ms. Davis thought his estimate was too high and that they could settle for a lot less. Attorney Mark Marlow stated that he believed that it could be settled for "even less than $15M," for around $10 million. Roger Sudbeck, counsel for Avera, said defendants "may need at least $15M to resolve." Matt Murphy, counsel for Avera, testified that he had agreed with Mr. Haigh that the settlement value was $12 million to $15 million. Farchione testified that although he would have litigated the cases based on *Pitt-Hart*, given the strength of the defenses, the case could have settled in the $2-3 million range. Ghiselli testified that he though MMIC's $2 million offer was "gratuitous," but Bill McDonough, CEO of MMIC, testified that he did not share that view.

Although MMIC had not set reserves in Avera's case, it had set reserves of $3 million on the lawsuit against LCSH. This is much less than the $2 million that MMIC offered to contribute

---

[8] There is evidence in the record that Roger Sudbeck had opined that it would cost approximately $250,000 per firm to try each case and Avera would likely incur significant litigation costs.

to mediation at the outset and may be considered as evidence of bad faith. S.D. Pattern Jury Instructions 30-20-50 (citing *Crabb v. Nat'l Indem. Co.*, 206 N.W.2d 633, 636-37 (S.D. 1973) (stating that the amount of reserve established by an insurer may be considered as a factor in a bad faith analysis)). In addition, Avera and LCSH faced $22 million just in medical damages and prejudgment interest which the parties agreed would be recoverable if the hospitals were found liable for negligent credentialing. Sheila Davis and Dawn Domsten had indicated in their June 2019 large loss committee report that there was merit for compensation for non-economic damages in cases where the surgeries were unnecessary. There was also uncertainty whether non-economic damages would be subject to the $500,000 statutory cap for medical malpractice claims.

On the second day of mediation, after counsel for the defendants had raised the issue of bad faith, MMIC conditioned its $2 million settlement contribution on Plaintiffs' waiver of bad faith. It appears from admissible evidence that this condition was not previously part of MMIC's initial commitment to contribute $2 million to a global settlement. In *Isaac v. State Farm Mut. Auto. Ins. Co.*, 522 N.W.2d 752 (S.D. 1994), the South Dakota Supreme Court held that an insurance company may not condition payment of insurance benefits on a waiver of bad faith claims. *Id.* at 761. Defendants argue that *Isaac* is distinguishable from this case. *Isaac* was a first-party failure to pay underinsured motorist benefits claim whereas this case is a third-party failure to settle case. Defendants argue that unlike in the first-party insurance context at issue in *Issac*, MMIC owed no payment to its insureds because there was a dispute over how much MMIC would pay and how much the insureds would pay towards settlement in light of the non-covered exposure for the fraud and intentional tort claims. Defendants argue that given the statute of repose defense, MMIC did not owe an obligation to pay anything towards settlement at the time of mediation, that it could have canceled the mediation and continued to litigate the cases. (Doc. 81 at 2195-96).

The South Dakota Supreme Court has held that the duty to settle in appropriate cases, although not an express duty like the duty to indemnify, is an implied duty in every insurance contract. *See Helmbolt*, 404 N.W.2d at 57. The Court concludes that in a third-party context, as with a first-party claim, an insurance company cannot condition compliance with a contractual duty, whether it be express or implied, only if the insured agrees to the release a bad faith claim. "An insurer may not 'ignore[ ] its duty of good faith for the purpose of protecting its own interest.'"

48

*Id.* Allowing an insurer to condition its duty to settle in appropriate cases on a release of bad faith would permit an insurance company to insulate itself from bad faith liability for settlement contributions that do not even remotely approximate an insurer's liability and damages estimation for covered claims. Under the present circumstances, South Dakota law does not allow a settlement offer for an insured to be conditioned upon waiver of all bad faith claims against the insurer.

It follows then, as expressed by expert Daniel Doucette, that MMIC's $2 million settlement contribution, made contingent upon Plaintiffs' waiver of a legal right, essentially rendered MMIC's contribution to zero. (Doc. 101-4, Doucette Dep. 147:20-148:3; 154:2-155:5). The Court expects that there will be much testimony about liability and damages relating to the negligent credentialing claims at trial and their approximate value. Whatever their value be determined by the jury at trial, Mr. Doucette opined that the exposure Plaintiffs' faced in the negligent credentialing claims was not zero. Viewing the facts in the light most favorable to Plaintiffs at this summary judgment stage, there is a jury question as to whether MMIC placed its interests ahead of those of Plaintiffs.

### C. Does LCSH have sufficient evidence to create a fact issue that MMIC acted in bad faith?

After mediation, LCSH and its owners paid $500,000 to settle the 29 lawsuits pending against it. After settlement was reached, personal counsel for LCSH, Brett Lovrien, sent a letter to MMIC requesting that MMIC made good on its promise to contribute $1,000,000 on behalf of LCSH to a global settlement. Citing to *Isaac v. State Farm*, 522 N.W.2d 752 (S.D. 1994), Mr. Lovrien informed MMIC that under South Dakota law, it is bad faith to condition the payment of MMIC's legal obligation to LCSH on a release of their bad faith claims. Mr. Lovrien requested that MMIC make payment of $1,000,000 towards the settlement on behalf of LCSH without any release of a bad faith claim. Defendants argue that there is no fact issue that MMIC put its interests ahead of LCSH when it offered twice what LCSH had paid in settlement of the cases, conditioned upon LCSH waiving its bad faith claims against it.

LCSH was a defendant in 29 of the 36 lawsuits and faced exposure for their claims. MMIC set settlement reserves of $3 million for LCSH. If found liable for the negligent credentialing claims, LCHS was facing very substantial damages. LCSH's policy limits with MMIC totaled $5

million. As the Court has already held, it is impermissible for an insurer to condition its duty to settle in appropriate cases on a release of bad faith claims against it. Doing so effectively rendered MMIC's settlement offer to zero. Expert Daniel Doucette opines that Plaintiffs' exposure to the negligent credentialing claims was more than zero. The Court concludes there is a jury question on whether MMIC breached it good faith duty to settle and whether MMIC acted in bad faith.

### D. Reasonableness of settlement payment

In its opinion on the motion to dismiss, the Court stated that the majority of courts have held that the breach of the duty to settle in good faith, even though it is an implied and not an express duty like the duty to defend, also excuses an insured from compliance with the cooperation, no voluntary payments, and no action clauses. In such circumstances, the court noted, an insured may enforce a settlement against the insurers if reasonable and made in good faith. (Doc. 61 at 902). The Court predicted that the South Dakota Supreme Court "would following the majority rule and conclude that an insurer has waived its rights under the 'cooperation,' 'no voluntary payments' and 'no action' provisions if the insured proves that the insurer breached its duty to give equal consideration to the interests of its insured when settling a case." (Doc. 61 at 905).

MMIC argues that Avera's payment of $9,925,000 out of a total settlement of $10,675,000 is unreasonable as a matter of law. MMIC argues that Avera knew it was paying for 93% of the settlement and that its contribution would be used to resolved cases where it was not a party. (Doc. 81 at 2172). MMIC points out that Avera was not a defendant in 17 cases and that Roger Sudbeck, Avera's counsel, estimated that Avera's proportionate liability was only 35%. MMIC also notes that the plaintiff's last demand to Avera at the mediation was $6.25 million and argues that paying several million dollars more than plaintiff's last settlement demand is unreasonable as a matter of law. MMIC argues that despite the fact that Avera was obligated to indemnify LCSH for any losses relating to the negligent credentialing claims under the parties' asset purchase agreement, Avera's payment was solely to settle its own liability, not that of LCSH. In support of this assertion, MMIC points to deposition testimony of Chris Specht, risk manager for Avera, who testified that the $15 million in settlement authority he had on behalf of Avera was undelineated between the liability of Avera and that of LCSH, and that "frankly, the indemnity of LCSH didn't come up." (Doc. 81 at 2173).

Under the *Miller-Shugart* line of cases, the reasonableness of a settlement is determined from the point of view of a prudent person in the position of the insured defendant at the time of settlement. *Miller v. Shugart*, 316 N.W.2d 729, 735 (Minn. 1982) ("The test as to whether the settlement is reasonable and prudent is what a reasonably prudent person in the position of the defendant would have settled for on the merits of plaintiff's claim."). "This involves a consideration of the facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial." *Id.* Reasonableness is not determined by conducting the very trial obviated by the settlement. *Alton M. Johnson Co. v. M.A.I. Co.*, 463 N.W.2d 277, 279 (Minn. 1990). "Consequently, the decisionmaker receives not only the customary evidence on liability and damages but also other evidence, such as expert opinion of trial lawyers evaluating the 'customary' evidence. This 'other evidence' may include verdicts in comparable cases, the likelihood of favorable or unfavorable rulings on legal defenses and evidentiary issues if the tort action had been tried, and other factors of forensic significance. *Id.*

The Court finds that the jury could reasonably find that the settlement agreement was reasonable. Even though Chris Specht testified in his deposition that Avera's obligation to indemnify LCSH for any losses related to the negligent credentialing claims "didn't come up," MMIC knew of Avera's duty to indemnify LCSH for any losses relating to the negligent credentialing claims under the asset purchase agreement. At the time of settlement, LCSH had less than $200,000 in the bank. All parties clearly contemplated entering into a global settlement at mediation. In fact, MMIC conditioned its $2 million contribution to settlement on the parties achieving a global resolution. If there was to be global settlement of plaintiffs' claims, any funds needed on top of MMIC's settlement contribution would have to come from Avera and the other defendants regardless of Roger Sudbeck's estimation of each of Avera's and LCSH's share of liability. While Joe Farchione testified that he thought all but one of the negligent credentialing claims would be dismissed either by the circuit court or the South Dakota Supreme Court on intermediate appeal under the statute of repose, near the time of settlement, many of the South Dakota lawyers who had been working on the case for the more than five years were uncertain whether South Dakota courts would apply the statute of repose to the negligent credentialing claims. If Avera and LCSH received an unfavorable ruling on the statute of repose with the circuit court, there was further uncertainty whether the South Dakota Supreme Court would take the issue up on immediate appeal, let alone how it would rule if it did take the immediate appeal. If it did

not take the immediate appeal, Avera and LCSH would be faced with trying the 36 cases individually. Avera would have to pay its own defense costs and under its indemnification agreement with LCSH, Avera would be facing damages in excess of $22 million dollars just in medical expenses and prejudgment interest. The Court concludes that the jury could find that a reasonably prudent person in the position of Avera would have settled for $10.675 million given the exposure Avera was facing on the covered claims.

### E. Allocation of Settlement Between Covered and Uncovered Claims

Defendants argue that because the case involved both covered and non-covered claims, an allocation between those claims is required to determine what portion MMIC would be required to pay if Plaintiffs establish that MMIC acted in bad faith and the settlement was reasonable. (Doc. 81 at 2175). Defendants argue that Plaintiffs' failure to allocate any of the settlement to non-covered claims is unreasonable as a matter of law. (Doc. 81 at 2176).

On summary judgment and at oral argument, Plaintiffs argued that the only claims that MMIC definitively showed were not covered under Plaintiffs' policies with MMIC were punitive damages. Plaintiffs appear to argue that all of the claims, other than claims for punitive damages, should be treated as covered claims because there was never a determination that any of the claims brought by the Sossan plaintiffs were not covered. (Doc. 901 at 3456). At oral argument, Plaintiffs argued that in the reservation of rights letters to Avera and LCSH, MMIC did not definitely disclaim liability for claims based on fraud and other intentional conduct.

The Court disagrees. Plaintiffs' policies with MMIC provided that coverage did not apply to "(d) any willful, fraudulent, dishonest, criminal or malicious act or omission, by or with the knowledge or consent of, or at the direction of, any insured." The initial and subsequent reservation of rights letters set forth MMIC's positions more fully. Of course, it is the policy language which controls. MMIC's reservation of rights letters to Plaintiffs provided that if found liable for fraud, deceit or other intentional conduct alleged in the complaint, that any associated damages were not covered under the policies. MMIC's reservation of rights letter to Avera provided that "six of the eight causes of action asserted against the Avera Defendants—deceit and unfair trade practices, fraudulent misrepresentation, fraudulent concealment, conspiracy, RICO violations, unjust enrichment, and bad faith review—require conduct barred by that exclusion. Moreover, if Plaintiffs prove (as alleged) that the extension of privileges to Sossan and/or the

allowance of performance of unnecessary surgery was a knowing and direct result of an intentional scheme to increase profit, then said claims may be barred by exclusion d." (Doc. 84-4 at 2534). The reservation of rights letter issued to LCSH provides that the "MMIC policy does not cover damages awarded against [LCSH] based on a finding of intentional, dishonest, or fraudulent conduct. The policy does not provide coverage for any punitive damages, declaratory relief, or injunctive relief. Allegations of negligent credentialing are covered to the extent the credentialing was done by a committee at Lewis & Clark." (Doc. 78-6 at 1301). In an updated reservation of rights letter issued to LCSH, MMIC provided that any damages awarded against the hospital for unjust enrichment or other ill-gotten gains do not qualify as "damages" and are not covered under the policy, and that exclusions for "any willful, fraudulent, dishonest, criminal or malicious acts or omissions, by or with the knowledge or consent of, or at the direction of, any insured," "preclude coverage for all of plaintiffs' claims except for the negligence claim." (Doc. 78-7 at 1330-31).

There is no dispute that the settlement agreement in this case encompassed not only negligence claims, but also claims for fraud, deceit, and other intentional conduct alleged against Avera and LCSH that are excluded from coverage under Plaintiffs' policies with MMIC. Chris Specht testified that the $10.675 million settlement was "a global settlement of all claims that were made or could have been made, including claims for fraud, deceit, and other intentional conduct." (Doc. 85-14, Specht Dep. 52:5-53:9). However, contrary to the argument put forth by Defendants, failure to allocate a settlement between covered and uncovered claims does not render the agreement unreasonable. *See Kings Cove Marina, LLC v. Lambert Commercial Const.*, LLC, 958 N.W.2d 310, 322 (Minn. 2021) ("We hold that the failure to allocate between covered and uncovered claims does not make the . . . settlement agreement per se unreasonable."). In *Kings Cove Marina, LLC v. Lambert Commercial Const., LLC*, a case cited to by both parties in their briefs, the Minnesota Supreme Court said that the issue of how much of the settlement is covered is distinct from the issue of whether a settlement is reasonable." *Id.* The court stated that "the allocation issue relates to the relative value of covered and uncovered claims," that "an allocation is, by its very nature, a determination of the relative value—not the absolute value—of the items being assessed." *Id.* The court in *King's Cove* stated that if the district court finds that the unallocated settlement is reasonable, the district court then considers the issue of allocation. *Id.* at 323-24. "The test is how a reasonable person in the position of the insured would have valued and

allocated the covered and uncovered claims at the time of the settlement." *Id.* The court concluded that the burden of proof on allocation falls on the insured, King's Cove. *Id.* at 323.

As the Court held in its motion to dismiss, MMIC's good faith duty to settle only extended to covered claims, not uncovered claims. Thus, any damages awarded in this case will be limited to what the jury finds to be reasonable amounts paid by Plaintiffs to settle the credentialing claims in the 36 Sossan lawsuits. In evaluating how a reasonable person in the position of the insured would have valued covered and uncovered claims at the time of the settlement, jurors may consider "any facts that bear on the issues of liability, damages, and the risks of trial."[9] *King's Cove*, 958 N.W.2d at 324. The relevant evidence regarding allocation may include (1) information that was available to the parties at the time of the settlement regarding the underlying facts, (2) materials produced in discovery and any court rulings in the underlying litigation, (3) evidence of how the parties and their attorneys evaluated the claims at the time of settlement, and (4) expert testimony about the value of the settled claims. *Id.* "Events and circumstances happening after settlement are relevant only insofar as they inform how a reasonable party would have valued and allocated the claims at the time of settlement." *Id.* Jurors may not base their verdict on speculation, guesswork, or conjecture and "[f]acts must exist and be shown by the evidence which afford a basis for measuring the loss of the plaintiff with reasonable certainty." *Weekley v. Postrollo*, 778 N.W.2d 823, 830 (S.D. 2010); *McKie v. Huntley*, 620 N.W.2d 599, 603 (S.D. 2000) ("Reasonable certainty requires proof of a rational basis for measuring loss, without allowing a jury to speculate."); South Dakota Pattern Jury Instructions (Civil), 50-00-10.

## II.    Breach of Duty to Defend

In ruling on the motion to dismiss, this Court held that under the facts alleged, a reasonable inference could be made that MMIC abandoned its defense of LCSH. The Court looked to *Church*

---

[9]     The Court acknowledges that in *King's Cove Marina, LLC v. Lambert Commercial Const. LLC*, 958 N.W.2d 310 (Minn. 2021) and *RSUI Indemnity Co. v. New Horizon Kids Quest*, 933 F.3d 960 (8th Cir. 2019), the district courts were directed on remand to determine the relative value of covered and uncovered claims. The procedural posture in *King's Cove* and *New Horizon* was quite different from this case. There, the insureds had filed declaratory judgment actions contesting coverage for part of the settlement amount/jury award. On appeal, the district court was directed to allocate the damages between covered and uncovered claims in a subsequent coverage action. *King's Cove*, 958 N.W.2d at 324; *New Horizon*, 933 F.3d at 963. Here, however, the relative value of the covered claims must be determined by the jury because it will be tasked with determining liability and damages for the bad faith claim. Furthermore, the Court notes that in an Eighth Circuit case analyzing Minnesota law, the allocation issue was to be presented to the jury. *See UnitedHealth Group Inc. v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 865-66 (8th Cir. 2017).

*Mutual Ins. Co. v. Smith*, 509 N.W.2d 274 (S.D. 1993).  In *Church Mutual*, the excess insurer, State Farm, sued the primary insurer, Church Mutual, to recover attorney fees it incurred in performing its secondary duty to defend its insureds.  *Id.* at 276.  Church Mutual was asked to perform its duty to defend its insured as early as February 27, 1989.  *Id.*  Instead of defending, Church Mutual began to investigate whether coverage existed and denied coverage on April 6, 1989.  *Id.*  In response to the insureds' second request for coverage, Church Mutual responded with a reservation of rights letter on November 2, 1989, denying coverage but agreeing to provide counsel.  *Id.*  At the same time, Church Mutual began a declaratory judgment action asking the court to determine whether coverage existed for the insureds under its policies.  *Id.* at 275.  Church Mutual retained counsel who reviewed depositions and kept abreast of the case in order to be prepared to take over the insured's defense if the court decided it was the primary insurer, but counsel provided no assistance to its insureds during this time.  *Id.* at 275-76.  The trial court ruled in favor of the insureds in the declaratory judgment action, finding that Church Mutual had primary coverage and a duty to defend in the lawsuit.  *Id.* at 275.

Following the court's judgment declaring Church Mutual the primary insurance carrier, State Farm filed a motion to recover attorney fees expended in both the declaratory judgment action and in the underlying lawsuit against the insureds.  State Farm, as the excess carrier, sought attorney fees not only for the time period prior to Church Mutual's reservation of rights letter, but also for the time period following Church Mutual's reservation of rights letter in which Church Mutual did not actively defend the insureds.  *Id.* at 276.

The trial court denied State Farm's request for attorneys' fees for the time-period following Church Mutual's reservation of rights letter on the basis that State Farm failed to present any testimony or evidence that Church Mutual's participation during this timeframe was inadequate. *Id.*  The trial court found that Church Mutual had retained counsel who reviewed depositions and kept abreast of the case in order to be prepared to take over the insureds' defense if the court decided it was the primary insurer.  *Id.*

On appeal, the South Dakota Supreme Court agreed with cases allowing for recovery of attorney fees on the basis of equitable principles such as unjust enrichment or denying a party profit from its failure to perform its broad duty to defend.  *Id.*  The court awarded attorneys' fees

to State Farm for the entire period after the demand during which Church Mutual failed to actively defend the insured.  *Id.* at 276-77.  The court reasoned that:

> It is clear that Church Mutual was asked to perform its duty and defend Smith and Miller as early as February 27, 1989.  Instead, Church Mutual hired Foster and Company to investigate and determine whether coverage existed.  Coverage counsel for Church Mutual denied coverage on April 6, 1989.  In response to Smith's and Miller's second requests for coverage, Church Mutual responded with a reservation of rights letter on November 21, 1989, denying coverage but agreeing to provide counsel.  "Trial counsel" was not hired by Church Mutual to actually represent Smith and Miller, however, but to "step in and do a good job without undue delay in case the need arose."  Later, Church Mutual brought a declaratory judgment action to determine the coverage question.  Throughout this time, the Kindt lawsuit was proceeding through the courts and Church Mutual was in violation of its duty to defend.  We see no real difference between a primary carrier who refuses to defend and one who agrees to defend but does not actually do so.  Likewise, hiring "trial counsel" for the carrier's benefit does not provide a defense to Smith and Miller.

*Id.* at 276.

In this motion for summary judgment, Defendants argue that this case is distinguishable from *Church Mutual* because "the insurer in *Church Mutual* agreed to provide a defense, but did not instruct counsel to actually conduct the defense.  Separate counsel was already defending the insured, and the counsel Church Mutual assigned to defend the case never had a role in the litigation; instead they were on 'standby' until the coverage issues were resolved." (Docs. 103 at 4333).  Defendants argues that "in stark contrast to the *Church Mutual* case, MMIC provided a thorough defense to LCSH under a reservation of rights through five years of litigation.  That counsel provided a professional and competent defense.  MMIC paid the fees incurred by the defense counsel." (Doc. 81 at 2179).

Upon further reflection and a more developed record, this Court finds that the facts of *Church Mutual* are distinguishable from this case. In *Church Mutual*, the issue on appeal was "whether an excess insurance carrier may recover attorney fees from the primary insurer for the entire period after demand during which the primary insurer fails to actively defend the insured." *Id.* at 275. Even though counsel was hired by Church Mutual after it issued its reservation of rights letter, the court found that counsel hired by Church Mutual "provided no assistance to its insureds during this case," and were directed by Church Mutual only to serve as standby counsel and keep

abreast of the case in order to be prepared to take over the insureds' defense if the court decided it was the primary insurer. The court held that:

> Where the trial court determines, as it did here, that Church Mutual was the only primary carrier and State Farm was the excess carrier, Church Mutual should be required to reimburse State Farm for all attorney fees incurred because of its failure to perform its duty to defend. Otherwise, State Farm is being unfairly punished for voluntarily performing its "secondary" duty to defend its insured and Church Mutual is being unjustly enriched for shirking its "primary" duty to defend its insured.

*Id.* at 277.

Although the *Church Mutual* case discusses the duty to defend, it is in an entirely different context than we have here. *Church Mutual* does not speak to whether, by directing counsel who has been retained by the insurer to represent the insured, to leave active and ongoing settlement negotiations, an insurance company has breached its duty to defend, thus excusing its insured from its obligation to comply with the no voluntary payments, no cooperation, and no actions clauses in the insurance policy.

Contrary to Defendants' argument, the Court does not find that *Sapienza v. Liberty Mutual Fire Insurance Co.*, 389 F.Supp.3d 648 (D.S.D. May 17, 2019) is on point either. There, the insurer, Liberty Mutual, had a duty to defend and independent counsel was retained to represent the *Sapienzas*. *Id.* at 653-54. In their lawsuit against Liberty Mutual, the Sapienzas alleged that the insurance company breached its duty to defend by failing to provide them with a proper defense. *Id.* at 653. Because there was no South Dakota precedent on an insurer's liability for providing an inadequate defense, the court looked to the Restatement of the Law on Liability Insurance for guidance given that the South Dakota Supreme Court had found the Restatement to be persuasive in many instances. *Id.* Specifically, the court examined the draft[10] section 12 of the Restatement of Liability Insurance entitled "liability of insurer for conduct of defense." It provides:

> (1) If an insurer undertakes to select counsel to defend a legal action against the insured and fails to take reasonable care in so doing, the insurer is subject to liability for the harm caused by any subsequent negligent act or omission of the

---

[10] Since the *Sapienza* decision was issued, Section 12 of the Restatement of the Law of Liability Insurance has been published in its final form. *See* Restatement of the Law of Liability Insurance § 12 (2019). The final version does not differ from the draft version cited by Judge Lange in *Sapienza*.

selected counsel that is within the scope of the risk that made the selection of counsel unreasonable.

(2) An insurer is subject to liability for the harm caused by the negligent act or omission of counsel provided by the insurer to defend a legal action when the insurer directs the conduct of the counsel with respect to the negligent act or omission in a manner that overrides the duty of the counsel to exercise independent professional judgment.

Restatement of the Law of Liability Insurance § 12 (2019). Because the Sapienzas had hired their own defense counsel, the court confined its analysis to subsection (2). *Id.* at 654. The court noted that section 12 of the Restatement rejected the notion that insurers are vicariously liable for any malpractice committed by defense counsel. *Id.* at 656; *see also* cmt. e to Restatement of the Law of Liability Insurance § 12 ("The vicarious-liability rule rejected."). The court found that the Sapienzas failed to state a claim for breach of the duty to defend because they had not alleged facts that Liberty Mutual overrode defense counsel's professional judgment, nor any harm resulting from any such actions. *See id.*

The issue in this case does not regard whether MMIC may be held liable for any malpractice or inadequate defense committed by counsel it retained to represent its insureds. The issue in this case is whether MMIC breached its duty to defend such that it forfeited the right to assert control over the defense and settlement of the Sossan lawsuits. The Court has found no South Dakota caselaw on point and as the court did in *Sapienza*, will look to the Restatement for guidance. Section 19 of the Restatement of the Law of Liability Insurance provides that "[a]n insurer that breaches a duty to defend a legal action forfeits the right to assert any control over the defense of settlement of the action." Comment b. to section 19 provides:

> The remedies stated in this Section are available only in the case of a material breach of the duty to defend, not a technical or inconsequential breach. A material breach includes a refusal to defend when required, a provision of a materially inadequate defense, a failure to provide an independent defense when required, and a withdrawal of a defense when the duty to defend has not terminated.

cmt. b, Restatement of the Law of Liability Insurance § 19 (2019).

Viewing the facts in the light most favorable to Plaintiffs, the non-moving parties, the Court finds that a reasonable juror could find that MMIC committed a material breach of its duty to defend. At the end of the first day of mediation, John Gray, attorney retained by MMIC to defend LCSH, was told by MMIC representatives that his firm did not have to attend the mediation the

second day and that Joe Farchione would handle things. Gray testified that he did not receive any further communication from Farchione after this day. (Doc. 85-6, Gray Dep. 157:14-18). The next day, MMIC conditioned its $2 million contribution on LCSH waiving its bad faith claims. Mark Haigh, attorney retained by MMIC to represent Dr. Swift, was told by MMIC representatives mid-way through the next day that he too could leave the mediation, that the parties were too far apart. Both Mr. Gray and Mr. Haigh testified that they were not aware that on the second day of mediation, MMIC had conditioned its $2 million settlement contribution on their clients waiving bad faith. Having taken its $2 million settlement contribution off the table unless Avera and LCSH waived bad faith, MMIC representatives also left the mediation. It appears from the testimony of Mark Haigh, John Gray, and his partner Jeff Wright, that they had no further involvement in settlement negotiations. (Docs. 79-17, Wright Dep. 83:9-16; 85-6, Gray Dep. 157:24-158:4; 85-8, Haigh Dep. 148:13-14). MMIC knew that settlement negotiations were ongoing, but there is evidence that MMIC did not further represent its insureds. Accordingly, Defendants' Motion for Summary Judgment on the breach of duty to defend claim is denied.

## III.   Deceit

Under South Dakota law, "[o]ne who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." SDCL 20-10-1. Acts constituting deceit include:

(1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

(2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

(3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

(4) A promise made without any intention of performing.

SDCL 20-10-2. The tort of deceit requires evidence of deceitful intent. *See Bruske v. Hille*, 567 N.W.2d 872, 876 (S.D. 1997) (quoting *Schmidt v. Wildcat Cave, Inc.,* 261 N.W.2d 114, 117 (S.D. 1977) ("The tort action of deceit is based only upon actual fraud as defined by SDCL 20-10-2, and requires scienter or its equivalent.")); *In re Johnson v. Weber*, 898 N.W.2d 718, 729 (S.D. 2017). On a claim of fraudulent concealment under SDCL 20-10-2(3), a plaintiff must prove:

(1) The defendant had a duty to disclose a material fact to the plaintiff;

(2) The defendant willfully concealed or suppressed the fact;
(3) The defendant acted with the intent to induce the plaintiff to alter the plaintiff's position to the plaintiff's injury or risk.
(4) The undisclosed information was something the plaintiff could not discover by acting with reasonable care.
(5) The plaintiff relied on the misrepresentation to the plaintiff's detriment;
(6) The plaintiff suffered damage as a result.

South Dakota Pattern Jury Instructions (Civil) 20-110-25.  SDCL 20-10-2(3) "only imposes liability for fraudulent concealment on a person 'who is bound to disclose.'" *Schwartz v. Morgan*, 776 N.W.2d 827, 831 (S.D. 2009).  Cases where the South Dakota Supreme Court has found a duty to disclose have all involved an employment or fiduciary or confidential relationship. *Taggart v. Ford Motor Credit Co.*, 462 N.W.2d 493, 499 (S.D. 1990); *Buxcel v. First Fidelity Bank*, 601 N.W.2d 593, 596-97 (S.D. 1999).  Whether a duty to disclose exists is a question of law.  *See Schwartz*, 776 N.W.2d at 830; *Lindskov v. Lindskov*, 800 N.W.2d 715, 719 (S.D. 2011) ("The existence of a duty to disclose is a question of law. . . .").  Questions of materiality are questions for the jury. *Moss v. Guttormson*, 551 N.W.2d 14, 16 (S.D. 1996) ("What one is bound to disclose is a fact question depending upon the particular circumstances of each case.").

An insurance relationship alone, is not enough to give rise to a fiduciary relationship. *Azar v. Prudential Ins. Co. of America*, 68 P.3d 909, 926 (N.M. Ct. App. 2003).  Instead, an insurer assumes a fiduciary obligation toward an insured only in matters pertaining to the performance of obligations in the insurance contract.  *Id.*  At least two states within the Eighth Circuit have held that insurer's right to determine whether an offer of compromise of a claim shall be accepted or rejected creates a fiduciary relationship between it and the insured. *Hortica-Florists' Mut. Ins. Co. v. Pittman Nursery Corp.*, 729 F.3d 846, 858 (8th Cir. 2013) (applying Arkansas law); *Dairy Farmers of Am., Inc. v. Travelers Ins. Co.*, 292 F.3d 567, 573 (8th Cir. 2002) (applying Missouri law).  The South Dakota Supreme Court has held that in a third-party coverage situation such as this, the relationship of an insurer to its insured is like that of a fiduciary because the insurer must give as much consideration to its insured's interests as it does its own. *Trouten v. Heritage Mut. Ins. Co.*, 632 N.W.2d 856, 863-64 (S.D. 2001); *see also Crabb v. Nat'l Indem. Co.*, 205 N.W.2d 633, 637 (S.D. 1973) (holding that a jury question existed as to whether the "insurer violated its fiduciary relationship by not giving 'equal consideration' to the interests of the insured in its constant refusal to discuss or consider a settlement within the policy limits. . . .").

Defendants argue that courts in South Dakota have only held that an insurer has a duty to disclose when an insurer has actively deceived an insured. Defendants cite to *Biegler v. American Family Mutual Ins. Co.*, 621 N.W.2d 592 (S.D. 2001) and *Dziadek v. Charter Oak Fir Ins. Co.*, 213 F.Supp.3d 1150, 1160-62 (D.S.D. 2016), *aff'd*, 867 F.3d 1003 (8th Cir. 2017). *Dziadek* is distinguishable from this case because it is a first-party underinsured motorist case where the insurer was not acting akin to a fiduciary, but rather had an adversarial position with its insured. *See Bertelsen v. Allstate Ins. Co.*, 796 N.W.2d 685, 701 (S.D. 2011) (citing *Hein v. Acuity*, 731 N.W.2d 231, 235 (S.D. 2007)) (discussing an "adversarial first-party coverage situation"). *Biegler*, however, was a third-party coverage case. In *Biegler*, the court upheld a jury verdict for deceit against the insurer under SDCL 20-10-2(3). The court reasoned:

> In this case American Family made it very clear in its correspondence that it was of the opinion that it had no responsibility to pay or to defend. This position was made known at the beginning of American Family's involvement and no other position was ever communicated to Biegler or King even though Biegler tendered defense of Schwan's lawsuit and American Family knew it had a duty to defend under the terms of the contract of insurance. American Family's action was particularly egregious when one considers that it never did advise Biegler or King that it may have a duty to defend once Biegler provided proof of service of the summons and complaint. How would Biegler know what American Family was thinking when American Family did not communicate its thinking to him?
>
> Prior to Biegler's reaching his agreement with Schwan, American Family had sufficient information to know it had a duty to defend and it failed to impart this very important information to Biegler. Based on what a reasonable insurance company should understand, American Family's initial denial was a fact that one would realize would be relied upon by another to their detriment . . . . As a reasonable insurance company, it knew that Biegler would have it assume defense of Schwan's complaint with that information and would not settle with Schwan outside his relationship with it. American Family's actions clearly fall within the meaning of SDCL 20-10-2(3).

*Id.* at 602.

The Court finds that although this case presents a different set of facts, it is reasonably analogous to the situation presented in *Biegler*. On June 11, 2019, Ghiselli and Specht agreed that MMIC and Avera would each contribute $2 million to a global resolution of the Sossan cases. Ghiselli admits that no other position was communicated to Plaintiffs until the second day of mediation. A juror could find that MMIC's concealment was willful. In the weeks leading up to the mediation, Avera asked Ghiselli to confirm MMIC's $2 million settlement contribution in

writing. Ghiselli did so, but still never disclosed that such contribution was contingent upon Plaintiffs waiving their right under South Dakota law to pursue a bad faith action against MMIC. A jury may reasonably conclude that Plaintiffs did not know about and could not have reasonably anticipated that MMIC intended Plaintiffs to waive their bad faith claims as part of a "global resolution." Ghiselli testified that he never communicated his intent that a global resolution of all claims would require Plaintiffs to waive bad faith claims, and there is evidence that such a condition was unusual. Ghiselli testified that conditioning settlement on a bad faith waiver was uncommon and that he could not remember requiring an insured to waive bad faith claims as a condition to settlement previously. (Doc. 80-6, Ghiselli Dep. 25:23-26:3; 35:7-36:8). MMIC representative, Tim Schultz, testified that he had been involved in "tens of thousands of cases" over his career and could never remember an insurer conditioning its payment to settle a claim brought against one of its insureds on the insured waiving bad faith. (Docs. 90, ¶ 217; 102, ¶ 217). Furthermore, a jury could conclude a reasonable insurance company should understand that an unconditional $2 million contribution from MMIC was a fact that would be relied upon by Plaintiffs to their detriment in the mediation and that Plaintiffs suffered damages as a result. Given the fiduciary-like relationship that arises between an insurer and its insured in a third-party coverage case under these circumstances, if the jury finds the bad faith waiver was material to Plaintiffs under the facts of this case, MMIC had a duty to disclose that its $2 million settlement offer was contingent on a waiver of bad faith.

Plaintiffs also allege that MMIC engaged in deceit by failing to disclose prior to mediation that its settlement contribution would not exceed $2 million. (Doc. 91 at 3468). Plaintiffs argue that they would not have agreed to attend the mediation if they had known about the cap on MMIC's contribution and would not have settled the cases on their own.

At the June 11, 2019, meeting Avera, LCSH, the individual doctors, and their counsel understood from Ghiselli's comments at the meeting and from the customs and practices relating to insurance settlement negotiations, that MMIC's $2 million settlement offer was only a starting point. It appears that this was MMIC's view at this point in time as well. In his June 19, 2019, email introducing Farchione to coverage counsel, Mark Malloy, Ghiselli indicated that in addition to its two million dollar offer, MMIC "tentatively agreed to contribute [its] quota share of liability." MMIC hired Farchione to help it evaluate its exposure on covered claims. In a subsequent email

to Malloy and Farchione on July 8, 2019, Ghiselli stated, "Joe, I need a well-reasonable articulated answer for Chris for why we can or cannot contribute to mediation. If your team finds weak evidence of negligent credentialing, MMIC will be limited to its already committed two million. If your team finds strong evidence of negligent credentialing, we will contribute in proportion to our exposure." (Doc. 80-13 at 1858). Farchione's research led him to believe that the negligent credentialing claims would be dismissed under the statute of repose as interpreted by the South Dakota Supreme Court in *Pitt-Hart* in all but one of the 36 cases.

As the September mediation approached, Ghiselli sent an email to Chris Specht on August 20, 2019, stating:

> As you requested, this email confirms MMIC's commitment to contribute up to two million dollars to the mediation for a global resolution of all claims. As we discussed, MMIC believes the court should dismiss the negligence claims in 35 of the 36 cases based on the *Pitt-Hart* case which was reaffirmed by the *Halverson* case. MMIC was not made aware of recent case law supporting the dismissal of negligence claims when it made its commitment to contribute two million dollars at our defense counsel strategy meeting.[11] Nevertheless, MMIC in good faith, reaffirms its decision to contribute two million dollars despite the lack of viable claims.

(Doc. 80-12 at 1856). Ghiselli testified as a representative of MMIC that anyone that has an understanding of the English language would understand by reading this email that $2 million was the limit of MMIC's contribution. (Doc. 85-5, Ghiselli Dep. 42:12-43:3). Based on evidence in the record, a jury may reasonably find that MMIC never intended to offer more than $2 million at the mediation.

Plaintiffs made clear to MMIC in the days leading up to mediation that it was their understanding that MMIC would be contributing more than $2 million to settlement. In Chris Specht's August 21, 2019, email to Nick Ghiselli, Mr. Specht inquired how much MMIC was willing to contribute in excess of Avera's SIR, and reiterated his expectation that MMIC would be contributing more than $2 million to get the matter resolved. (Doc. 80-12 at 621-22). In his August 30, 2019, letter to MMIC, Brett Lovrien, corporate counsel for LCSH, indicated his belief that his client faced significant exposure on covered claims and his expectation that MMIC would come to the mediation to work towards settlement. (Docs. 83-12). In his August 30, 2019, letter to

---

[11] This meeting took place on June 11, 2019.

MMIC, Mike Marlow, counsel for some of the physician defendants, asked what settlement contribution MMIC was prepared to make on behalf of LCSH and his clients so that he could advise his clients on how to proceed. (Docs. 83-13). Counsel for the insureds, as well as experts for Plaintiffs, indicated that based on custom and practice in the industry, Plaintiffs had a reasonable expectation that MMIC would offer at mediation more than the $2 million it had promised to kick-start the mediation.

While an insurer does not necessarily have a duty to disclose its settlement authority, the Court finds that given the fiduciary-like relationship between MMIC and Plaintiffs, MMIC was required to disclose that $2 million was the limit of its settlement contribution. Viewing the facts in the light most favorable to Plaintiffs, Plaintiffs had a reasonable expectation that MMIC would contribute more than the $2 million to help settle the credentialing claims. MMIC was made aware of this expectation when it received emails and letters by its insureds and their counsel in the days and weeks leading up to mediation inquiring how much MMIC was prepared to contribute to settlement and reiterating their expectation that MMIC would contribute meaningfully to settle the covered claims. There is no evidence that MMIC responded, saying that $2 million was its final offer or even that $2 million was its final offer unless MMIC was convinced during mediation that its exposure on the covered claims was greater than $2 million. Ghiselli indicated in an email to Malloy and Farchione that Avera was willing to contribute in excess of its SIR. The Court finds that a reasonable insurer should anticipate that its insureds would rely on, to their detriment when entering mediation, MMIC's $2 million offer to kick-start negotiations and MMIC's relative silence in response to its insureds' inquiries on MMIC's proposed additional settlement contribution. A jury question exists as to whether MMIC willfully concealed this evidence with intent to induce Plaintiffs to attend the mediation and settle the covered claims using their own money.

**IV.    Breach of Contract by Withdrawing $2 Million Promised for Settlement**

To prevail on a breach of contract claim under South Dakota law, a party must prove "(1) an enforceable promise; (2) a breach of the promise; and (3) resulting damages." *Bowes Constr., Inc. v. S.D. Dept. of Transp.*, 793 N.W.2d 36, 43 (S.D. 2010). Here, Plaintiffs allege that MMIC breached its contractual obligation to contribute $2 million to settle the Sossan Lawsuits. MMIC argues it is entitled to summary judgment on the breach of contract claim, asserting that there is

no contract to contribute $2 million because there was no consideration for MMIC's promise to pay, and even if there was a contract that MMIC breached, Plaintiffs suffered no damages because the case was not settled at mediation. (Doc. 103 at 4337-38).

### 1. Existence of a Contract

To establish the existence of a contract, a plaintiff must show "(1) [p]arties capable of contracting; (2) [t]heir consent; (3) [a] lawful object; and (4) [s]ufficient cause or consideration." *J. Clancy, Inc. v. Khan Comfort, LLC*, 955 N.W.2d 382, 389 (S.D. 2021) (citing SDCL 53-1-2). "Contracts may be express or created by implication." *Id.* The element in dispute here, consideration, need not take the form of mutual promises. Under SDCL 53-6-1, "[a]ny benefit conferred or agreed to be conferred upon the promiser by any other person to which the promiser is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer as an inducement to the promiser, is a good consideration for a promise."

Plaintiffs assert "the consideration for MMIC's promise to pay $2 million toward the settlement was Avera, LCSH and the doctors agreeing to participate in mediation and Avera offering the remainder of its self-insured retention." (Doc. 91 at 3463). MMIC responds that Plaintiffs did not agree to mediate in exchange for the $2 million contribution. However, there is evidence in the record that MMIC committed $2 million "to start a mediation," and that MMIC would "stand by that commitment." (Doc. 80-7, email from Nicholas Ghiselli to Christ Specht.) In addition, there is deposition testimony that MMIC contributed $2 million "in seed money" to move the case toward mediation. (Doc. 85-15, Sudbeck Dep. 195:8-15). This is evidence for the jury to consider when deciding if Plaintiffs' participation in mediation was consideration for MMIC's promise to pay $2 million toward settlement. Thus, MMIC is not entitled to summary judgment based on lack of consideration.

### 2. Damages

The South Dakota Supreme Court has stated that "the ultimate purpose behind allowance of damages for breach of contract is to place the injured party in the position he or she would have occupied if the contract had been performed, or to 'make the injured party whole.' " *Ducheneaux v. Miller*, 488 N.W.2d 902, 915 (S.D. 1992) (citations omitted) (quoting *Hulstein v. Meilman Food*

*Indus., Inc.*, 293 N.W.2d 889, 891 (S.D. 1980)); SDCL 21-2-1. MMIC argues that any breach of contract by its failure to pay $2 million did not cause Plaintiffs to incur damages because the case did not settle at mediation.[12] Rather, the case settled 13 days later when Plaintiffs knew that MMIC required Plaintiffs to waive bad faith claims. According to MMIC, Plaintiffs were not required to settle the case when they did, and they could have chosen to litigate instead.[13]

MMIC does not explain how settling the case equates to Plaintiffs suffering no damages from MMIC's alleged breach of the promise to contribute $2 million to the settlement. Plaintiffs will have the opportunity to present this issue at trial, and the jury will decide the damages, if any, that resulted from MMIC's failure to contribute $2 million.

For these reasons MMIC's motion for summary judgment on the claim for breach of contract relating to MMIC's promise to pay $2 million towards settlement of the Sossan Lawsuits is denied.

## V.   Promissory Estoppel

Under South Dakota law, "promissory estoppel may be invoked where a promisee alters his position to his detriment in the reasonable belief that a promise [will] be performed." *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 848 (S.D. 1990). In addition to a promise: "(1) the detriment suffered in reliance must be substantial in an economic sense; (2) the loss to the promisee must have been foreseeable by the promisor; and (3) the promisee must have acted reasonably in justifiable reliance on the promise made." *Id.*; *see also Martz v. Hills Materials*, 857 N.W.2d 413, 417 (S.D. 2014).

As the Court indicated during oral argument on this summary judgment motion, it does not find any evidence that Plaintiffs reasonably relied on MMIC's unconditional $2 million global settlement contribution when settling the case. It is undisputed that MMIC informed Plaintiffs 13 days before settlement was reached that it was withdrawing its $2 million offer unless Plaintiffs

---

[12] It is not uncommon for settlement negotiations to continue after the formal mediation ends.

[13] Counsel for the plaintiffs in the Sossan Lawsuits avers that the settlement was "less than approximately 50% of the medical bills, including prejudgment interest incurred by the thirty-six plaintiffs." (Doc. 88, ¶ 8.) "Obtaining unanimous client approval to attempt a second global mediation would have been unlikely." (*Id.* at ¶ 9.) According to counsel for Sossan plaintiffs, had Plaintiffs not settled the Sossan Lawsuits when they did, considerable additional discovery would have been undertaken, and there could have been thirty-six separate jury trials. (*Id.* at ¶¶ 10-11.)

waived all bad faith claims against MMIC. When Plaintiffs were informed of the bad faith waiver condition, they had not yet suffered any economic detriment and yet proceeded to settle the case 13 days later. Accordingly, Defendants motion for summary judgment on Plaintiffs' promissory estoppel claim is granted.

## VI.   Punitive Damages

South Dakota law permits a jury to award punitive damages for "any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed[.]" SDCL § 21-3-2. "[P]unitive damages are not allowed absent an award for compensatory damages." *Schaffer v. Edward D. Jones & Co.*, 521 N.W.2d 921, 928 (S.D. 1994). Although punitive damages may not be awarded for a breach of contract, an insured may "seek punitive damages from her insurer when prosecuting a bad faith action." *Biegler v. Am. Family. Mut. Ins. Co.*, 621 N.W.2d 592, 604 (S.D. 2001) (citing *Harter v. Plains Ins. Co.*, 579 N.W.2d 625 (S.D. 1998)).

MMIC argues that it is entitled to summary judgment on Plaintiffs' punitive damages claim in this case for two reasons. First, MMIC says that there is no evidence of malice. Second, though MMIC acknowledges that South Dakota law does not allow an insurer to condition payment of benefits on a release of any bad faith claim, MMIC argues that only applies in the first-party insurance context, and that it does not apply to the third-party insurance context as in this case.

> [I]nsurance bad faith actions are classified as either first-party or third-party claims. A first-party coverage situation arises when an insurance company contracts to pay benefits directly to an insured. First-party bad faith occurs "when an insurance company consciously engages in wrongdoing during its processing or paying of policy benefits to its insured." By contrast, a third-party coverage situation arises when an insurance company contracts to indemnify an insured against liability to third parties. And third-party bad faith occurs "when an insurer breaches its duty to give equal consideration to the interests of its insured when making a decision to settle a case" brought against its insured by a third party.

*Bertelsen v. Allstate Insurance Co.*, 796 N.W.2d 685, 700 (S.D. 2011); *see also Hein v. Acuity*, 731 N.W.2d 231, 235 (S.D. 2007).

In *Athey v. Farmers Ins. Exchange*, 234 F.3d 357 (8th Cir. 2000), the Eighth Circuit observed that under South Dakota law an insurer's refusal to enter into meaningful settlement negotiations and an insurer's attempt to condition the settlement of a breach of contract claim on

the release of a bad faith claim support a claim of bad faith. *Athey,* 234 F.3d at 362 (citing *Harter v. Plains Ins. Co., Inc.,* 579 N.W.2d 625, 634 (S.D.1998); *see also Isaac v. State Farm Mut. Auto. Ins. Co.,* 522 N.W.2d 752, 761 (S.D.1994).

In *Isaac,* the South Dakota Supreme Court held that an insurance company may not condition payment of insurance benefits on waiver of bad faith claims. MMIC argues that *Isaac* is distinguishable from this case. *Isaac* was a first-party failure to pay an underinsured motorist benefits claim whereas this case is a third-party failure to settle case. MMIC asserts that unlike in the first-party insurance context at issue in *Issac,* MMIC owed no payment to its insureds because there was a dispute over how much MMIC would pay and how much the insureds would pay towards settlement in light of the non-covered exposure for the fraud and intentional tort claims. According to MMIC, given the statute of repose defense, MMIC did not owe an obligation to pay anything towards settlement at the time of mediation and it could have canceled the mediation and continued to litigate the cases.

Plaintiffs list conduct by MMIC that may support an award of punitive damages. (Doc. 91 at 3472-73). The list includes the fact that on the second day of mediation MMIC conditioned any contribution to settlement on Plaintiffs' release of any bad faith claims. MMIC does not deny this. Rather, MMIC distinguishes *Isaac* and argues it does not apply here.

As the Court has already discussed at length with regard to bad faith, the *Isaac* case applies here to this third-party coverage situation. The Court will not repeat its analysis here. There is evidence in the record to support submission of the issue of punitive damages to the jury, and MMIC's motion for summary judgment on punitive damages is denied.

Accordingly, it is hereby ORDERED that Defendants' Motion for Summary Judgment (Doc. 77) is GRANTED IN PART and DENIED IN PART as follows:

1. DENIED on Plaintiffs' bad faith claim;
2. DENIED on LCSH's breach of duty to defend claim;
3. DENIED on Plaintiffs' deceit claim;
4. DENIED on Plaintiffs' breach of contract claims premised on withdrawing $2 million promised for settlement;
5. GRANTED on Plaintiffs' promissory estoppel claim; and
6. DENIED on Plaintiffs' request for punitive damages.

Dated this 31st day of May, 2023.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK